❏ Original     ❏ Duplicate Original

CLERK'S OFFICE
A TRUE COPY
May 01, 2024
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>2218 S. 21st St., Milwaukee, WI 53215<br>("Target Location 4"), as further described in<br>Attachment A-4 | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. **24-M-372 (SCD)**

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before      5-15-24      *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.     ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to      Hon. Stephen C. Dries      .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)*     ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:      5-1-24 9:45 am

*Stephen C. Dries*
*Judge's signature*

City and state:    Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

<u>ATTACHMENT A-4</u>

**Place To Be Searched**

The place to be searched pursuant to this warrant is 2218 S. 21st, Milwaukee, Wisconsin  ("**Target Location 4**"), more fully described below:

• 2218 S. 21st Street, Milwaukee, Wisconsin is a two-family home located on the east side of S. 21st Street (see figure 1). There are two front doors on the front of the building which faces westbound. The siding for the residence is blue, the front doors are white, and the window trim is white. 2218 S. 21st Street is the upper unit and accessed through the northern most door. The lower unit is accessed through a separate door and has a separate address. The numbers "2218" are affixed above a black mailbox to the right of the front door. This warrant authorizes case agents to search the upper unit (2218 S. 21st Street), as well as any common or storage areas accessible to the occupant(s) of the upper unit, including the detached garage to the rear of the residence, and vehicles located at the premises, to include a 2014 Jeep Grand Cherokee - Silver (WI APK9306, VIN #1C4RJFBG5EC269554), a 2001 Toyota 4Runner - Gray (WI ANR7001, VIN #JT3HN86R410331744), and a 2012 GMC Sierra Pickup truck - Black (WI PX8933, VIN #3GTP2XE25CG147023).



Figure 1

Page 1

<u>ATTACHMENT B</u>

**Items To Be Seized**

All items, records and information related to violations of Title 21, United States Code, Sections 841, 843(b), and 846; more specifically:

1. Paraphernalia associated with the manufacture and distribution of controlled substances including but not limited to materials and items used for packaging, processing, diluting, weighing, and distributing controlled substances;

2. Duffel, canvas bags, suitcases, safes, or other containers to hold or transport controlled substances and drug trafficking related items and proceeds;

3. Proceeds of drug trafficking activities, such as United States currency, precious metals, financial instruments, and jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the proceeds from drug trafficking activities;

4. Firearms, including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition, silencers, components of firearms including laser sights and other components which can be used to modify firearms, ammunition and ammunition components, bulletproof vests, gun boxes and any and all documentation related to the purchase of such items;

5. Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;

6. Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed;

7. Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, receipts, documents and other items or lists reflecting names, addresses, purchases, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

8. Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

Page 2

9. Cellular telephones, text messaging systems, other communication devices, and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data, as well as any records associated with such communications services used to commit drug trafficking offenses;

10. Records, items and documents reflecting travel for the purpose of participating in drug trafficking activities, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxi cab receipts, hotel and restaurant receipts, canceled checks, maps, and records of long distance calls reflecting travel;

11. Indicia of occupancy, residency or ownership of the premises, vehicles, and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents and keys;

12. Photographs, videotapes or other depictions of assets, firearms, coconspirators, or controlled substances;

13. Computers, laptops, or other electronic storage device capable of being used to commit the violations or store any of the information described above.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

Page 3

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin



CLERK'S OFFICE
A TRUE COPY
May 01, 2024
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>2218 S. 21st St., Milwaukee, WI 53215 ("Target<br>Location 4"), as further described in Attachment<br>A-4 | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. **24-M-372 (SCD)** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Eastern_____ District of _____Wisconsin_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1); 846;<br>and 843(b) | Distribution and possession with the intent to distribute controlled substances;<br>Conspiracy to distribute and possess with the intent to distribute controlled<br>substances; and Illegal use of a communication facility. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Andrew Langer, FBI TFO
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date:   5-1-24

_____
*Judge's signature*

City and state:   Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
_____
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT
## AND SEARCH AND SEIZURE WARRANTS

Your Affiant, Andrew Langer, Task Force Officer of the Federal Bureau of Investigation, being duly sworn, depose and state that:

## I. INTRODUCTION AND AFFIANT'S BACKGROUND

1. I am an investigator and law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I have been a Certified Law Enforcement Officer with the City of Milwaukee Police Department since July 20, 2015. I have received basic Law Enforcement Training at the Milwaukee Police Academy located in the City and County of Milwaukee, State of Wisconsin. I am currently assigned to the Federal Bureau of Investigations as a Task Force Officer. Prior to my current assignment, I was assigned to the Milwaukee Police Department- District Two Violent Crimes Reduction Unit.

3. I have received training and have experience in the area of controlled substances investigations, money laundering, financial investigations, and various methods that drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of controlled substances laws to include violations of 21 U.S.C. §§ 841, 843(b), and 846, as well as other violations associated with the trafficking of controlled substance. I have participated in numerous drug investigations utilizing various means of investigation including, but not limited to, the execution of search warrants, the use of subpoenas, and the use of informants. Additionally, I have training and experience in relation to firearm investigations, and in that training and experience has been directly involved in numerous investigations involving prohibited people possessing firearms,

1

people possessing illegal firearms including machine guns, and people possessing firearms in furtherance of drug trafficking. I have participated in firearm and narcotic investigations at the local, state, and federal levels.

4. As an FBI TFO and MPD police officer, I have participated in the investigation of narcotics-related offenses, resulting in the seizure of illegal drugs, weapons, United States currency, and other evidence of criminal activity. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the narcotics traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover operations, court-ordered wiretaps, analysis of phone records, and the arrests of numerous drug traffickers. I have also been the affiant of search warrants. Additionally, I have spoken with other experienced narcotics investigators on numerous occasions concerning the method and practices of drug traffickers and money launderers. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities. Based on my training, experience, and participation in drug trafficking investigations and associated financial investigations involving controlled substances, I know and have observed the following:

    a. I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

    b. I am familiar with the coded language used over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

    c. I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities

2

to avoid detection of these assets by government agencies. I know that even though these assets are in the names other than the drug traffickers, the drug traffickers actually own, use and exercise dominion and control over these assets;

d. I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;

e. Drug traffickers frequently possess firearms and ammunition to protect their illegal product;

f. I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses, vehicles, or other locations over which they maintain dominion and control;

g. I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned book, records, receipts, notes, ledger, etc., are maintained where the traffickers have ready access to them;

h. It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence.

i. It is also common that individuals who are attempting to conceal their true income from the IRS will maintain records that will establish their true ownership of assets or other expenditures in a secret manner. These records have included bank records, automobile titles, property deeds, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices.

j. I know large-scale drug traffickers often use electronic equipment such as telephones, pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record, and/or store the information described in the items above, as well as conduct drug trafficking activities;

3

k.  I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers use the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses that may generate large quantities of currency. To this end, I am also familiar with the analysis of financial documents;

l.  I know drug traffickers commonly maintain addresses or telephones numbers in books or papers that reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

m.  I am familiar with computers, cellular telephones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers and by those engaged in money laundering activities to communicate with their associates and financial institutions; That drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, flash drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices; and

n.  Specifically, I know the following information can be retrieved to show evidence of use of the computer to further the drug trade and/or money laundering activities; Computer systems and cellular telephones, including but not limited to system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; and computer media and any data contained within such media and other material relating to computer systems and the internet including but not limited to, documentation, operating system software, application or access program disks, manuals, books, brochures, or notes; and computer access codes, user names, log files, configuration files, and passwords, screen names, email addresses, IP addresses and cellular / wireless telephones, SIM cards, any removable storage devices for telephones, and any data contained therein, including but not limited to stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data.

5. Pursuant to my official duties, I am submitting this Affidavit in support of an application for a criminal complaint, arrest warrants, and search warrants for property described in Attachment A, for violations of federal law, including violations of Title 21, United States Code, Sections

4

841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances), 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances), and 843(b) (Use of Communications Facilities to Facilitate Controlled Substance Felonies) and Title 18, United States Code, Section 2(a) (Aiding and Abetting the Aforementioned Offenses), collectively referred to as the Target Offenses.

6.     I am currently participating in an investigation of the Botello Drug Trafficking Organization (Botello DTO) and its members and associates.  I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers; (c) information obtained from witnesses, including confidential sources; (d) administratively subpoenaed and court ordered records; and (e) Court Authorized Title III intercepts for TARGET TELEPHONE 1 ((847) 641-6044), TARGET TELEPHONE 2 ((414) 499-6919), TARGET TELEPHONE 3 ((414)399-7825), and TARGET TELEPHONE 4 ((414) 406-8785), TARGET TELEPHONE 5 ((262) 224-4619), TARGET TELEPHONE 6 ((414) 366-6544), and TARGET TELEPHONE 7 ((224) 713-6938).

## II.     PURPOSE OF AFFIDAVIT

### A.     Individuals for Whom a Criminal Complaint are Sought.

7.     This affidavit is being submitted in support of both applications for search warrants and a criminal complaint naming the following individuals:

|   | Name | Date of Birth |
|---|------|---------------|
| 1 | Cain Botello, Sr. | March 1, 1974 |

5

| 2 | Cain Botello, Jr. | January 23, 1998 |
|---|---|---|
| 3 | Victoriano Botello a/k/a "Vic" | December 25, 1977 |
| 4 | Juan Carlos Espinoza a/k/a "Pedrito" a/k/a "Gordo" | August 12, 1987 |
| 5 | Marco Medel | April 11, 1987 |
| 6 | Roberto Aviles-Rogel a/k/a "Negro" | April 13, 1976 |
| 7 | Andrew Sabo | September 3, 1981 |
| 8 | Tomas Castro Estrada | December 21, 1975 |
| 9 | Jayme Congleton a/k/a Jaymo | June 29, 1991 |
| 10 | Jaime Reyes Delgado | November 22, 1976 |
| 11 | Mario Garcia-Puentes a/k/a Luis Garcia | December 26, 1974 or June 2, 1976 |

**B.     Properties for Which Search Warrants are Sought.**

8.     For the reasons discussed herein, there is probable cause to believe that located at and in the following properties, more fully described in Attachment A and collectively referred to as "TARGET PREMISES," are items that constitute evidence of the Target Offenses.

a. 2000 W. Historic Mitchell Street, Milwaukee, Wisconsin (El Infierno Bar) ("**Target Location 1**");

- 2000 W Historic Mitchell Street is the address for El Infierno Bar. The building itself is located on the northwest corner of the intersection S. 20th Street and W.

6

Historic Mitchell Street. The building is a multi-purpose building consisting of a bar, "El Infierno," on the ground level and living units on the ground level and above the bar on the second floor. There is a sign above the front door of the bar identifying it as El Infierno. The siding is off white with brown trim. The numbers "2000" are affixed in white lettering above the front door (See figure 1). Case agents are not seeking to search the residential units. Case agents are requesting permission to search any basements or common areas accessible to the bar and its occupants. CHS#4 reported seeing a hidden door in the bar floor leading to a concealed basement area where Botello DTO members were observed by CHS#4 to congregate. Case agents are also seeking permission to search the garage that connects to the rear of the bar through an added mud room. This mud room is maroon in color and has a white pedestrian door that opens onto S. 20th Street. The mud room connects directly to the garage that has off white siding (see figure 2). Case agents have observed employees of the bar to exit from the pedestrian door in the maroon mud room. Case agents have observed Medel enter the bar through the front door and later exit through the pedestrian door in the maroon mud room and therefore know that the mud room is part of the bar. Further, case agents have viewed a Google Map photo of the bar and garage from before the maroon mud room was constructed and can see that there was a pedestrian door on the back side of the garage that would now be accessible from inside the mudroom. Therefore, case agents believe that the maroon mud room and garage are directly accessible to the bar and request that they be included in this warrant.

- Over the course of this investigation, case agents have observed over 50 suspected drug deals occur outside of this location. Based on intercepted communications, case agents are aware of dozens of instances where a customer would place a drug order with a DTO member, be told to meet at El Infierno, and the DTO member would either tell the customer to come inside or the DTO member would exit the bar with the drugs to sell to the customer outside, then return into the bar. Further, case agents are aware of multiple bulk cash payments that were made inside of the bar or with a DTO member exiting the bar and providing the cash to persons sent by the DTO's Mexico-based drug broker. Case agents also know through physical surveillance and intercepted communications that Medel, Espinoza, Botello, Sr. Victoriano Botello, Aviles-Rogel, Congleton, and Sabo all routinely frequent this bar. At least four of the controlled buys conducted in this investigation involved meetings or deliveries at El Infierno including during one of the controlled buys, Botello DTO members exchanged approximately ½ of a kilogram of cocaine inside the bar that was later sold to a CHS. Case agents know that nearly all of the DTO members congregate at El Infierno on almost a daily basis.

7



Figure 1



Figure 2

b. 921 W. Walker Street, Milwaukee, Wisconsin (Cain Botello, Sr.'s residence) ("**Target Location 2**");

- 921 W. Walker Street, Milwaukee, Wisconsin is a two-story single-family home on the southside of W. Walker Street approximately midblock between S. 9th Street and S. 10th Street. The siding for the residence is white with brown trim around the windows. The front access door for the residence on the east side of

8

the building and faces north. The numbers "921" are affixed to the front of the residence in black numbers. There is a separate, detached, rear cottage on the property and no garage. The rear property has the address "923A" and has gray siding with white trim. Case agents are not seeking to search the detached rear cottage.

- Over the course of this investigation, case agents have intercepted numerous calls and or messages involving Botello, Sr. that are believed to be narcotics related transactions. Case agents have observed Botello, Sr. enter and exit this residence almost daily over the past three weeks. Case agents also have observed large quantities of narcotics sourced directly from this residence which was confirmed via a controlled evidence purchase (during one of the controlled buys, Victoriano Botello acquired approximately ½ of a kilogram of cocaine from inside this residence, that was later provided to another DTO member inside of El Infierno and later sold to a CHS). Case agents have observed Botello, Sr. exiting or entering this location in possession of a hard-sided blue/white cooler on nearly a daily basis. Based on this investigation, case agents believe Botello, Sr. is using this cooler to transport and conceal controlled substances and/or drug proceeds. Finally, case agents have observed several DTO members at this residence including Botello, Sr., Botello, Jr., Victoriano Botello and Sabo.

- Based on numerous instances of surveillance, case agents know that Botello, Sr. primarily operates a Jeep and has used this Jeep to facilitate narcotics transactions. The Jeep is described as a 2011 Jeep Grand Cherokee - Gray (WI ASF1393, VIN #1J4RS4GT7BC707102). Case agents have observed Botello, Sr. operating this vehicle within the last 7 days and have seen this vehicle parked in the street near this location as recently as April 25, 2024, 2024.



9

c. 1118 S. 35th Street, Milwaukee, Wisconsin (Victoriano Botello's residence) ("**Target Location 3**");

- 1118 S. 35th Street is a two-story single-family home located on the east side of S. 35th Street. The house sits on top of a small hill adjacent to a T-Alley. The residence is partially fenced in with a driveway on the southside of the residence. The siding is off white with brown trim and a brown roof. The front door of the house faces west with a small brown roof over the front stoop. The numbers "1118" are attached to the detached garage in yellow numbers. Case agents are requesting authorization to search the residence and the detached garage because case agents believe that Victoriano Botello has access to the detached garage.

- Case agents have intercepted numerous communications involving Victoriano Botello that are apparently drug related in nature, including drug related communication with his suspected roommate. In at least one of those intercepted calls, it is apparent that Victoriano Botello is storing narcotics within this residence. Based upon phone location data and/or physical surveillance, case agents know that Victoriano Botello resides at this address and case agents have observed him entering or exiting on numerous occasions.

- Based on physical surveillance, case agents know that Victoriano Botello's most recent vehicle is a 2009 Chevrolet Tahoe - Tan (WI ASL3439, VIN #1GNFK13088R212004) and case agents have observed Victoriano Botello operating this vehicle within the last 21 days and have seen this vehicle parked at this location as recently as April 25, 2024, 2024.



10

d. 2218 S. 21st Street, Milwaukee, Wisconsin (Roberto Aviles-Rogel/Juan Espinoza's Residence) ("**Target Location 4**");

- 2218 S. 21st Street, Milwaukee, Wisconsin is a two-family home located on the east side of S. 21st Street. There are two front doors on the front of the building which faces westbound. The siding for the residence is blue, the front doors are white, and the window trim is white. 2218 S. 21st Street is the upper unit and accessed through the northern most door. The lower unit is accessed through a separate door and has a separate address. The numbers "2218" are affixed above a black mailbox to the right of the front door. Case agents are seeking authorization to search the upper unit (2218 S. 21st Street) as well as any common or storage areas accessible to the occupant(s) of the upper unit including the detached garage to the rear of the residence. Case agents have witnessed Espinoza accessing this garage during surveillance.

- Case agents have conducted at least two controlled buys that were sourced directly from this residence. Case agents know that two of the DTO members, Espinoza and Aviles-Rogel, live at this residence. Case agents have observed Espinoza conduct numerous suspected drug deals at the residence (exiting the residence, meeting with a drug customer to complete a sale, then returning into the residence) along with numerous deals directly after leaving this residence.

- Juan Carlos Espinoza has been observed operating at least three vehicles within the past month to facilitate narcotics transactions. Those vehicles are described as a 2014 Jeep Grand Cherokee - Silver (WI APK9306, VIN #1C4RJFBG5EC269554), a 2001 Toyota 4Runner - Gray (WI ANR7001, VIN #JT3HN86R410331744), and a 2012 GMC Sierra Pickup truck - Black (WI PX8933, VIN #3GTP2XE25CG147023). Case agents have seen each of these vehicles parked at or near this residence during surveillance and have seen Espinoza driving the Sierra and the 4Runner within the last 14 days. Case agents know that the Jeep is currently parked at 2040 S. 20th Street as it is damaged.



11

e. 2630 S. 7th Street, Milwaukee, Wisconsin (Marco Medel's residence) ("**Target Location 5**");

- 2630 S. 7th Street, Milwaukee, Wisconsin is a single-family home located on the east side of S. 7th Street. The front door is wood with a glass windowpane and faces west. There is a front porch accessed by a series of stairs. The siding is white, the window trim is gray, and the roof is brown shingles. The numbers "2630" are affixed to the siding near the front door in gold numbers. There is a detached garage to the rear of the residence.

- Case agents have observed Medel conduct numerous drug deals in the alleyway behind his residence after exiting the residence. Case agents have intercepted communications leading investigators to believe he stores narcotics in his residence. Case agents have observed Medel, Espinoza, Botello, Sr. and Congleton at this residence in conjunction with drug transactions.

- Medel has been observed over the course of this investigation operating two different vehicles. Those vehicles are described as a 2009 GMC Yukon - Black (WI AJU6218, VIN #1GKFK03279J107575) and a 2019 Infiniti Q50 - Black (WI ATY4364, VIN #JN1EV7AR1KM558645). Case agents have seen these vehicles parked at or near this residence during surveillance within the last 7 days.



f. 5089 W. Colonial Court, Greenfield, Wisconsin (Andrew Sabo's residence) ("**Target Location 6**");

- 5089 W. Colonial Court, Greenfield, Wisconsin is a multi-condo building located at the northeast corner of 51st and Crawford Avenue. Each condo has its own address and separate access doors. 5089 occupies the southernmost condo

12

of the building. The building consists of mostly brick with some white siding near the second floor. The front door faces west and is white. There is a red door facing east that has a white storm door. The numbers "5089" are affixed to the brick next to the rear door in black numbering. There are a series of garages to the east of the building on West Crawford Avenue. Case agents believe that each individual garage is assigned to a specific condo and therefore request to the search the detached garage assigned to Andrew Sabo's unit.

- Case agents have conducted at least one controlled buy from Sabo in which he stated that he has a significant quantity of methamphetamine at his house. Case agents have also followed Sabo to this residence after apparent narcotics related transactions with Botello, Sr.

- Andrew Sabo has been observed operating at least three different vehicles to facilitate narcotics transactions and has bragged in intercepted calls that he drives five different vehicles. His known vehicles are a 2020 Jeep Grand Cherokee - Black (WI G0TME1, VIN #1C4RJFN96LC279861), a 2017 Dodge Ram Pickup truck - Red (WI FB54999, VIN #3C63RRGL9HG545247) and a 2010 GMC Yukon - Black (WI AWJ7565, VIN #1GKUKMEF8AR151444) Case agents have seen each of these vehicles parked at or near this residence during surveillance. Case agents have also observed Sabo driving all of these vehicles during numerous suspected drug transactions.



g. 919 W. Walker Street, Milwaukee, Wisconsin (Cain Botello, Sr.'s stash location) ("**Target Location 7**");

- 919 W. Walker Street, Milwaukee, Wisconsin is a single-family home located on the south side of W. Walker Street approximately mid-block between S. 9th Street and S. 8th Street. There are gray stone pillars and a front porch on the

13

residence. The siding is off white/gray with white trim and a black shingled roof. The front door faces north and has a black storm door. The numbers "919" are affixed to the front of the residence in black numbers above a black mailbox. There is a detached garage to the rear of the residence and case agents have seen Mario Garcia-Puentes (a/k/a Luis Garcia) accessing this garage during surveillance.

- Case agents have observed Botello, Sr. carrying a blue/white cooler which they suspect contains narcotics from his residence (located directly next to 919 W. Walker Street) in/out of his neighbor's house on over 10 occasions before leaving his residence for the day. Case agents have also intercepted communications wherein Botello, Sr. arrived in the alley behind 919/921 W. Walker Street in order to acquire drugs to provide to a customer. He contacted an unknown female and instructed her to open the door. Case agents believe this was the door to 919 W. Walker Street. Further, intercepted communications have shown that Botello, Sr. sometimes directs customers to the alley behind his residence (and, therefore, also behind 919 W. Walker Street) to be served someone other than Botello, Sr. Case agents have tentatively identified this neighbor/runner as Mario Garcia-Puentes (a/k/a Luis Garcia). Case agents have intercepted calls between Botello, Sr. and Mario Garcia-Puentes/occupant of 919 W Walker Street leading case agents to believe that Botello, Sr. is storing some amount of his narcotics at this residence for his runner (Garcia) to supply to Botello, Sr.'s customers in the alley.

- Mario Garcia-Puentes (a/k/a Luis Garcia) has been observed driving a 2005 GMC Yukon – Black (WI 969UWZ VIN 1GKEK13T75R188972 on multiple occasions including on April 26, 2024. Case agents have observed this vehicle parked on the street near 919 W. Walker as recently as April 26, 2024.



14

h. 5946 S. Honey Creek Drive, Greenfield, Wisconsin (Jayme Congleton's residence) ("**Target Location 8**");

- 5946 S. Honey Creek Drive, Greenfield, Wisconsin is a multifamily building. Each unit within the building has its own address and access door. The first floor of the building consists of brick and the second floor consists of brown siding with brown trim. The access door to the building is brown with a brown storm door. The numbers "5946" are affixed in black numbering with a white background above the access door to the unit. The are no garages apparently accessible to the unit.

- Case agents have observed Congleton engage in over 20 suspected narcotics related transactions outside of El Infierno. Case agents also have intercepted drug communications between Congleton and Medel with at least one of those resulting in Congleton delivering narcotics to Medel after Congleton left this residence. Case agents have seen Congleton enter or exit this residence on multiple occasions.

- Case agents have only observed Jayme Congleton operating one vehicle. That vehicle is described as a 2005 Jeep Grand Cherokee - Black (WI JAYM0, VIN #1J4GR48K45C513625). Case agents have seen this vehicle parked at or near this residence during surveillance as recently as April 25, 2024.



i. 2040 S. 20th Street Milwaukee, Wisconsin (Juan Espinoza's stash location) ("**Target Location 9**");

- 2040 S. 20th Street, Milwaukee, Wisconsin is a two-story single-family home located on the eastside of S. 20th Street adjacent to the alley way. The front door of the residence faces west. The siding is white, the trim is brown, and the roof

15

is a brown shingles roof. There is a gray porch with stairs leading to the front door. The numbers "2040" are affixed to the front of the residence in black letters above a gray mailbox. There is a detached garage to the rear of the residence.

- Case agents have intercepted multiple communications in which Espinoza directs drug customers to meet him at "Leo's" or on 20th Street. Case agents surveilled some of those transactions and confirmed that Espinoza exited 2040 S. 20th Street, met with the customer(s) outside, and then returned inside the residence. Case agents have observed Espinoza engage in over 10 narcotics related transactions at/around 2040 S. 20th Street.

- Case agents are aware that Espinoza has been seen operating a 2014 Jeep Grand Cherokee - Silver (WI APK9306, VIN #1C4RJFBG5EC269554) on multiple occasions during this investigation but know that it was involved in an accident. Since that time, case agents have seen that the Jeep is parked at 2040 S. 20th Street as it is damaged.



j. 1639 S. 12th Street, Milwaukee, Wisconsin (Jaime Reyes Delgado's residence) ("**Target Location 10**");

- 1639 S. 12th Street is a one-story, two-family home located on the west side of S 12th Street. There is a wooden porch on the front of the residence with white pillars. The siding is white over gray with white trim around the windows and door. The front door to the residence faces east and grants access to the front unit. There is a second door on the southside of the residence granting access to the rear unit or unit "A". The markings near the second door "1639 A" are affixed to the siding near that door. There is a detached garage to the rear of the residence.

16

Case agents observed an apparent drug deal between Jaime Reyes-Delgado that occurred near the detached garage. Case agents are requesting authorization to search 1639 S. 12th Street, all common areas, basements, and garages accessible to the unit occupied by Delgado. During physical surveillance case agents have observed Delgado exiting and entering the front door for 1639 S 12th Street at least 5 times within the past two weeks. Case agents are not seeking to search 1639 A S. 12th Street, which is accessible via the side door.

- Case agents have intercepted several calls in which Jaime Reyes-Delgado has ordered narcotics from Espinoza. On one of those deals, believed to be for a ½ of a kilogram of cocaine, Espinoza was observed delivering the narcotics to Reyes Delgado at this residence. This occurred within the last 14 days.

- Jaime Reyes Delgado has three known vehicles registered to him. The vehicles are described as a 2016 Ford Escape, gray in color (WI 730-XKZ VIN# 1FMCU9GX9GUC82937) a 2013 F-150, black in color (WI ST7670 VIN# 1FTFW1ET3DKD05746), and a 2004 Nissan Titan, black in color (WI NW8742 VIN# 1N6AA07B04N516566). Case agents have seen these vehicles parked at or near this residence during surveillance as recently as in the last 14 days.



k. 2055A N 31st Street, Milwaukee, Wisconsin (Cain Botello, Jr.'s residence) ("**Target Location 11**");

17

- 2055A N. 31st Street, Milwaukee, Wisconsin is a two-family home consisting of an upper and lower unit. Unit "A" occupies the second floor of the residence (upper unit). Unit "A" is accessed through the door on the southwest corner of the residence. The access door to unit "A" is near the driveway on the south side of the house. The house mostly consists of gray siding with white trim. There is wooden balcony on the front of the residence. The numbers "2055" are affixed in black numbers on a white pillar on the front of the residence. Case agents are seeking authorization to search the upper unit as well as any common or storage areas accessible to the occupant(s) of the upper unit. There is no garage to this residence, and Botello, Jr. exclusively parks in the driveway or parking slab.

- Case agents have observed Botello, Jr. coming and going to this house on almost a daily basis. Case agents have conducted at least three controlled buys of cocaine from Botello, Jr. In the most recent controlled buy, he was observed leaving this residence shortly before the controlled buy. Case agents have also observed Botello, Jr. carry what is believed to be several pounds of marijuana into this residence.

- Cain Botello, Jr. has been observed operating two vehicles over the course of this investigation. Those vehicles are described as a 2016 Dodge Charger - Black (WI ARB1674, VIN #2C3CDXL94GH214519) and a 2024 Jeep Grand Cherokee - White (WI ARH8573, VIN #1C4RJHDG8RC699786). Case agents have seen these vehicles parked at this residence during surveillance as recently as April 25, 2024.



l. 2436 S. 8th Street, Milwaukee, Wisconsin (Medel's Mother's residence) ("**Target Location 12**");

- 2436 S. 8th Street Milwaukee, Wisconsin is a two-family home

18

consisting of an upper and lower unit. Per Milwaukee Tax Portal, the entire home lists to J. Santos Medel Martinez (believed to be Medel's father). Case agents know via intercepted communications and physical surveillance that Medel refers to this residence as his mother's residence. Case agents believe the Medel family has access to the entire house. The house has yellowish siding with white trim. There is a porch on the front of the residence with brick pillars and a white railing. The front door faces S. 8th Street. The numbers "2436" are affixed to the siding near the front door. Case agents have intercepted communications where Medel states he has moved drugs to his mother's residence since he was fighting with his wife, and she restricted his access to his house. Case agents have witnessed Medel conduct over 5 drug transactions in the rear of Medel's mother's house and precision phone location information for Medel's phone showed that Medel's phone pinged overnight in the area of this residence once in the last 5 nights (April 29, 2024) leading case agents to believe that Medel stayed the night at this location.



m. W234N700 Busse Road, Waukesha, Wisconsin (Mario Garcia-Puente's Employer Parking Area) ("**Target Location 13**")

- This location is an unenclosed employee parking lot associated with Woodway Industries accessible from a paved drive located to the west of Busse Road. Search to include only the vehicle operated to that location by Mario Garcia-Puente (including but not limited to 2005

19

GMC Yukon – Black (WI 969UWZ VIN 1GKEK13T75R188972). Case agents are seeking permission to search only the vehicle operated to that location by Mario Garcia-Puentes and not the vehicles of any other employee or customer or any portion of the building itself.

8. This Affidavit is being submitted in support of the requested criminal complaint, arrest warrants, and search warrants and does not set forth all my knowledge about this matter. There is probable cause to believe that the following subjects have committed the TARGET OFFENSES: Roberto Aviles-Rogel, aka "Negro," Victoriano Botello, aka "Vic," Cain Botello, Sr., Cain Botello, Jr., Marco Medel, Jayme Congleton, aka "Jamo," Juan Carlos Espinoza, aka "Pedrito," aka "Gordo," Tomas Castro Estrada, Andrew Sabo, Jaime Reyes Delgado, Mario Garcia-Puentes (a/k/a Luis Garcia) and others yet un-identified.

### III.    BASIS OF INFORMATION

9. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

   a. my experience investigating drug trafficking organizations ("DTOs");

   b. oral and written reports, and documents about this investigation that I have received from members of the Federal Bureau of Investigations, local law enforcement, and other federal law enforcement agencies;

   c. discussions I have had personally concerning this investigation with experienced narcotics investigators;

   d. physical surveillance conducted by the Federal Bureau of Investigation and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

   e. public records;

   f. telephone toll records, pen register and trap and trace information, and telephone subscriber information;

   g. statements of confidential sources;

20

h.   consensually recorded meetings and phone calls over TARGET TELEPHONE 1, Cain Botello, Jr.'s telephone number, and Andrew Sabo's telephone number;

i.   controlled purchases of narcotics;

j.   court ordered precision location data ("pings") from telephone service providers for TARGET TELEPHONE 1, TARGET TELEPHONE 2, TARGET TELEPHONE 3, TARGET TELEPHONE 4, TARGET TELEPHONE 5, TARGET TELEPHONE 6, TARGET TELEPHONE 7, and other cellular telephones used by members of the Botello DTO; and

k.   Court authorized Title III interception for TARGET TELEPHONE 1, TARGET TELEPHONE 2, TARGET TELEPHONE 3, TARGET TELEPHONE 4, TARGET TELEPHONE 5, TARGET TELEPHONE 6, and TARGET TELEPHONE 7.

10.   Since this affidavit is being submitted for the limited purpose of securing the requested criminal complaint, arrest warrants, and search warrants, I have not included each and every fact known to me concerning this investigation or every aspect of the investigation to date. I have set forth only the facts that I believe are necessary to establish the foundation for probable cause for the requested criminal complaints and warrants.

11.   Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

## IV.   BOTELLO DTO MEMBERS

12.   Information about the Botello DTO members comes from the following sources and criminal indices: observations made during physical and electronic surveillance, analysis of phone tolls, the instillation of pen register/trap and trace devices, interviews conducted with confidential human sources (CHS), information obtained from other law enforcement officers, controlled evidence purchases, the use of a GPS tracking device, warrants obtained authorizing location data for cellphones, an interdiction traffic stop, a business check, the attempted introduction of an undercover law enforcement officer, and information generated via court ordered interceptions on TARGET TELEPHONE 1, TARGET TELEPHONE 2, TARGET TELEPHONE 3, TARGET

21

TELEPHONE 4, TARGET TELEPHONE 5, TARGET TELEPHONE 6, and TARGET TELEPHONE 7. Through a review of that information, the following persons have been identified and for whom there is sufficient personal or criminal history information to ensure their accurate identification:

- **Roberto Aviles-Rogel, aka "Negro"**- Roberto Aviles-Rogel is a cocaine and methamphetamine trafficker selling narcotics on behalf of the Botello Drug Trafficking Organization. Aviles-Rogel resides at 2218 S. 21st Street, Milwaukee, Wisconsin (**Target Location 4**). Aviles-Rogel also frequently stays at his girlfriend's residence located at 18650 Lawnsdale Road, New Berlin, Wisconsin. Aviles-Rogel has been arrested approximately 1 time for Driving without a Valid Wisconsin Driver's License. Aviles-Rogel is in the United States after being deported in the past and no other criminal history was located regarding him. Aviles-Rogel is the known user of TARGET TELEPHONE 1.
  - o Case agents have intercepted communications between Aviles-Rogel and others that are drug related in nature. Case agents have conducted over 5 controlled buys involving Aviles-Rogel. One of those controlled buys involved Aviles-Rogel selling approximately one pound of actual[1] methamphetamine while another involved Aviles-Rogel supplying over 350 grams of cocaine. Case agents have purchased approximately 950 grams of cocaine and approximately 485 grams of actual methamphetamine from Aviles-Rogel during this investigation through controlled buys and estimate he has distributed

[1] All of the methamphetamine obtained during this investigation was crystal methamphetamine. In past investigations, TFO Ploch has seized quantities of crystal methamphetamine that were later sent to the crime laboratory for testing and purity analysis, and he is aware that, generally, the purity for crystal methamphetamine is high (often over 90% pure). Therefore, case agents believe that the same will be true for the crystal methamphetamine seized in this case.

22

significantly more cocaine and methamphetamine based on the intercepted communications. Based on this investigation to date, case agents believe that Aviles-Rogel has engaged in narcotics discussions and/or transactions involving Medel, Botello, Sr. Victoriano Botello and Espinoza.

- **Victoriano Botello, aka "Vic"-** Victoriano Botello is a mid-level cocaine trafficker selling narcotics on behalf of the Botello Drug Trafficking Organization. He is Cain Botello, Sr.'s brother and Cain Botello, Jr.'s paternal uncle. Victoriano Botello resides at 1118 S. 35th Street, Milwaukee, Wisconsin (**Target Location 3**). Victoriano Botello has been arrested for, and convicted of, 2nd Degree Recklessly Endangering Safety (date of conviction—October 10, 2000), Possession with Intent THC (>2500-10,000 g) (Use of a Dangerous Weapon) (date of conviction—July 28, 2015) and Felon in Possession of a Firearm (date of conviction—July 28, 2015). Victoriano Botello is the known user of TARGET TELEPHONE 3 and TARGET TELEPHONE 4.

  o Case agents have observed Victoriano Botello conduct apparent drug transactions and intercepted calls that are drug related numerous times over the course of this investigation. Case agents have observed Victoriano Botello conduct these apparent drug transactions both at/near El Infierno and his residence. Case agents also believe that Victoriano Botello has retrieved narcotics from Botello, Sr.'s residence on several occasion. During one of the controlled buys, Victoriano Botello acquired over 350 grams of cocaine from Botello, Sr.'s residence that was later provided to another Botello DTO member inside of El Infierno, and subsequently sold to a CHS. Based on surveillance and the intercepted communications, case agents estimate he has distributed over 400 grams of cocaine. Based on this investigation to date case agents

23

believe that Victoriano Botello has engaged in drug related transactions or discussions with Medel, Botello, Sr., Botello, Jr. Congleton, and Aviles-Rogel.

- **Cain Botello, Sr.-** Cain Botello, Sr. is believed to be the primary source of supply for the Botello Drug Trafficking Organization in the Milwaukee Area. He is Victoriano Botello's brother and Cain Botello, Jr.'s father. Cain Botello, Sr. resides at 921 W. Walker Street, Milwaukee, Wisconsin (**Target Location 2**). Case agents believe he has a narcotics stash at his neighbor's residence (919 W Walker Street, Milwaukee, Wisconsin (Target Location 7)). Cain Botello, Sr. has been arrested approximately 5 times, including arrests for: Possession of Heroin, Possession of Cocaine/Coca (Second/Subsequent Drug Offense), Battery (Habitual Criminality), Possession with Intent-Cocaine (>40g) (Second/Subsequent Drug Offense), and two counts of Operating a Motor Vehicle While Under the Influence-4th Offense (General Alcohol Concentration Enhancer). Cain Botello, Sr. has prior convictions for Possession of Heroin (date of conviction—September 23, 2003), Possession of Cocaine (Second/Subsequent Drug Offense) (date of conviction—April 18, 2005), Operating While Under the Influence (3rd) (date of conviction—February 17, 2005), Battery (Habitual Criminality) (date of conviction—January 9, 2006), and Possession with Intent-Cocaine (>40g)(Second/Subsequent Drug Offense (date of conviction—May 24, 2007). Cain Botello, Sr. is the known user of TARGET TELEPHONE 6, and TARGET TELEPHONE 7.
  - o Case agents have intercepted numerous drug related conversations in which Botello, Sr. discusses narcotics related transactions. Case agents are still intercepting communications on Botello, Sr.'s phone. Case agents have observed Botello, Sr. engage in apparent drug deals and have observed

24

suspected narcotics leave his residence. Case agents believe Botello, Sr. is also stashing narcotics at his neighbor's residence and other locations based on intercepted calls. Case agents know based on intercepted communications that Botello, Sr. has also instructed other individuals to consummate drug deals on his behalf. For example, case agents have intercepted communications wherein Botello, Sr. instructs a runner to supply drugs to a customer in the alleyway behind Botello, Sr.'s residence. Further, case agents believe that the one pound of actual methamphetamine purchased from Sabo by a CHS was sourced from Botello, Sr. Further, case agents know, based on the interceptions, that Botello, Sr., utilizing Mario Garcia-Puentes (a/k/a Luis Garcia) distributed a least six ounces of cocaine in a single day in April 2024. Further, case agents know that the 365 grams of cocaine that Victoriano Botello provided to a DTO member inside of El Infierno (and later sold to a CHS) was obtained from Botello, Sr.'s residence while Botello, Sr. was in Mexico. Based on surveillance and intercepted communications, case agents believe Botello, Sr. has distributed significantly more cocaine and methamphetamine based on the intercepted communications. Based on this investigation to date case agents believe that Botello, Sr. has engaged in drug related transactions or discussions with Sabo, Medel, Botello, Jr., Mario Garcia-Puentes (a/k/a Luis Garcia), and Victoriano Botello.

- **Cain Botello, Jr.-** Cain Botello, Jr. is a street level marijuana and cocaine trafficker distributing narcotics on behalf of the Botello Drug Trafficking Organization. He is Cain Botello, Sr.'s son and Victoriano Botello's nephew. Cain Botello, Jr. resides at 2055A N. 31st Street, Milwaukee, Wisconsin (**Target Location 11**). Cain Botello, Jr. has been

25

arrested approximately 2 times, including arrests for: Possession with Intent THC (>200-1000g) and Possession of THC (Second/Subsequent Drug Offense). Cain Botello, Jr. has prior convictions for: Possession with Intent THC (>200-1000g) (date of conviction—October 8, 2015) and Possession of THC (Second/Subsequent Drug Offense) (date of conviction—February 23, 2017).

- o Case agents have conducted at least three controlled evidence purchases directly from Botello, Jr. for approximately 150 grams of cocaine. Case agents also know based on CHS reporting that Botello, Jr. continues to advertise marijuana for sale on Telegram, an encrypted social media platform. Case agents have observed Botello, Jr. carrying what is believed to be pounds of suspected marijuana into his residence. Based on this investigation to date, case agents believe that Botello, Jr. has engaged in drug related transactions or discussions with Botello, Sr. and Victoriano Botello.

- **Marco Medel-** Marco Medel is a cocaine and methamphetamine trafficker selling narcotics on behalf of the Botello Drug Trafficking Organization. Marco Medel resides at 2630 S. 7th Street, Milwaukee, Wisconsin (**Target Location 5**). Medel has been arrested approximately 1 time in the County of Milwaukee for Entry into Locked Vehicle, Theft-Moveable Property (<=$2500) and Entry into Locked Vehicle. Marco Medel has prior convictions for two counts of Entry into Locked Vehicle (Party to a Crime) and two counts of Theft-Moveable Property (<=$2500) (Party to a Crime) (date of convictions—August 24, 2005). Additionally, Medel has been found guilty of a criminal traffic offense for Operating Without a Valid License (2nd within 3 years) (date of conviction—January 12, 2005). Medel is the known user of TARGET TELEPHONE 2.

- Case agents have intercepted calls, conducted physical surveillance, and observed Medel conduct numerous drug transactions. Furthermore, case agents have observed Medel provide bulk cash to others that was sent to his source of supply in Mexico (Tomas Castro Estrada). In one controlled buy, Aviles-Rogel sold approximately 484 grams of actual methamphetamine that he acquired from Espinoza but had originally arranged with Medel to supply. During this investigation, case agents estimate that Medel has distributed significant amounts of cocaine and methamphetamine based on the intercepted communications. In one call alone, case agents believe that Medel and Estrada Castro discussed a shipment and logistics for approximately 16 pounds of methamphetamine. In another, case agents believe Medel and Estrada discussed shipment and logistics of at least 1 kilogram of cocaine and additional methamphetamine. Case agents have intercepted numerous communications between Medel and drug customers and/or DTO members wherein Medel acquired drugs or arranged to sell drugs to customers. Based on this investigation to date case agents believe that Medel has engaged in drug related transactions or discussions with Botello, Sr., Victoriano Botello, Espinoza, Congleton and Aviles-Rogel.

- **Jayme Congleton, aka "Jamo"-** Jayme Congleton is a narcotics trafficker selling cocaine on behalf of the Botello Drug Trafficking Organization. Jayme Congleton resides at 5946 S. Honey Creek Drive, Greenfield, Wisconsin, (**Target Location 8)** and does not have any prior criminal arrests in Wisconsin.

  - Case agents have observed Congleton conduct over 30 suspected narcotics transactions outside of El Infierno. Case agents have intercepted Congleton

27

engaging in apparent drug related discussions including sourcing Medel on at least one occasion. On other occasions, Medel has apparently supplied Congleton. On yet another occasion, Congleton drove Medel to Medel's residence so Medel could pick up narcotics from his house. Congleton then drove Medel back to El Infierno so Medel could deliver the narcotics to Botello, Sr. (inside of El Infierno). Case agents know that Congleton is part of a group chat involving the "tanda," [a suspected drug money pool] with Medel. Based on the investigation to date, case agents believe that Congleton has engaged in drug related transactions and discussions with Medel, Espinoza, and Victoriano Botello.

- **Juan Carlos Espinoza, aka "Pedrito," aka "Gordo," -** Juan Espinoza is a methamphetamine and cocaine trafficker selling large amounts of methamphetamine for the Botello Drug Trafficking Organization. On February 9, 2024, CHS#2 conducted a methamphetamine purchase from Aviles-Rogel that was sourced by Juan Espinoza. Juan Espinoza resides at 2218 S. 21st Street, Milwaukee, Wisconsin, (**Target Location 4**) and does not have any prior criminal arrests in Wisconsin. Espinoza is the known user of TARGET TELEPHONE 5. Espinoza also utilizes 2040 S. 20th Street Milwaukee, Wisconsin (**Target Location 9**) to sell narcotics.

  o Over the course of this investigation Espinoza has sourced both cocaine and methamphetamine and case agents have purchased cocaine and methamphetamine that was sourced by Espinoza during controlled evidence purchases. Case agents have observed Espinoza conduct numerous drug transactions at both 2218 S 21st Street and 2040 S 20th Street. Case agents have intercepted numerous apparent drug related communications involving

28

Espinoza and others. Case agents know that Espinoza has sourced narcotics later recovered via controlled buys. One of those controlled buys involved Espinoza supplying Aviles-Rogel with approximately one pound of actual methamphetamine that was later supplied to a CHS. Another controlled buy involved Espinoza supplying Aviles-Rogel with nearly 200 grams of cocaine. Case agents believe that Espinoza recently delivered a half kilogram of cocaine to Reyes Delgado. Case agents know that Espinoza lives with fellow DTO member Aviles-Rogel. Based on this investigation to date case agents believe that Espinoza has engaged in drug related transactions or discussions with Medel, Aviles-Rogel, "Leo" (the occupant of 2040 S 20th Street), and Reyes Delgado.

- **Tomas Castro Estrada AKA Mexico-based drug broker and user of 52.677.107.3715** — Castro Estrada is Medel's methamphetamine broker and/or source of supply in Mexico. After interceptions began on TARGET TELEPHONE 1 and TARGET TELEPHONE 2, case agents identified the user of this number as Tomas Castro Estrada. Estrada has prior federal convictions for immigration-related offenses and his specific residence and location are unknown, but he is believed to be in Mexico. Tomas Castro Estrada was identified several times by name in conjunction with international money transfers. His birthday was confirmed via Grand Jury Subpoenas associated with those money transfers. Finally, after learning his name and birthday, case agents learned he previously held a State of Wisconsin ID card.

  o Case agents know that Castro Estrada is Medel's Mexico based narcotics broker. Case agents have intercepted numerous narcotics related conversations between Castro Estrada and Medel. Case agents have also intercepted drug

payment-related discussions between Castro Estrada and Medel and witnessed money couriers pick up money/send money in conjunction with those calls. Information obtained pursuant to subpoena confirmed that Medel's associates have wired money to Castro Estrada in Mexico. Based on this investigation to date, case agents know that Castro Estrada exclusively discusses narcotics related matters with Medel. Case agents believe that Castro Estrada is responsible for sending kilogram quantities of cocaine and multi-pound quantities of methamphetamine from Mexico to Medel.

- **Andrew A. Sabo:** Andrew Sabo is a cocaine and methamphetamine trafficker sourced with narcotics by the Botello DTO. He resides at 5089 W. Colonial Court, Greenfield, Wisconsin (**Target Location 6**). He has prior convictions for: Possession with Intent to Deliver Cocaine (>5-15g) (Second/Subsequent Drug Offense) and Felon in Possession of a Firearm (Repeater) in 2016, Bail Jumping (felony) and Possession with Intent to Deliver Cocaine (<1-5g) in 2011, Criminal Damage to Property (Party to a Crime), Possession of THC, Resisting/Obstructing an Officer in 2006, Escape-Criminal Arrest in 2004, and Attempted Burglary and Second Degree Recklessly Endangering Safety (Use of a Dangerous Weapon) in 2001.
  - Case agents have intercepted communications involving Sabo that based on context are believed to be drug related in nature. Case agents have observed Sabo engage in apparent drug transactions/meeting with Botello, Sr. on over four occasions with at least two involving El Infierno. Case agents have bought approximately one pound of actual methamphetamine directly from Sabo. Case agents have intercepted communications between Sabo and Botello, Sr. discussing counter surveillance tactics and law enforcement presence. To date

30

case agents believe that Botello, Sr. is Sabo's narcotics source of supply and Sabo is not known to communicate with other DTO members via telephone.

- **Jaime Reyes Delgado:** Jaime Reyes Delgado was recently identified as a drug customer sourced by Juan Carlos Espinoza. Jaime Reyes Delgado was intercepted ordering a suspected half kilogram of narcotics from Espinoza and surveillance later confirmed the transaction occurred at Jaime Reyes Delgado's listed address, 1639 S. 12th Street, Milwaukee, Wisconsin (**Target Location 10**). Jaime Reyes Delgado has been arrested for traffic offenses in Wisconsin and has an active arrest warrant for Operating While Revoked. Case agents have intercepted prior communications where Espinoza has agreed to give Jaime Reyes Delgado a kilogram on consignment. Jaime Reyes Delgado's listed address and address in Law Enforcement databases is 1629 S 12th Street Milwaukee, WI. Subsequent physical surveillance has confirmed him entering and exiting that residence via the front door.

  - Case agents have intercepted several apparent drug related conversations between Espinoza and Reyes Delgado. Based on the context of a portion of those conversations, case agents believe that Espinoza agreed to sell a ½ kilogram of cocaine to Reyes Delgado. Physical surveillance later observed Espinoza drive to Reyes Delgado's residence in conjunction with that deal. Case agents believe that Espinoza is Reyes Delgado's source of supply. In another call between Espinoza and Reyes Delgado that occurred on April 5, 2024, Reyes Delgado asks Espinoza to lend him a "big one" and they will talk next week. Espinoza agrees. Case agents believe this shows that Espinoza is willing to give Reyes Delgado one kilogram on consignment.

31

## V. SUMMARY OF PROBABLE CAUSE

### A. Summary of Investigation

13. In approximately May 2022, the FBI received information concerning a family involved in the distribution of narcotics throughout Milwaukee. The Milwaukee Police Department and the FBI initiated an investigation into individuals distributing large quantities of cocaine throughout Milwaukee, Wisconsin. Law enforcement officers identified the leader of the drug trafficking organization (DTO) as Cain Botello, Sr. Said investigation revealed that the DTO was using various residences and businesses as part of their drug trafficking operations including Botello, Sr.'s residence, El Infierno Bar, and various stash locations. Based on their training, experience, and knowledge of this investigation, case agents know that the Botello DTO has distributed in excess of 1 kilogram of cocaine, a Schedule II controlled substance, and in excess of 800 grams of actual methamphetamine, a Schedule II controlled substances to informants. Case agents know the Botello DTO has supplied significantly more narcotics than this because these estimated quantities represent only the narcotics actually purchased from the Botello DTO pursuant to controlled buys. These estimated quantities do not represent the hundreds of other drugs deals observed through surveillance or intercepted on the various wiretaps.

14. Court-authorized intercepted communications, video surveillance, phone records, controlled buys, and other evidence reflects that the Botello DTO is sourced by numerous sources of supply including Tomas Castro Estrada who is located in Mexico. The investigation revealed that Castro Estrada supplies crystal methamphetamine to Marco Medel as part of the Botello DTO. This was confirmed through court-authorized interceptions between Tomas Castro Estrada and Marco Medel, discussing money owed to Tomas Castro Estrada by Marco Medel for narcotics previously supplied by Tomas Castro Estrada.

15. The investigation also revealed that the Botello DTO works together to supply each other with narcotics and each member of the Botello DTO has their own customer base. The Botello DTO mainly distributes narcotics and conducts its illegal activity at a bar called El Infierno and case agents have observed DTO members together at El Infierno almost daily since this investigation started. Case agents have also discovered through court-authorized intercepted communications, physical surveillance, phone records, and controlled buys that the Botello DTO members will sell narcotics to their customers from their residences and other locations. Specifically, case agents have observed Juan Espinoza complete multiple narcotics sales at his residence located at 2218 S 21st Street and that he will also utilize 2040 S 20th Street to sell narcotics. I know through my training and experience, narcotics traffickers will use multiple locations to sell, package, and store their narcotics. Cain Botello, Sr. utilizes 921 W Walker Street, which is his residence, to store narcotics, but has also been observed on multiple occasions utilizing 919 W Walker Street. Due to my training and experience, I know large-scale narcotics traffickers will commonly use one residence to store money or firearms and another residence or storage space to store and package the narcotics. The two highest volume narcotics suppliers within the Botello DTO are Cain Botello, Sr. and Juan Espinoza. During multiple controlled narcotics purchases, DTO member Roberto Aviles-Rogel would attempt to source a large amount of methamphetamine or cocaine through Marco Medel and Victoriano Botello, but due to the price and expedited accessibility, Roberto Aviles-Rogel ultimately sourced the narcotics from Juan Espinoza.

16. While continuing to investigate the Botello DTO, case agents discovered through multiple court ordered intercepted conversations between Victoriano Botello, Roberto Aviles-Rogel, Jayme Congleton and Marco Medel, that they are contributing money toward a "Tanda." This contribution is commonly made at El Infierno. A "Tanda" is a rotating savings and credit

association formed by a group of people who know each another for the purpose of helping each other save money for a larger goal. The members of the group get together regularly to contribute an agreed-upon amount of money to a pool that is given to one of the members. Case agents have video surveillance and court ordered interceptions of Jayme Congleton conducting multiple narcotics sales at El Infierno Bar and discussing how he needs to contribute to the "Tanda." Case agents believe this pool of money is being gathered, so the Botello DTO can order bulk quantities of narcotics to sell and further their narcotics trafficking organization. Case agents observed a meeting of DTO members (including Medel, Congleton, Victoriano Botello, and Botello, Sr.) at El Infierno after numerous intercepted communications concerning the Tanda. Cain Botello, Sr. left this meeting and met with a suspected drug source of supply at a secondary location, before returning to El Infierno.

17. During this investigation, case agents have observed Congleton give Medel rides to and from El Infierno. Specifically, Medel asked Congleton to give him a ride to his residence after Botello, Sr. asked Medel to source him with methamphetamine to give to Andrew Sabo. Andrew Sabo is known to case agents as a methamphetamine trafficker who supplies pound quantities of methamphetamine to his customers. This has been confirmed through a controlled narcotics purchase for a pound of methamphetamine from Sabo. Another instance of the Botello DTO working together is during controlled narcotics purchase #6. During this controlled narcotics purchase, case agents instructed a CHS to purchase a large amount of cocaine. Roberto Aviles-Rogel took the money for the cocaine and brought it to El Infierno. Medel was at El Infierno when Aviles-Rogel arrived with the money. Video surveillance captured Victoriano Botello entering Cain Botello, Sr's residence and exiting with a red "Ritz Cracker" box inside a bag. Victoriano Botello brought the "Ritz Cracker" box to El Infierno, where Aviles-Rogel and Medel were waiting. Roberto Aviles-Rogel was in possession of pre-recorded buy money that case agents

34

provided to the CHS for the purchase of the cocaine. Roberto Aviles-Rogel brought the CHS the large amount of cocaine, still packaged in the "Ritz Cracker" box, and Victoriano Botello immediately went back to Cain Botello, Sr.'s house. Case agents believe Victoriano Botello placed the money from the cocaine purchase inside of Cain Botello, Sr.'s residence. This also shows Botello DTO members working together for the common goal of trafficking large amounts of narcotics.

18. Throughout this investigation case agents have captured numerous narcotics transactions between Botello, Sr., Botello, Jr., Victoriano Botello, Medel, Congleton, Aviles-Rogel, Reyes Delgado, Sabo, and Espinoza utilizing court ordered interceptions, physical surveillance, and video surveillance. Specifically, case agents have intercepted Botello, Sr., Victoriano Botello, Aviles-Rogel, Castro Estrada, Sabo, Congleton and Medel discussing distribution of methamphetamine and cocaine. Case agents continue to discover other DTO members involved in this large-scale narcotics trafficking. For example, on April 20, 2024, case agents intercepted a call between Espinoza and Jaime Reyes-Delgado. Jaime Reyes-Delgado ordered what case agents believe to be a half of a kilo of cocaine that Espinoza later retrieved from 2218 S 21st Street and delivered directly to Reyes Delgado at 1639 S 16th Street. Case agents previously intercepted drug related communication between the two, but Reyes Delgado's identity was not confirmed until this deal. Between April 1, 2023, and April 22, 2024, case agents have done CHS controlled buys from Botello, Jr., Aviles-Rogel, and Sabo and have purchased a total of approximately 1 kilogram of powder cocaine and 2 pounds of crystal methamphetamine. Substance identification is based upon field testing.

## VI.    TIII ORDERS FOR BOTELLO DTO MEMBERS

19. As part of this investigation, case agents secured court authorization to intercept communications for certain Botello DTO members:

- On February 5, 2024, United States District Court Judge Brett Ludwig signed an Order authorizing the interception of electronic and wire communications over (847) 641-6044 ("TARGET TELEPHONE 1"), a telephone number that law enforcement had identified as Roberto Aviles-Rogel's (*See* App. No. 24-AP-1, E.D. Wis.). Investigators began the authorized interceptions on February 5, 2024. Said interceptions ended on March 5, 2024. Law enforcement has intercepted numerous drug-related conversations and surveilled several suspected drug transactions pursuant to the same.

- On February 20, 2024, Judge Ludwig signed an Order authorizing the interception of electronic and wire communications over (414) 499-6919 ("TARGET TELEPHONE 2"), a telephone number that law enforcement had identified as Marco Medel's (*See* App. No. 24-AP-2, E.D. Wis.). Investigators began the authorized interceptions on February 20, 2024. On March 20, 2024, Judge Ludwig signed an Order extending the interception of electronic and wire communications over TARGET TELEPHONE 2. Said interceptions ended on April 18, 2024. Law enforcement has intercepted numerous drug-related conversations and surveilled several suspected drug transactions pursuant to the same.[2]

- On March 13, 2024, Judge Ludwig signed an Order authorizing the interception of electronic and wire communications over (414) 399-7825 (TARGET TELEPHONE 3)

---

[2] On March 11, 2024, case agents intercepted an electronic message sent from Veronica Perez (414-499-6999) to TARGET TELEPHONE 2. In the message, Perez mentioned that it would cost $800 to file the paperwork through the court for divorce. Prior to this message, case agents were not aware that Perez and Medel might be married given that they do not share a common last name and never referred to each other as husband or wife. Starting on March 11, 2024, all conversations between Medel and Perez were automatically minimized. On March 13, 2024, case agents confirmed that Medel and Perez are married via a vital records request.

and (414) 406-8785 (TARGET TELEPHONE 4). Both telephone numbers have been identified as being utilized by Victoriano Botello (See App. No. 24-AP-4 E.D. Wis.). Investigators began the authorized interceptions on March 13, 2024. Said interceptions ended on April 11, 2024. Law enforcement has intercepted drug-related conversations pursuant to the same.

- On April 4, 2024, Judge Ludwig signed an Order authorizing the interception of electronic and wire communications over TARGET TELEPHONE 5, TARGET TELEPHONE 6, and (224) 795-9899 with IMEI 359188100511963.[3] TARGET TELEPHONE 5 is utilized by Juan Carlos Espinoza while TARGET TELEPHONE 6 and (224) 795-9899 were known to be used by Cain Botello, Sr. (See App. No. 24-AP-6 E.D. Wis.). Investigators began the authorized interceptions on April 4, 2024. Intercepts of (224) 795-9899 and IMEI 359188100511963 were originally authorized under 24-AP-6. However, when the order was served on T-Mobile, case agents learned that the telephone number (224) 795-9899 was changed on March 29, 2024, to (224) 713-6938, but the IMEI remained 359188100511963. On April 9, 2024, Judge Ludwig signed an amended order (See App. No. 24-AP-6 (Amended), E.D. Wis.) as to TARGET TELEPHONE 7. Interceptions are ongoing as to TARGET TELEPHONE 5, TARGET TELEPHONE 6, and TARGET TELEPHONE 7 and are scheduled to end on May 4, 2024 (as of 11:59 PM on May 3, 2024).

---

[3] (224) 795-9899 and IMEI 359188100511963 was originally called TARGET TELEPHONE 7 in 24-AP-6. However, in this amended document, TARGET TELEPHONE 7 means telephone number (224)713-6938 and IMEI 359188100511963. When reference is made to (224) 795-9899 throughout this amended document, it is now referred to as "(224) 795-9899."

Case 2:24-mj-00372-SCD    Filed 05/01/24    Page 43 of 218    Document 1

20.     Identification of callers, phone numbers, and addresses referenced herein have been established over the course of the investigation through the investigative means discussed herein, including many conversations of intercepted communications over months, phone records, information from confidential sources, public records searches, and electronic and physical surveillance. The intercepted calls detailed herein are provided solely as a sample of what case agents believe are numerous inculpatory interceptions with the targets identified in this affidavit. Furthermore, the significance and meaning attributed to the intercepted communications are based on case agents' training, experience, and knowledge thus far derived from this investigation.

### VII.     SOURCES OF INFORMATION

21.     Special Agents of Federal Bureau of Investigations and local officers have received information concerning the illegal drug trafficking activities of members of the Botello Drug Trafficking Organization ("DTO").

      a. CHS#1 has been reporting to the Federal Bureau of Investigations since approximately May of 2022. CHS#1 is cooperating as part of a proffer agreement. CHS #1 is under indictment and cooperating with law enforcement for consideration regarding a federal investigation involving narcotics trafficking. CHS #1 is a convicted felon with prior convictions for Theft, Criminal Damage to Property, Criminal Trespass, Armed Robbery, Recklessly Endangering Safety and Carrying Concealed Weapon. CHS#1 has provided information regarding drug trafficking organizations and the methods utilized by those organizations. CHS#1's information has been accurate and corroborated, in part, by investigators' knowledge of violent gang members in the Milwaukee area, as well as intelligence gathered from other Milwaukee gang investigations. This intelligence includes consensually recorded phone calls, surveillance, and information from other

38

confidential sources. CHS#1's information has directly led to the arrest and conviction of at least one individual. CHS#1 has also provided information in other investigations that has been helpful in the recovery of wanted vehicles. CHS#1 provided firsthand knowledge of the Botello DTO's members and trafficking techniques. For these reasons affiant believes the information provided by CHS#1 is accurate and reliable and that CHS#1 is credible.

b. CHS#2 has, since approximately July 2022, provided information to law enforcement officers concerning criminal activity in the Milwaukee, Wisconsin area. CHS#2's information has been accurate and corroborated, in part, by case agents' knowledge of violent gang members in the Milwaukee area, intelligence gathered from other Milwaukee gang investigations through controlled narcotics purchases and consensually recorded phone calls, independent investigation including surveillance, and information from other confidential sources. CHS#2 is cooperating with case agents for monetary compensation. CHS#2 is a convicted felon with prior convictions for Burglary, Operating a Motor Vehicle Without Owner's Consent, Battery, and Possession with Intent to Deliver Narcotics. CHS#2 has conducted controlled purchases of cocaine and methamphetamine on behalf of case agents as part of the investigation into the Botello DTO. Following each of these controlled buys, CHS#2 made a statement to case agents about what occurred during the buy. Case agents were able to review surreptitiously recorded audio and/or video made by CHS#2 of two of the controlled buys and found that the recordings corroborated CHS#2's statements to case agents about what occurred during the buys. One of the controlled buys involving CHS#2 was not fully recorded, however, surveillance observations by case agents during the second

39

controlled buy were consistent with the information provided by CHS#2 about what occurred. CHS#2 has debriefed with case agents and possesses firsthand knowledge of the Botello DTO. For these reasons affiant believes the information provided by CHS#2 is accurate and reliable and that CHS#2 is credible.

c.  CHS#3 has been cooperating with the Federal Bureau of Investigation since approximately May 2023. CHS#3 was cooperating for monetary compensation and did not have any open legal matters at the time CHS#3 provided the cooperation to case agents detailed in this affidavit. CHS#3 has a prior arrest for aggravated assault/battery, and as noted below, following CHS#3's cooperation on this investigation, CHS#3 was arrested for fleeing.  CHS#3 is not a convicted felon. CHS#3 has conducted at least three controlled buys of narcotics and one controlled buy related to firearms, more specifically, a "Switch" (an automatic sear device known to law enforcement that converts a semi-automatic weapon to a fully automatic weapon) on behalf of case agents. The controlled buy involving the aforementioned "switch" was pursuant to a separate FBI investigation and did not involve any members of the Botello DTO or TARGET SUBJECTS of this investigation. After each of these controlled buys, case agents met with CHS#3 and CHS#3 made statements about what occurred during the buy.  Each time, case agents then reviewed audio or video footage made by CHS#3 of the transaction and found that it was consistent with CHS#3's statement.  CHS#3 has provided information on Milwaukee area narcotics and firearms traffickers that has been independently corroborated by law enforcement. CHS#3 has debriefed with case agents and possesses firsthand knowledge of the Botello DTO. For these reasons affiant believes the information provided by CHS#3 is accurate and reliable and

40

that CHS#3 is credible. In March 2024, case agents learned that CHS#3 was involved in a fleeing incident in late February 2024 and has been criminally charged, that case remains an open matter and CHS#3 has not been convicted at this time. All of CHS#3's information provided to case agents concerning the Botello DTO and controlled buys involving CHS#3 (except the controlled buy on April 17, 2024) occurred before this new felony arrest and case agents do not believe that it has any bearing on CHS#3's credibility or the reliability of CHS#3's information. CHS#3 has participated in one controlled buy (April 17, 2024) after being charged with fleeing. As detailed below, CHS#3 was monitored before, during, and after this buy and CHS#3 was found to be reliable. CHS#3 conducted the controlled buy on April 17, 2024, in hope of receiving credit on his open criminal case and is receiving credit by having the charge reduced to a misdemeanor. CHS#3 is also currently cooperating in hopes of receiving additional monetary compensation.

d. CHS#4 has been cooperating with the Federal Bureau of Investigations since approximately August of 2023. CHS#4 is cooperating for consideration in a pending federal felony narcotics case. CHS#4 is a convicted felon with prior arrests for armed robbery and possession with intent to distribute marijuana. CHS#4 has provided information on drug and gun traffickers operating within Milwaukee. That information has been independently corroborated by investigators. CHS#4 has participated in controlled evidence purchases and provided information that directly led to the arrest and indictment of at least one individual. CHS#4's information has also directly led to the recovery of firearms and narcotics that CHS#4 had indicated would be found at specific locations. CHS#4 has debriefed

41

with case agents and possesses firsthand knowledge of the Botello DTO. CHS#4 conducted multiple controlled narcotics purchases of narcotics from the Botello DTO on behalf of case agents and information provided by CHS#4 about what occurred during the April 2024 controlled buy and all other narcotics purchases with the Botello DTO was corroborated by case agents' review of the TIII interceptions and/or controlled buy recordings. For these reasons affiant believes the information provided by CHS#4 is accurate and reliable and that CHS#4 is credible.

### VIII.     FACTS ESTABLISHING PROBABLE CAUSE

22.    In the probable cause section below, your affiant has attempted to first describe the progress of the investigation in the Botello DTO, followed by summary provisions regarding the persons to be arrested and the locations to be searched, for ease of reference.

**Historical Information Provided by CHS#1**

23.    In approximately May of 2022 members of the Federal Bureau of Investigation began participating in proffer interviews of CHS#1. Over the course of those interviews, CHS#1 provided information on the Botello Family DTO who CHS#1 identified as multi-kilogram quantity cocaine traffickers operating in the Milwaukee area. Specifically, CHS#1 identified Cain Botello, Sr. and Victoriano Botello as members of the DTO.

24.    CHS#1 stated to case agents that CHS#1 was also a kilogram quantity cocaine distributor operating within Milwaukee and would spend time with members of the Botello DTO as they had similar circles within the Milwaukee area. CHS#1 identified Cain Botello, Sr. as the leader of the distribution network in the Milwaukee area. CHS#1 stated that Cain Botello, Sr. has family in Mexico and California that help traffic cocaine to the Milwaukee area. CHS#1 also identified Victoriano Botello as a member of the DTO. CHS#1 stated Victoriano Botello frequents Milwaukee

42

area bars and sells ounce quantities of cocaine on behalf of Cain Botello, Sr. CHS#1 stated that Cain Botello, Sr. and Victoriano Botello frequent bars on the south side of Milwaukee (particularly Club Sixth Street – 2101 S. 6th Street and El Infierno Bar – 2000 W. Mitchell Street) where they would deal cocaine. CHS#1 stated that Cain Botello, Sr. had a relative named Victoriano Botello. CHS#1 stated that Cain Botello, Sr. would supply Victoriano Botello with cocaine.  CHS#1's information is based on personal conversations CHS#1 had with Cain Botello, Sr.

25. CHS#1 stated that CHS#1 has never personally purchased cocaine from Victoriano Botello. CHS#1 has purchased kilogram quantities of cocaine from Cain Botello, Sr. CHS#1 estimated that CHS#1 last purchased one kilogram of cocaine directly from Cain Botello, Sr. at the end of 2021 or the beginning of 2022.

26. Due to CHS#1's pending cooperation and arrest, CHS#1 has not recently spoken with the Botello DTO members. CHS#1 was arrested for charges related to the distribution of cocaine and case agents know that members of the Botello DTO are aware CHS#1 was arrested.  According to CHS#1, it is common for drug dealers to distance themselves from other drug dealers that have been arrested and are suspected of cooperating with law enforcement. For these reasons, the FBI was not able to further the investigation at that time by using CHS#1 to infiltrate the Botello DTO or conduct controlled drug purchases.

**Milwaukee Police Department's Investigation into El Infierno Bar**

27. In the beginning of 2023, Milwaukee Police Department ("MPD") Officer Justin Torres and I were approached by CHS#2 regarding large-scale narcotics trafficking from 2000 W. Mitchell Street, Milwaukee, Wisconsin (**Target Location 1**).  This location includes an attached upper, residential unit (1673 S. 20th Street, Upper Unit) and a tavern on the ground floor called El Infierno Bar **(Target Location 1)**.  CHS#2 stated that CHS#2 has witnessed multiple kilo-level drug transactions at 2000 W. Mitchell Street (**Target Location 1**) and 1673 S. 20th Street, Upper Unit,

involving two different narcotics traffickers (known to CHS#2 by the nicknames "Negro" and "Cuba"). In March 2023, CHS#2 physically identified "Negro's" vehicle to me. CHS#2 pointed at a blue, Chevrolet Silverado pick-up truck bearing Wisconsin License Plate #TA6987 that was parked in the area of 2000 W. Mitchell Street (**Target Location 1**), which is the address for the El Infierno Bar. Based on this information, I opened an investigation into El Infierno Bar.

28. In order to identify other potential drug traffickers operating out of El Infierno Bar, investigators began conducting frequent physical surveillance at the bar and conducted a "Tavern Check" utilizing uniformed Milwaukee Police Officers. A "Tavern Check" is when uniformed police enter a licensed bar during business hours to conduct a regulatory inspection and/or show a presence in the establishment to deter any criminal activity or disruptive patrons. Milwaukee Police conducted a "Tavern Check" at El Infierno Bar **(Target Location 1)** on April 6, 2023. Based on this physical surveillance, information gathered during the "Tavern Check," and information provided to me by CHS#2, investigators identified several potential narcotics dealers operating out of El Infierno Bar. In part, the potential narcotics dealers identified as frequenting El Infierno Bar were Victoriano Botello, aka "Vic," Jordan Nerby, aka "Playboy," and Jayme Congleton, aka "Jamo." Case agents later commenced controlled buys focused on members of the Botello DTO.

29. Based on my training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant, such as the CHS, purchases drugs from a target at the direction of law enforcement. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When a CHS is used, she/he is searched for contraband, weapons, and money before the operation. The CHS is also wired with a concealed body recorder and/or a monitoring device. When the transaction is completed, the CHS meets cases agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The CHS is again searched for contraband, weapons, and money and

then interviewed by the case agents about the drug transaction. A sample of the suspected drugs is then field tested by the case agents for the presumptive presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. Often, the calls to the target by the CHS are consensually recorded calls under the direction and control of case agents and/or made in the presence of case agents.

**April 6, 2023: Controlled Buy #1**
**(Roberto Aviles-Rogel)**

30. On April 6, 2023, Milwaukee Police Officers with the Violent Crime Reduction Unit conducted a controlled buy of cocaine from El Infierno Bar. For this buy, CHS#2 met with MPD Officer Justin Torres and I. PO Torres searched CHS#2 for contraband, finding none. CHS#2 contacted "Negro" at phone number (847) 641-6044 ("TARGET TELEPHONE 1") and ordered an amount of cocaine. This was done in the presence of Officer Torres and me, who confirmed that the number contacted was (847) 641-6044. This call was not recorded. CHS#2 was provided with a quantity of buy money to purchase the cocaine and recording equipment in order to surreptitiously record the transaction. Law enforcement officers drove CHS#2 to El Infierno Bar **(Target Location 1)**. Officer Torres watched CHS#2 enter El Infierno Bar, where CHS#2 remained for a short time before TFO Veloz and PO Torres observed CHS#2 exit. CHS#2 then went directly to investigators. CHS#2 turned over an amount of cocaine to me, which later field tested positive for cocaine pursuant to the Nark II #07 field test. PO Torres searched CHS#2 for money and/or contraband, finding none. CHS#2 advised investigators that CHS#2 exchanged the buy money with "Negro" in exchange for the cocaine in the bathroom of El Infierno Bar. From the time that CHS#2 was searched prior to entering El Infierno Bar, until the time CHS#2 returned to Officer Torres and me, CHS#2 was kept under constant surveillance. CHS#2 made no stops other than entering El Infierno Bar. At that point in the investigation, case agents had not yet identified "Negro" by name, but later identified him as

45

Roberto Aviles-Rogel. Case agents reviewed the recording made by CHS#2 of this transaction, but the recording quality was poor.

31.     After Controlled Buy#1, additional surveillance was conducted at El Infierno Bar over the next several weeks. During that surveillance, investigators began observing Victoriano Botello frequenting the bar. Based on information provided by CHS#1, investigators believed that the Botello DTO may be utilizing this bar to traffic narcotics. Unfortunately, conducting surveillance at this location was difficult because most activity occurred inside the bar, not out on the street where it would be visible to police.

32.     During surveillance at El Infierno Bar in April 2023, investigators identified Jordan Nerby at the bar on occasion. Jordan Nerby's nickname is "Playboy." According to CHS#2, "Playboy" is a drug trafficker operating out of El Infierno Bar. CHS#2 reported seeing "Playboy" interacting with Victoriano Botello at El Infierno Bar in April 2023. CHS#2 has personally observed "Playboy" selling narcotics within the bar in 2023.

33.     During surveillance at El Infierno Bar in April 2023, investigators identified Jayme Congleton aka "Jamo" at the bar on occasion. According to CHS#2, "Jamo" is a drug trafficker operating out of El Infierno Bar. CHS#2 reported seeing "Jamo" interacting with Victoriano Botello and "Playboy" at El Infierno Bar in April 2023. CHS#2 has personally observed "Jamo" selling narcotics within the bar in 2023.

34.     Between March 2023 and January 2024, CHS#2 would occasionally enter El Infierno Bar and report back to case agents on the activities occurring within. These observations were not pre-scheduled, recorded, or specifically directed by law enforcement. Following CHS#2's trips within El Infierno Bar, CHS#2 told me that there is an area of the bar with a table utilized by certain individuals to play cards. CHS#2 stated that the same people generally sit at this table and play cards. CHS#2 believed that the group at the table was responsible for the narcotics trafficking at the bar

46

based on personal observations made while interacting at the bar on multiple occasions. CHS#2 has told your affiant he/she has personally observed these individuals sell narcotics in El Infierno Bar while they are all together.

35. On or about September 6, 2023, I was conducting physical surveillance around El Infierno Bar **(Target Location 1)**. During that time, I observed Victoriano Botello outside of the bar talking with an unidentified black male. I observed Victoriano Botello receive an amount of cash from this black male while outside. Victoriano Botello then instructed the black male to meet him inside the bar. I could not hear their conversation, but, based upon my observations of Victoriano Botello's body language/gestures, it was clear that he was instructing the black male to enter into the bar. I observed both Victoriano Botello and the black male enter into El Infierno Bar. When Victoriano Botello entered the bar, an individual, later identified by CHS#2 as "Pelon," stood in the doorway of the bar acting as a lookout. Moments later, I observed the black male exit the bar and leave the area. Based on my training and experience, I suspected that Victoriano Botello provided this unknown black male with narcotics. However, I was unable to see within the bar, making physical surveillance of any specific transaction impossible.

**Information Received From CHS#3**
**(Botello, Sr. and Victoriano Botello)**

36. In or about September 2023, FBI Task Force Officer Richard Klarkowski spoke with CHS#3, who had been providing information to area law enforcement since May 2023. CHS#3 identified Cain Botello, Jr. as a cocaine and marijuana trafficker operating within the Milwaukee Area. CHS#3 knows Cain Botello, Jr. from Instagram and has discussed cocaine and marijuana deals with Cain Botello, Jr. originally via Instagram but later via a phone number belonging to Cain Botello, Jr. CHS#3 informed FBI TFO Klarkowski that CHS#3 was willing to purchase marijuana and cocaine from Cain Botello, Jr. Based on the information provided by CHS#1, Cain Botello, Jr.'s familial relationship to Cain Botello, Sr. (father) and Victoriano Botello (uncle), and

47

the investigation to that point, investigators believed that Cain Botello, Jr. was likely a drug trafficker with the Botello DTO.

**September 25, 2023: Controlled Buy #2**
**(Roberto Aviles-Rogel)**
**El Infierno Bar (Target Location 1)**

37. On September 25, 2023, investigators utilized CHS#2 to conduct another controlled buy of cocaine from "Negro." In my presence, CHS#2 called "Negro's" phone number, which I observed to be (847) 641-6044 ("TARGET TELEPHONE 1"). At that point in the investigation, case agents had still not yet determined "Negro's" true name. I listened to the conversation between CHS#2 and "Negro." From the content of their conversation as explained to me by CHS#2, the overall context, and my training and experience, it was clear to me that CHS#2 ordered a quantity of cocaine from "Negro" during this call. This call was done in Spanish and was not recorded. I later reviewed administratively subpoenaed phone toll records for TARGET TELEPHONE 1 and confirmed that the phone number case agents know to be used by CHS#2 was, in fact, in contact with TARGET TELEPHONE 1 during the each of the phone contacts on September 25, 2023, detailed in this paragraph.

38. I searched CHS#2 for money and/or contraband finding none. CHS#2 was provided with a quantity of buy money to purchase the cocaine and recording equipment in order to surreptitiously record the transaction. Law enforcement officers drove CHS#2 to El Infierno Bar **(Target Location 1)**. TFO Cabral watched CHS#2 enter "Negro's" vehicle (Dark Blue, Chevrolet, Silverado bearing Wisconsin License Plate #TA6987), which was parked near the bar. TFO Cabral observed "Negro's" vehicle drive from the area while CHS#2 was still inside. Surveillance officers followed the vehicle to the area of S. 11th Street and W. Lincoln Avenue, CHS#2 stated he/she observed "Negro" enter La Salsita (a bar/restaurant located at 1105 W. Lincoln Avenue, Milwaukee, Wisconsin). Shortly thereafter, CHS#2 observed "Negro" exit La Salsita and re-enter

48

the dark blue Chevrolet Silverado vehicle containing CHS#2. Surveillance then followed "Negro" and CHS#2 back to El Infierno Bar, where officers observed CHS#2 exit "Negro's" vehicle and then meet up with police.

39. I met with CHS#2, and CHS#2 turned over an amount of cocaine that later field tested positive for cocaine pursuant to the Nark II #07 field test. I searched CHS#2 after the controlled buy for money and/or contraband, and I found none. From the time that CHS#2 was searched prior to entering "Negro's" vehicle, until the time CHS#2 returned to me, CHS#2 was kept under constant surveillance. CHS#2 did not interact with anyone other than "Negro." CHS#2 stated that "Negro" exited La Salsita and provided CHS#2 with the cocaine in exchange for the buy money. CHS#2 stated that "Negro" picked up additional cocaine while inside of La Salsita and told CHS#2 that he was going to sell it at El Infierno. Case agents reviewed the recording made by CHS#2 of this transaction, but the recording quality was poor. Based on my training and experience, I believe that Aviles-Rogel used TARGET TELEPHONE 1 to arrange and complete this cocaine transaction with CHS#2 on September 25, 2023.

**September 27, 2023: Controlled Buy #3**
**(Cain Botello, Sr. and Cain Botello, Jr.)**
**921 W. Walker Street (Target Location 2)**

40. On September 27, 2023, CHS#3 met with TFO Klarkowski to conduct a controlled buy of cocaine from Cain Botello, Jr. TFO Klarkowski searched CHS#3 for money and/or contraband and found none. CHS#3 was provided with a quantity of pre-recorded buy money to purchase the cocaine and recording equipment in order to surreptitiously record the transaction. CHS#3 contacted Cain Botello, Jr. via Cain Botello, Jr.'s known Instagram page ("boostedcee"). CHS#3 contacted Cain Botello, Jr. via Instagram in the presence of TFO Klarkowski. Cain Botello, Jr. instructed CHS#3 to meet near the Guadalajara Restaurant (which case agents knew to be near a residence associated to Cain Botello, Jr. in Milwaukee, Wisconsin.) Case agents kept CHS #3

49

under constant visual surveillance from that time that CHS #3 left the pre-determined location until CHS #3 reached the location where CHS #3 was to meet with Cain Botello, Jr. CHS #3 made no stops and interacted with no one until case agents observed CHS#3 meet with Cain Botello, Jr. While conducting surveillance in the area of S. 10th Street and W. Walker Street, case agents observed a gray Jeep Grand Cherokee (WI ASF1393) double park in the middle of the street in front of 921 W. Walker Street **(Target Location 2)**. Case agents observed an older Hispanic male with long hair in a ponytail wearing glasses exit the driver seat. After this subject exited his vehicle, he entered the gangway between 915 and 921 W. Walker Street (**Target Location 2**). Case agents later identified this subject as Cain Botello, Sr. Case agents reviewed online City of Milwaukee tax records for 921 W. Walker Street **(Target Location 2)** that listed the residence's owner as "Cain Botello" but did not indicate if it was Botello, Sr. or Botello, Jr.  Case agents did regular surveillance at that location in 2023 and regularly observed Cain Botello, Sr. at 921 W. Walker Street **(Target Location 2)**, leading case agents to believe that Cain Botello, Sr. resides at that address.

41.     While on surveillance prior to CHS #3's arrival, case agents observed a gray 2022 Honda Pilot (WI ARH8573) parked across the street from 921 W. Walker Street **(Target Location 2)**.  After conducting a check through the Wisconsin Department of Transportation, case agents determined that the gray Honda Pilot was registered to Cain Botello, Jr. Case agents later observed Cain Botello, Jr. emerge from the alleyway between S. 9th Street and S. 10th Street (which is located near 921 W. Walker Street). Case agents observed Cain Botello, Jr. approach the vehicle being operated by CHS #3.  Case agents observed Cain Botello, Jr. enter the front passenger seat. The vehicle being operated by CHS #3 was then observed pulling into the alley behind 921 W. Walker Street **(Target Location 2)**. After a short time, case agents observed Cain Botello, Jr. exit the front passenger seat and approach the rear gangway off the alley behind 921 W. Walker Street **(Target**

50

**Location 2)**. Case agents on surveillance in front of the 921 W. Walker Street (**Target Location 2**) residence observed Cain Botello, Sr. exit the gangway and return to the driver seat of the Jeep Grand Cherokee. This occurred within minutes of Cain Botello, Jr. exiting the vehicle operated by CHS #3 after the controlled buy had been completed. TFO Klarkowski later met with CHS #3 at a pre-determined location to discuss the controlled buy. At that time, CHS #3 provided him with a clear plastic baggie containing a white chunky substance he suspected to be cocaine. TFO Klarkowski also recovered the recording equipment from CHS#3. CHS #3 stated that when CHS #3 arrived in the area, Cain Botello, Jr. jumped into CHS #3's vehicle and instructed CHS #3 to go into the alley. CHS #3 indicated that CHS #3 handed Cain Botello, Jr. the US Currency and, in exchange, Cain Botello, Jr. gave CHS #3 a clear plastic sandwich bag that contained the suspected cocaine. CHS #3 stated that after this exchange was made, Cain Botello, Jr. exited the vehicle and went back towards the residence. TFO Klarkowski conducted a final search of CHS #3 and did not discover any contraband, money, or weapons. Case agents kept CHS #3 under constant visual surveillance from the time that CHS #3 left the controlled buy location until CHS#3 met up with case agents. CHS #3 made no stops and interacted with no one. Case agents identified Cain Botello, Jr. as the person who entered CHS#3's vehicle, which is consistent with what CHS#3 told TFO Klarkowski occurred.

42. TFO Klarkowski transported the suspected cocaine to District 2 for testing. While at District 2, he turned over the suspected cocaine to PO Boyd, who later subjected a sample of the suspected cocaine to Nark II 07/33 field tests, which yielded presumptive positive results for cocaine salt and fentanyl. The cocaine/fentanyl weighed approximately one ounce.

43. Based on my training and experience, I believe that Cain Botello, Jr. likely met with Cain Botello, Sr. for a short time in the gangway between the addresses of 915 and 921 W. Walker Street (**Target Location 2**) prior to Cain Botello, Jr. conducting the controlled buy. This would be

51

consistent with Cain Botello, Sr. providing cocaine to Cain Botello, Jr. to sell to CHS#3. Based on the location of surveillance, case agents were not able to see any interaction between Cain Botello, Sr. and Cain Botello, Jr. However, I believe that Cain Botello, Sr. and Cain Botello, Jr. were coordinating with each other to effectuate the drug transaction because (a) CHS#1's information that Cain Botello, Sr. is a source zof supply of cocaine for Cain Botello, Jr.; (b)the fact that Cain Botello, Sr. arrived in the area of 921 W. Walker Street (**Target Location 2**) moments before Cain Botello, Jr. arrived in that same approximately area to conduct the cocaine transaction; and (c) subsequent phone toll analysis showed that phone numbers associated with Cain Botello, Jr. and Cain Botello, Sr. were in phone contact during the approximate timeframe of this controlled buy. Case agents reviewed the recording made by CHS#3 of this transaction, but the recording ceased just prior to the buy.

**November 21, 2023: Control Buy #4**
**(Cain Botello, Jr.)**

44. On November 21, 2023, case agents met with CHS#3 for the purposes of conducting a controlled evidence purchase of cocaine from Cain Botello, Jr. CHS #3 stated that CHS #3 contacted Cain Botello, Jr. at phone number 414-460-5121 to arrange this cocaine transaction. CHS #3 indicated that CHS #3 located this number in Botello, Jr.'s Telegram channel. TFO Klarkowski observed a conversation on CHS #3's phone between Cain Botello, Jr. using 414-460-5121 and CHS #3 setting up the transaction.

45. TFO Klarkowski conducted a search of CHS #3 and did not discover any contraband, money, or weapons. TFO Klarkowski provided CHS#3 with a quantity of pre-recorded buy money and recording equipment to record the transaction with Cain Botello, Jr. Case agents kept CHS#3 under constant visual surveillance from that time that CHS#3 left the pre-determined location until CHS#3 reached the location where CHS#3 was to meet with Cain Botello, Jr. CHS#3 made no stops and interacted with no one until case agents observed CHS#3 meet with Cain Botello, Jr.

52

46. CHS#3 advised case agents that CHS#3 was contacted by Cain Botello, Jr. while enroute to the pre-determined buy location, and that Cain Botello, Jr. stated to CHS#3 that he would be in a white Jeep. This phone call was not recorded, but portions can be heard on the recording equipment that case agents had activated and provided to CHS#3.

47. While conducting surveillance in the area of S. 33rd Street and W. Scott Street, case agents observed a white 2024 Jeep Grand Cherokee (WI ARH8573) traveling eastbound on W. Scott Street from S. 34th Street. Case agents observed this vehicle's path of travel was consistent with it coming from the area of Victoriano Botello's residence **(Target Location 3)**; however, case agents did not see specifically where the vehicle came from. Case agents later observed this same vehicle park near the area where Cain Botello, Jr. instructed CHS#3 to meet him. After conducting a check through the Wisconsin Department of Transportation, case agents determined that the white Jeep was registered to Cain Botello, Jr.

48. Prior to CHS#3 arriving at the location, case agents observed a gray Jeep Grand Cherokee (WI ASF1393) parked in front of 921 W. Walker Street **(Target Location 2)**, which is the only known vehicle that Cain Botello, Sr. operates based on prior instances of case agent surveillance.

49. Case agents observed CHS#3 operating CHS#3's vehicle and park near Cain Botello, Jr.'s white Jeep at the pre-determined buy location. Case agents observed CHS#3 quickly exit CHS#3's vehicle and enter the front passenger seat of the white Jeep belonging to Cain Botello, Jr.

50. After a short time, case agents on surveillance observed CHS#3 exit the white Jeep and return to CHS#3's vehicle and leave the location.

53

51.     While conducting mobile surveillance after the controlled buy had concluded, case agents were able to follow Cain Botello, Jr.'s white Jeep to the area where Cain Botello, Sr. lives. Case agents followed the white Jeep to the area of S. 15th Street and W. Greenfield Avenue before case agents lost sight of the vehicle due to its extremely reckless driving. Approximately 2 minutes later, case agents again observed the white Jeep traveling westbound in the alley behind the address of 921 W. Walker Street **(Target Location 2)**.  Case agents did not see the white Jeep stop in the alleyway due to their surveillance positions and again lost sight of the vehicle until it was observed driving approximately three to four blocks away from the 921 W. Walker Street **(Target Location 2)** residence. However, approximately less than 3 minutes elapsed between when Cain Botello, Jr.'s vehicle entered the alleyway behind 921 W. Walker Street **(Target Location 2)** and when it was observed less than four blocks away.  This amount of time is more consistent with Cain Botello, Jr. making a brief stop in the alleyway rather than driving directly through the alleyway to the area three to four blocks away, as that direct route would have taken less time.  As such, I believe that Cain Botello, Jr. likely made a brief stop in the area of Cain Botello, Sr.'s residence **(Target Location 2)** after the buy.  Case agents believe that Cain Botello, Jr. drove to the alleyway behind 921 W. Walker Street **(Target Location 2)** likely to meet with Cain Botello, Sr. to provide Cain Botello, Sr. with money obtained from the controlled buy. I know from my training and experience that individuals who partner together in narcotics trafficking will often split the profits made from their sales.

52.     TFO Klarkowski later met with CHS#3 at a pre-determined location to discuss the controlled buy of drugs from Cain Botello, Jr. At that time, CHS #3 provided TFO Klarkowski with suspected cocaine.  TFO Klarkowski also recovered the recording equipment from CHS#3. CHS #3 stated that when CHS #3 arrived in the buy area, CHS #3 exited CHS #3's vehicle and

entered the front passenger door of Cain Botello, Jr.'s vehicle. CHS #3 stated that when CHS #3 entered the vehicle, Cain Botello, Jr. advised CHS #3 that the cocaine inside of the front passenger door handle compartment was for CHS #3. CHS #3 stated CHS#3 then gave Cain Botello, Jr. the US Currency. CHS #3 stated that CHS#3 exited Cain Botello, Jr.'s vehicle with the narcotics. TFO Klarkowski conducted a final search of CHS #3 and did not discover any contraband, money, or weapons. Case agents kept CHS #3 under constant visual surveillance from the time that CHS #3 arrived at the buy location, prior to the controlled buy, until the time that CHS #3 met with case agents to turn over the cocaine. CHS #3 made no stops and interacted with no one other than Cain Botello, Jr. in the white Jeep. TFO Klarkowski reviewed audio recorded by CHS #3 of the cocaine transaction with Cain Botello, Jr. and found that it was consistent with CHS #3's statement as to what occurred. TFO Klarkowski is able to independently identify Cain Botello, Jr.'s voice on the recording based upon his review of videos of Cain Botello, Jr. posted on social media.

53.    TFO Klarkowski transported the suspected cocaine to District 2 for testing. TFO Klarkowski later subjected a sample of the cocaine to Nark II 07/33 field tests, which yielded presumptively positive results for cocaine salt and fentanyl. The cocaine/fentanyl weighed over 30 grams.

54.    Based on the observations made during this buy and case agents' knowledge of the investigation to this point, investigators believe that the cocaine sold to CHS#3 by Cain Botello, Jr. was acquired from Victoriano Botello's residence **(Target Location 3)**. Case agents believe the proceeds were then transported by Cain Botello, Jr. to his father, Cain Botello, Sr., at 921 W Walker Street **(Target Location 2)**.

### Aviles-Rogel's Phone Tolls and Phone Location Data Analysis

55.    On November 14, 2023, case agents obtained a Pen Register/Trap and Trace order and a warrant for Aviles-Rogel's (aka "Negro's") phone records and location information

55

associated with (847) 641-6044 ("TARGET TELEPHONE 1"). Case agents also obtained a federal GPS tracker warrant for Aviles-Rogel's (aka "Negro's") vehicle (Dark Blue in color, Chevrolet, Silverado, bearing Wisconsin License Plate #TA6987). On November 16, 2023, case agents observed Aviles-Rogel's (aka "Negro's") phone ("TARGET TELEPHONE 1") was in the area of Waukegan, Illinois based off of the "pings" provided pursuant to the above-described order. Based on location data, Aviles-Rogel's (aka "Negro's") phone remained in Waukegan for a short time before heading back north towards Wisconsin. Physical surveillance was conducted on Aviles-Rogel (aka "Negro") as he re-entered Wisconsin and I ultimately traffic stopped him. "Negro" was identified as Roberto Aviles-Rogel. He did not have a valid driver's license and his vehicle was subsequently towed. Prior to the tow, a drug detecting police canine conducted a sniff of the vehicle and alerted to the odor of narcotics within the vehicle. A search was conducted, and no narcotics were located within.

56. The vehicle was towed to the Milwaukee Police City tow lot located at 3811 W. Lincoln Avenue, Milwaukee, Wisconsin. On November 17, 2023, the GPS tracker was affixed to the vehicle while at the City Tow Lot pursuant to the GPS tracking warrant.

**November 3, 2023: Control Buy #5**
**(Roberto Aviles-Rogel)**
**El Infierno Bar (Target Location 1)**

57. On November 3, 2023, I arranged for CHS#2 to conduct a controlled buy of cocaine from Aviles-Rogel (aka "Negro"). In my presence, CHS#2 called Aviles-Rogel's cellular phone number which I observed to be 847-641-6044 ("TARGET TELEPHONE 1"). TFO Ploch later reviewed administratively subpoenaed phone toll records for TARGET TELEPHONE 1 and confirmed that the phone number case agents know to be used by CHS#2 was, in fact, in contact with TARGET TELEPHONE 1 during the timeframe when I observed CHS#2 in phone contact with Aviles-Rogel's phone on November 3, 2023. TFO Veloz and I listened to CHS#2's

conversation with Aviles-Rogel, which was in Spanish. Case agents instructed CHS#2 to order approximately $6,000 worth of cocaine from Aviles-Rogel. During this voice call, Aviles-Rogel told CHS#2 to meet him at El Infierno (which was said in Spanish, but I recognized the words "El Infierno" and this was confirmed to me by CHS#2). From the content of their conversation as explained to me by CHS#2, the overall context, and my training and experience, it was clear to case agents that CHS#2 ordered a quantity of cocaine from Aviles-Rogel during this call. Further, as explained to me by CHS#2, Aviles-Rogel instructed CHS#2 to meet with him at his truck parked in the rear of his apartment (which CHS#2 knew to be located at 2000 W. Mitchell Street.) During the call, which was in Spanish and explained to me by CHS#2, CHS#2 confirmed the price per ounce with "Negro." I attempted to record the phone calls between CHS#2 and Aviles-Rogel, but the recording equipment did not work. TFO Kyle Veloz and I drove CHS#2 to 2000 W. Mitchell Street **(Target Location 1)** and observed the blue, 2004 Chevrolet Silverado pick-up truck bearing a Wisconsin registration TA6987 parked at that address. CHS#2 identified this car as "Negro's," and noted it was the only vehicle CHS#2 had ever observed "Negro" drive over the past three years.

58. I searched CHS#2 and did not locate any contraband, money, or weapons. I gave CHS#2 a quantity of pre-recorded buy money and recording equipment. I dropped CHS#2 off north of W. Mitchell Street. I observed CHS#2 walk toward the 2004 Chevrolet Silverado (WI TA6987). I observed CHS#2 enter the vehicle and then exit moments later. I then picked CHS#2 up and debriefed CHS#2 about what occurred in the subject vehicle. CHS#2 indicated that "Negro" took the cash and instructed CHS#2 to come back in approximately 15 minutes to pick up. Case agents kept CHS#2 under constant visual surveillance from the time that CHS#2 was dropped off near W. Mitchell Street until I picked CHS#2 up. CHS#2 made no stops and interacted

57

with no one other than the occupant of the 2004 Chevrolet Silverado (WI TA6987). I conducted another search of CHS#2 and did not locate any contraband, money, or weapons including the pre-recorded buy money.

59. CHS#2 told me that while in the subject vehicle, "Negro" and CHS#2 discussed how much "Negro" is charging CHS#2. "Negro" confirmed how much CHS#2 would receive for money given to "Negro." CHS#2 gave the pre-recorded buy money to "Negro." "Negro" instructed CHS#2 to come back in approximately 15 minutes.

60. I waited with CHS#2 to receive the phone call from "Negro" telling CHS#2 that the cocaine was ready to pick up. After less than an hour, CHS#2 received a cellular phone call from 847-641-6044 ("TARGET TELEPHONE 1") in my presence and was instructed by "Negro" to come pick up. This call was not recorded, was in Spanish, and explained to me by CHS#2. I dropped CHS#2 off at the same location near W. Mitchell Street and watched CHS#2 walk to the parking slab behind 2000 W. Mitchell Street **(Target Location 1)**. I observed CHS#2 enter the front passenger seat of the 2004 Chevrolet Silverado (WI TA6987). Moments later, I observed CHS#2 exit the front passenger seat of the 2004 Chevrolet Silverado (WI TA6987) and walk northbound. I picked up CHS#2, who immediately gave TFO Veloz a bag containing a white substance that I suspected to be cocaine base. CHS#2 advised that "Negro" told CHS#2 that "Negro" was short right now and needed to pick up another load of narcotics. CHS#2 was told that "Negro" would get the rest at a later time. CHS#2 stated "Negro" indicated that the other guy (believed by case agents to be "Negro's" supplier) had to go to get the other brick and cut it. "Negro" stated he only has the amount that he has right now until the guy picks up the other brick.

"Negro" stated he is going to receive a call and he will call CHS#2.[4] I later reviewed audio/video footage made by CHS#2 of this interaction with "Negro" and found it to be consistent with CHS#2's statement.

61. I conducted a final search of CHS#2 and did not discover any contraband, money, or weapons. Case agents kept CHS#2 under constant visual surveillance from that time that CHS#2 was dropped off near W. Mitchell Street until I picked CHS#2 up. CHS#2 made no stops and interacted with no one other than the occupant of the 2004 Chevrolet Silverado (WI TA6987). I later reviewed audio/video footage made by CHS#2 of this interaction with "Negro" and found it to be consistent with CHS#2's statement. I transported the suspected cocaine base to the Milwaukee Police Department District Two for testing. I observed it to be a white, hard, brick-like substance. I tested the suspected cocaine base using the Nark II Field Test Kit, Pouches #07 and #33. These are presumptive field tests that I am trained to administer, and which tested for the presence of cocaine and fentanyl, respectively. The substance field tested positive for cocaine base and fentanyl. The total weight of the cocaine base / fentanyl was over 100 grams. I later reviewed administratively subpoenaed phone toll records for TARGET TELEPHONE 1 and confirmed that the phone number case agents know to be used by CHS#2 was, in fact, in contact with TARGET TELEPHONE 1 during the phone contacts on November 3, 2023. Based on my training and experience, I believe that Aviles-Rogel used TARGET TELEPHONE 1 to arrange and complete this cocaine transaction with CHS#2 on November 3, 2023.

---

[4] I am aware that the next day, CHS#2 advised me that CHS#2 had been contacted by "Negro" and that CHS#2 had arranged for an unwitting third party to acquire the remaining cocaine from "Negro." I later reviewed administratively subpoenaed phone toll records for TARGET TELEPHONE 1 and confirmed that the phone number case agents know to be used by CHS#2 was, in fact, in contact with TARGET TELEPHONE 1 on November 4, 2023. I watched this unwitting third party enter into Aviles-Rogel's parked Silverado behind 2000 W. Mitchell Street **(Target Location 1)** and could see that Aviles-Rogel was in the Silverado. I then watched the unwitting third party exit the Silverado and return to CHS#2's vehicle. I met with CHS#2, who provided me with an amount of cocaine that later field tested positive for the presence of cocaine base and fentanyl.

59

**December 4, 2023: Controlled Buy #6**
**(Roberto Aviles-Rogel, Marco Medel, and Victoriano Botello)**
**El Infierno Bar (Target Location 1) and 921 W. Walker Street (Target Location 2)**

62.    On December 4, 2023, I met with CHS#2 regarding a controlled buy of cocaine from Aviles-Rogel, aka "Negro." CHS#2 communicated with Aviles-Rogel via telephone (voice call) at the phone number of 847-641-6044 ("TARGET TELEPHONE 1") which was witnessed by a Milwaukee Police Department (MPD) undercover officer ("undercover officer"). This phone call between CHS#2 and TARGET TELEPHONE 1 was recorded and also witnessed by the undercover officer, who speaks Spanish.  According to the undercover officer, CHS#2 called TARGET TELEPHONE 1 and left a message asking for a "car" (according to CHS#2, "car" is a codeword used by Aviles-Rogel and CHS#2 for cocaine).  TFO Klarkowski reviewed pen register/trap and trace data for TARGET TELEPHONE 1 and confirmed that the phone number case agents know to be used by CHS#2 was, in fact, in contact with TARGET TELEPHONE 1 during the timeframe when the undercover officer observed CHS#2 in phone contact with Aviles-Rogel's phone on December 4, 2023.  CHS#2 received a call from TARGET TELEPHONE 1 outside the presence of the undercover officer, which I was able to confirm by reviewing phone records for TARGET TELEPHONE 1.  While in phone contact with the user of (847) 641-6044 ("TARGET TELEPHONE 1"), CHS#2 arranged for CHS#2 and the undercover officer to meet with Aviles-Rogel to conduct the cocaine purchase using an FBI undercover vehicle. The undercover officer then picked CHS#2 up and they drove to the buy location.

63.    The undercover officer conducting the controlled buy with CHS#2 conducted an initial search of CHS#2 and did not discover any contraband, money, or weapons. Case agents kept the undercover officer and CHS#2 under constant visual surveillance from that time that CHS#2 left the pre-determined location until they reached the location within the Eastern District

60

of Wisconsin where CHS#2 and the undercover officer were to meet with Aviles-Rogel. CHS#2 made no stops and interacted with no one.

64. In the presence of the undercover officer, CHS#2 received a phone call from Aviles-Rogel at 847-641-6044 ("TARGET TELEPHONE 1") which was recorded. TFO Klarkowski reviewed pen register/trap and trace data for TARGET TELEPHONE 1 and confirmed that the phone number case agents know to be used by CHS#2 was, in fact, in contact with TARGET TELEPHONE 1 during the timeframe when the undercover officer observed CHS#2 in phone contact with Aviles-Rogel's phone on December 4, 2023. Case agents on surveillance were positioned around Aviles-Rogel's residence located at 2218 S. 21st Street, Milwaukee, Wisconsin **(Target Location 4)**. Case agents later determined that this residence is a duplex and that Aviles-Rogel resides in the upper unit with Juan Carlos Espinoza. This is known based on both physical surveillance and pole camera footage. During surveillance, case agents have observed both Espinoza and Aviles-Rogel entering this residence almost daily. They do not knock or request access, they simply enter and leave as they please. In this recorded call, which was translated by a Spanish speaking officer, the user of (847) 641-6044 ("TARGET TELEPHONE 1") and CHS#2 had the following conversation (approximate English translation):

| Aviles-Rogel: | In what area are you? |
| CHS#2: | I am here in the building **unintelligible** of Home Depot. I'm here in the main entrance. |
| Aviles Rogel: | Ah, okay. |
| CHS#2: | I'm in plates from Florida from my cousin. (UC car had Florida license plate) |
| Aviles-Rogel: | Oh okay. |

61

65. While on surveillance case agents observed Aviles-Rogel exit his residence and enter the driver seat of a black Chevrolet Silverado (WI UF3579) and leave the area southbound on S. 21st Street.

66. Case agents conducted mobile surveillance of Aviles-Rogel in the black Silverado until he arrived at El Infierno Bar, located at 2000 W. Mitchell Street **(Target Location 1)**. While parked outside the bar, case agents observed Aviles-Rogel meet with an unknown individual. After a brief interaction, case agents observed Aviles-Rogel leave the location in the black Silverado.

67. Case agents conducted mobile surveillance of Aviles-Rogel until he reached the pre-determined meet location (located within Milwaukee County). Case agents already on surveillance at the pre-determined meet location observed CHS#2 enter the front passenger seat of the black Silverado operated by Aviles-Rogel. Case agents then observed CHS#2 exit the black Silverado and return to the undercover vehicle where the undercover officer was located. According to the undercover officer, CHS#2 stated that CHS#2 provided the buy money to "Negro" while inside the black Silverado. CHS#2 did not obtain any cocaine from Aviles-Rogel during this initial contact and was when CHS#2 provided the money. Case agents and the undercover officer observed that Aviles-Rogel was the sole occupant of the black Silverado at the time that CHS#2 was inside the vehicle. CHS#2 also told the undercover that "Negro" was not interested in interacting with the undercover officer.

68. Case agents followed Aviles-Rogel in the black Silverado from the meet location and briefly lost sight of his vehicle. A short time later, case agents observed Aviles-Rogel park the black Silverado at the El Infierno Bar. Aviles-Rogel exited the black Silverado and entered the bar.

69. TFO Klarkowski later reviewed pole camera footage that depicted the exterior of the residence at 921 W. Walker Street, Milwaukee, Wisconsin **(Target Location 2)**, which I know through my investigation is a residence belonging to Cain Botello, Sr. TFO Klarkowski observed Victoriano Botello arrive at the residence and enter the front door during the timeframe just prior to this controlled buy. TFO Klarkowski was able to observe that Victoriano Botello was not carrying anything in his hands when he entered the residence.

70. On the pole camera footage, TFO Klarkowski later observed Victoriano Botello exit the residence **(Target Location 2)** approximately 11 minutes later, carrying a white plastic shopping bag in his right hand. Case agents on surveillance outside of El Infierno Bar **(Target Location 1)** observed Victoriano Botello arrive operating his black GMC Yukon (WI ASL-3439) wearing the same clothing as depicted on the pole camera footage. Case agents observed Victoriano Botello enter the front door of the bar carrying what appeared to be the same white plastic shopping bag. Based on prior surveillance, case agents were aware that Aviles-Rogel was inside of the bar at the time that Victoriano Botello entered with the white plastic bag.

71. Shortly thereafter, case agents observed Victoriano Botello exit the bar **(Target Location 1)** with no bag in his hands. Aviles-Rogel called CHS#2 from TARGET TELEPHONE 1. This is an approximate English translation of that call:

| | |
|---|---|
| **CHS#2:** | I'm heading to 11th and Mitchell. |
| **Aviles-Rogel:** | Huh/ what? |
| **CHS#2:** | I'm heading to 11th and Mitchell. |
| **Aviles-Rogel:** | Are you already there? |
| **CHS#2:** | You had me waiting at the original spot now I'm heading to 11th and Mitchell. |
| **Aviles-Rogel:** | If you want to come up I'm here at the bar. |

63

| | |
|---|---|
| **CHS#2:** | Where/ huh? |
| **Aviles-Rogel:** | I'm at the bar on 20th and Mitchell. |
| **CHS#2:** | I don't want to see Jamo and Playboy.  I'm still here on "Holt." I will return to the place I was at. |
| **Aviles-Rogel:** | Where am I going to see you |
| **CHS#2:** | Where I originally was. |
| **Aviles-Rogel:** | Are you going to be at 11th and Mitchell. |
| **CHS#2:** | No on Holt. |
| **Aviles-Rogel:** | Uh huh. I'll see you there. |

72. This call was recorded and overheard by the undercover officer. Within minutes of Victoriano Botello exiting/leaving the bar, case agents observed Aviles-Rogel exit the bar and appeared to be clutching something underneath or inside of his hooded sweatshirt.  Case agents observed Aviles-Rogel re-enter the black Silverado and drive away.

73. Surveillance followed Aviles-Rogel back to the pre-determined meet location where Aviles-Rogel was supposed to meet with the undercover officer and CHS#2. Case agents briefly lost visual of Aviles-Rogel's vehicle, but quickly regained surveillance.  Case agents then observed Aviles-Rogel parking the black Silverado next to the undercover vehicle operated by the undercover officer and CHS#2.  From the time that CHS#2 left Aviles-Rogel's black Silverado until the time that Aviles-Rogel returned to the meet location, CHS#2 was in the presence of the undercover officer and did not meet with anyone else.

74. Case agents then observed CHS#2 exit the undercover vehicle and enter the front passenger seat of the black Silverado operated by Aviles-Rogel.  Case agents observed CHS#2 remain inside the black Silverado for a short time and then return to the undercover vehicle

64

operated by the undercover officer. The undercover officer advised TFO Klarkowski that once inside the undercover vehicle, CHS#2 provided the undercover with a quantity of cocaine inside of a white plastic bag. TFO Klarkowski later viewed this bag, and it was consistent with the bag TFO Klarkowski observed Victoriano Botello obtain from the 921 W. Walker Street residence **(Target Location 2)** on the pole camera video and carry into the bar.

75. The undercover officer conducted a final search of CHS#2 and did not discover any contraband, money, or weapons. Case agents kept CHS#2 under constant visual surveillance from the time that CHS#2 left the undercover vehicle until CHS#2 returned to the undercover vehicle. CHS#2 made no stops and interacted with no one other than the occupant of the black Silverado. Case agents and the undercover officer observed that Aviles-Rogel was the sole occupant of the black Silverado at the time that CHS#2 was inside the vehicle.

76. FBI Special Agent David Shamsi transported the suspected cocaine to the FBI Milwaukee Field Office for presumptive drug testing. While at the FBI, TFO Larrel Lirette later subjected a sample of the suspected cocaine to a TruNark presumptive field test, which yielded positive results for cocaine HCI. The cocaine weighed approximately 366 grams. The weight of the cocaine is consistent with an amount intended for resale and not for personal use based upon my training and experience in drug investigations.

77. The undercover officer and I debriefed CHS#2 concerning the purchase of cocaine. CHS#2 advised that after getting into the black Silverado, CHS#2 acquired the cocaine from "Negro" (known to case agents to be Aviles-Rogel). The recording equipment CHS#2 possessed at the time of this transaction did not function properly (i.e., CHS#2 was supposed to bring the recording device into the car with Aviles-Rogel, but failed to do so, and the device remained in the vehicle with the undercover officer), so case agents were unable to review it to corroborate

65

what CHS#2 stated. However, the undercover officer was located nearby and observed CHS#2 exit the undercover vehicle, walk directly to the black Silverado that case agents observed Aviles-Rogel to be operating moments earlier, and then walk directly back to the undercover vehicle in possession of the cocaine.

78. After Victoriano Botello and Aviles-Rogel left the bar, TFO Klarkowski observed pole camera video of Victoriano Botello arriving back at the 921 W. Walker Street residence **(Target Location 2)** approximately 10 minutes later and remaining inside for approximately five minutes. Based upon this investigation, case agents believe that 921 W. Walker Street (Target Location 2) is a residence associated with Victoriano Botello's brother, Cain Botello, Sr. Cain Botello, Sr. was not in the Milwaukee area at the time of Controlled Buy #6.

79. Based on my training and experience, along with the observations made during this operation, I believe that Victoriano Botello retrieved the cocaine from the 921 W. Walker Street residence **(Target Location 2)** after Medel (TARGET TELEPHONE 2) contacted Victoriano Botello (TARGET TELEPHONE 3) and transported it in the white plastic bag to the bar, where he met with Aviles-Rogel. I believe that Victoriano Botello provided the cocaine to Aviles-Rogel in the white plastic bag in exchange for the buy money that CHS#2 had provided to Aviles-Rogel moments earlier. I believe that Victoriano Botello then delivered the buy money to the 921 W. Walker Street (Target Location 2) residence and Aviles-Rogel met with the CHS to provide the cocaine that Aviles-Rogel just acquired from Victoriano Botello.

80. I am also aware that another Botello DTO member, Marco Medel's phone (TARGET TELEPHONE 2), was in contact with Victoriano Botello's phone (TARGET TELEPHONE 3) and Aviles-Rogel's phone (TARGET TELEPHONE 1) during the December 4th controlled buy detailed above (Controlled Buy #6). Medel is a street level cocaine trafficker selling narcotics on

66

behal of the Botello DTO. Case agents later reviewed court ordered phone records for Aviles-Rogel's phone (TARGET TELEPHONE 1) and Victoriano Botello's phone (TARGET TELEPHONE 3). Upon reviewing records from Aviles-Rogel's phone (TARGET TELEPHONE 1), case agents observed that Aviles-Rogel's phone (TARGET TELEPHONE 1) was in contact with phone number (414) 499-6919 (TARGET TELEPHONE 2) (Medel) fairly regularly. Utilizing law enforcement databases, your Affiant learned that this number belonged to Medel. An administrative subpoena served for (414) 499-6919 (TARGET TELEPHONE 2) revealed that Marco Medel is the listed subscriber. Case agents have observed Medel at El Infierno Bar **(Target Location 1)** on multiple occasions over the last several months. I reviewed phone records for Aviles-Rogel's phone (TARGET TELEPHONE 1), Victoriano Botello's phone, and Medel's phone (TARGET TELEPHONE 2) for the date of the above-described controlled buy (Controlled Buy #6). Said records showed that CHS#2 contacted Aviles-Rogel's phone number (847) 641-6044 during that time ("TARGET TELEPHONE 1"). Aviles-Rogel's number (TARGET TELEPHONE 1) then called CHS#2 back (ostensibly to discuss the drug transaction). Within 30 minutes of the call between CHS#2 and Aviles-Rogel's phone (TARGET TELEPHONE 1), Aviles-Rogel's phone called Medel's phone number, (414) 499-6919 (TARGET TELEPHONE 2). Within 5 minutes after the last call between Aviles-Rogel and Medel's phones, Medel's phone (TARGET TELEPHONE 2) called Victoriano Botello's phone at (414) 399-7825 (TARGET TELEPHONE 3). Shortly thereafter, as detailed above, Aviles-Rogel met with CHS#2, and CHS#2 provided Aviles-Rogel with the buy money. Aviles-Rogel did not yet have the cocaine. Minutes later, Medel's phone number (TARGET TELEPHONE 2) called Aviles-Rogel's phone number (TARGET TELEPHONE 1) twice and Medel was observed by case agents at El Infierno Bar. Victoriano Botello was observed arriving at the bar, and Aviles-Rogel was later observed

67

exiting the bar. Aviles-Rogel ultimately met with CHS#2 to deliver the cocaine as detailed above. Case agents believe that Aviles-Rogel (using TARGET TELEPHONE 1) contacted Medel at TARGET TELEPHONE 2 to obtain the cocaine ordered by CHS #2, then Medel using TARGET TELEPHONE 2 immediately contacted Victoriano Botello at TARGET TELEPHONE 3, who acquired the cocaine from Cain Botello, Sr.'s residence.

81. TFO Klarkowski reviewed pen register/trap and trace records for TARGET TELEPHONE 1 and confirmed that the phone number case agents know to be used by CHS#2 was, in fact, in contact with TARGET TELEPHONE 1 during the timeframe of the controlled buy on December 4, 2023. Based on my training and experience, I believe that Aviles-Rogel used TARGET TELEPHONE 1 to arrange and complete this cocaine transaction with CHS#2 on December 4, 2023. Furthermore, I believe that Aviles-Rogel used TARGET TELEPHONE 1 to contact Marco Medel at TARGET TELEPHONE 2, who subsequently contacted Victoriano Botello at TARGET TELEPHONE 3. Victoriano Botello was then observed picking up the cocaine from Cain Botello, Sr.'s residence **(Target Location 2)** and delivering it to El Infierno **(Target Location 1)**. TFO Brian Ploch reviewed pen register/trap and trace records for TARGET TELEPHONE 3 (Victoriano) and confirmed that TARGET TELEPHONE 3 (Victoriano) was, in fact, in contact with TARGET TELEPHONE 2 (Medel) during the timeframe of the controlled buy on December 4, 2023, as detailed above. Therefore, I believe that TARGET TELEPHONE 1 (Aviles-Rogel), TARGET TELEPHONE 2 (Medel), and TARGET TELEPHONE 3 (Victoriano) were all utilized to facilitate this cocaine transaction.

**CHS#4's Observations:**
**(Medel and Victoriano)**

82. After Controlled Buy #6 on December 4, 2023, involving Roberto Aviles-Rogel, Marco Medel, Victoriano Botello, and Cain Botello, Sr.'s residence (TARGET LOCATION 2), case agents instructed CHS#4 to enter the El Infierno Bar with the intent that CHS#4 would

68

become known to various patrons and eventually be able to purchase cocaine from Botello DTO members. CHS#4 was shown pictures of individuals previously observed at the bar by investigators to include Victoriano Botello and Medel. CHS#4 was tasked with making observations and attempting to obtain Medel and/or Victoriano Botello's phone number.

83. Over the course of at least 5 trips to the bar between November and December 2023, CHS#4 observed Medel and Victoriano Botello in the El Infierno Bar on more than one occasion. CHS#4 stated that Medel showed CHS#4 approximately 7 grams of cocaine that Medel has in his pocket. Based on CHS#4's known prior history, I am confident that CHS#4 knows what cocaine looks like and is able to reliably identify it based on its appearance. CHS#4 stated that CHS#4 and Medel discussed drug transactions, but Medel was cautious and told CHS#4 that he would not give out his phone number until he knew CHS#4 better. CHS#4 also reported that Medel and Victoriano Botello were clearly working together and that Victoriano Botello would occasionally summon Medel to a concealed basement area within the bar **(Target Location 1)**. CHS#4 does not know what is in the basement or what discussions were had while Victoriano Botello and Medel were down there. To date, CHS#4 has been unsuccessful in obtaining Medel's phone number. Medel told CHS#4 that he could not give his number to CHS#4 unless Victoriano Botello approves.

84. In January 2024, CHS#4 contacted TFO Ploch and stated that CHS#4 ran into Marco Medel on the southside of Milwaukee. CHS#4 stated that CHS#4 and Medel discussed narcotics transactions. CHS#4 stated that Medel showed CHS#4 approximately 9 ounces of cocaine and that Medel instructed CHS#4 to come to El Infierno later on to further discuss the transaction. None of CHS#4's interactions at El Infierno Bar or CHS#4's interaction with Medel were recorded.

85. As of April 2024, CHS#4 has been unsuccessful in obtaining a phone number for Marco Medel and does not believe he/she will be successful in obtaining it.

69

**Surveillance at 1118 S 35th Street (Target Location 3)**
**(Victoriano Botello)**

86.    In March 2024, while reviewing pen register data of Victoriano Botello's phone number (TARGET TELEPHONE 4), TFO Klarkowski located phone number (262) 202-1168. TFO Klarkowski conducted a query of a reliable law enforcement database which revealed that (262) 202-1168 is registered to Aaron Menzer. TFO Klarkowski has personally used this database over 25 times in the past for the purpose of identifying the registered user of a specific phone number and have found that it is accurate and reliable. TFO Klarkowski observed that this number has been in contact with Victoriano Botello's phone number (TARGET TELEPHONE 4) approximately 73 times since February 24, 2024, and as recently as March 3, 2024.  TFO Klarkowski recalled an apparent drug transaction observed by TFO Lirette on January 4, 2024.

87.    On January 4, 2024, TFO Lirette conducted surveillance at Victoriano Botello's residence located at 1118 S. 35th Street, Milwaukee, Wisconsin **(Target Location 3)**. TFO Lirette observed a male (later identified as Aaron Menzer) park near Victoriano Botello's residence. Aaron Menzer entered the residence for a short time before exiting. When Menzer exited, TFO Lirette noted a bulge in Menzer's left front hoodie pocket. Based on the brief interaction at the residence and Menzer's mannerisms upon exiting, TFO Lirrete believes this interaction is consistent with a drug deal. Furthermore, Menzer has a prior drug-related arrest. Case agents believe that another subject/roommate resides at this residence with Victoriano Botello.  Case agents reviewed location information for Victoriano Botello's telephone (TARGET TELEPHONE 3), which showed that his phone was in the general area of this residence at the time of these observations.

**January 8, 2024: Controlled Buy #7**
**(Roberto Aviles-Rogel)**
**2218 S. 21st Street (Target Location 4)**

70

88. On January 7, 2024, case agents met with CHS#2 for the purposes of conducting a controlled buy from Roberto Aviles-Rogel. Case agents instructed CHS#2 to make contact with Aviles-Rogel and start discussing the specifics of another cocaine purchase. CHS#2 told me that CHS#2 had been in communication with Aviles-Rogel via 847-641-6044 ("TARGET TELEPHONE 1") to discuss the logistics of another cocaine deal. I reviewed the court ordered phone results provided by T-Mobile for 847-641-6044 ("TARGET TELEPHONE 1") which confirmed that the phone number case agents know to be used by CHS#2 and Aviles-Rogel's number ("TARGET TELEPHONE 1") had been in contact during the timeframe identified by CHS#2. CHS#2 told me that CHS#2 has observed Aviles-Rogel at the El Infierno Bar **(Target Location 1)** on at least 10 occasions since December 2023. Furthermore, I had observed Aviles-Rogel at the El Infierno Bar as recently as January 7, 2024.

89. On January 7, 2024, I met with CHS#2 regarding a controlled buy of cocaine from Aviles-Rogel, aka "Negro." CHS#2 voice called Aviles-Rogel by telephone at the phone number of 847-641-6044 ("TARGET TELEPHONE 1") which was recorded by case agents in order to discuss costs and they agreed to meet at El Infierno Bar **(Target Location 1)**. More specifically below is an approximate translated transcription of the conversation. I know based on my training and experience in drug investigations and information from CHS#2 that "truck" is a code word utilized between CHS#2 and Aviles-Rogel to reference a kilogram of cocaine.

| | |
|---|---|
| **CHS:** | You know about truck, I am going to need a price for how much you're going to sell it to me. |
| **Aviles-Rogel:** | Ok |
| **CHS:** | My girl is going to get another car I am going to get the money together, I can pay for half of it. How much is that going to be because my car is not working well. |

| | |
|---|---|
| **Aviles-Rogel:** | I can be at El Infierno in an hour. |
| **CHS:** | Alright, so we will talk in an hour over there. |

90. The conversation at the bar was not recorded but CHS#2 told me that CHS#2 met with Aviles-Rogel and arranged to purchase a quantity of cocaine. The next day, January 8, 2024, CHS#2 contacted 847-641-6044 again via voice call and arranged to meet Aviles-Rogel at a location within the City of Milwaukee. This call was witnessed by me and was recorded. CHS#2 and Aviles-Rogel (using TARGET TELEPHONE 1) had additional voice and electronic communications, which were witnessed by me and recorded discussing the specifics of the deal. I heard CHS#2 and Aviles-Rogel set up a time and location for the purchase. I heard them discuss the price and amount of narcotics for the price CHS#2 proposed. TFO Ploch reviewed pen register/trap and trace data for TARGET TELEPHONE 1 and confirmed that the phone number case agents know to be used by CHS#2 was, in fact, in contact with TARGET TELEPHONE 1 during the timeframe when I observed CHS#2 in phone contact with Aviles-Rogel's phone on January 8, 2024. The following conversations were had between CHS#2[5] and 847-641-6044 (TARGET TELEPHONE 1). More specifically, an approximate translated transcript of the conversation is listed below:

**First Voice Call:**

| | |
|---|---|
| **CHS:** | You know the El Ray by Mineral and 16th |
| **Aviles-Rogel**: | 16th? |
| **CHS**: | Ya the one on Chavez. |
| **Aviles-Rogel**: | Ah ok. |

---

[5] In the previous affidavit related to Target Telephone 1, a scrivener's error listed this as a different CHS. It was CHS#2. This scrivener's error does not impact the probable cause provided by this paragraph.

| | |
|---|---|
| **CHS**: | Ya, I can bring the car over there, you can help me with the car. Do you understand. |
| **Aviles-Rogel:** | What time? |
| **CHS**: | I am going to go over there now. |
| **Aviles-Rogel**: | Ok that is fine, I am getting picked up by somebody else. I'll advise you. |

**Electronic Messages Exchanged Between CHS#2's Phone and TARGET
TELEPHONE 1 Following the Voice Call:**

| | |
|---|---|
| **CHS:** | Don't have all the money 4 my girlfriend car |
| **CHS:** | I do have 10 wrenches |
| **Aviles-Rogel:** | I give u13 |
| **CHS**: | Ok |
| **CHS:** | Now |
| **Aviles-Rogel**: | 3 dm |
| **Aviles-Rogel:** | 3pm |
| **Aviles-Rogel**: | Okay |

91. I believe that this conversation represents CHS#2 not having the money for a full kilogram of cocaine and only having $10,000 and Aviles-Rogel agreeing to give CHS#2 approximately 13 ounces of cocaine for the $10,000. Based on my training and experience, and information from CHS#2, I believe "wrenches" refers to money (10 wrenches corresponds to $10,000) and that "car" refers to cocaine.

92. Later, prior to the controlled buy, I searched CHS#2 and CHS#2's vehicle for contraband with negative results. CHS#2 was then kept under constant surveillance until CHS#2 arrived at the pre-determined meet location. Case agents observed Aviles-Rogel leave his residence at 2218 S. 21st Street **(Target Location 4)** and travel directly to CHS#2's location, where

73

TFO Boyd observed Aviles-Rogel meet with CHS#2. Case agents were aware that this initial meeting was when CHS#2 would provide Aviles-Rogel with the buy money and that it was likely that Aviles-Rogel would need to travel elsewhere to obtain the cocaine.

93. Case agents then followed Aviles-Rogel back to his residence **(Target Location 4)**, where he remained for a short time, before leaving again and returning to CHS#2's location with a backpack. TFO Boyd witnessed Aviles-Rogel meet with CHS#2 and then depart the area. CHS#2 then returned to me and turned over a quantity of suspected cocaine. I then searched CHS#2 and CHS#2's vehicle for contraband with negative results. From the time that I initially searched CHS#2 until CHS#2 returned to me with the cocaine, CHS#2 was kept under constant surveillance and did not meet with anyone other than Aviles-Rogel.

94. TFO Ploch later reviewed pen register/trap and trace records for TARGET TELEPHONE 1 and confirmed that the phone number case agents know to be used by CHS#2 was, in fact, in contact with TARGET TELEPHONE 1 during the calls and electronic communications conducted during this buy. Based on my training and experience, I believe that Aviles-Rogel used TARGET TELEPHONE 1 via voice call and electronic communications to arrange and complete this cocaine transaction with CHS#2 on January 8, 2024.

95. The suspected cocaine was turned over to TFO Brian Ploch. TFO Ploch tested the cocaine utilizing TruNarc and received a positive reaction for the probable presence of cocaine. TFO Ploch weighed the cocaine which totaled approximately 368 grams (approximately 13 ounces, which is consistent with the amount agreed to in the electronic message exchange above). A review of Aviles-Rogel's phone contacts of TARGET TELEPHONE 1 did not show any phone contact with Victoriano Botello (TARGET TELEPHONE 3) or Marco Medel (TARGET TELEPHONE 2) in the timeframe around Controlled Buy #7. Although Aviles-Rogel's phone ("TARGET TELEPHONE 1") was not in direct contact with Marco Medel's phone ("TARGET

74

TELEPHONE 2") during Controlled Buy #7 (as it had been during Controlled Buy #6), both Marco Medel (TARGET TELEPHONE 2) and Aviles-Rogel's (TARGET TELEPHONE 1) phones were in contact with (414) 319-9973 (Jayme Congleton) during Controlled Buy #7. More specifically, Aviles-Rogel's phone ("TARGET TELEPHONE 1") was in contact with this number during the approximately 51-minute timeframe that overlapped with the timeframe that Marco Medel's phone (TARGET TELEPHONE 2) was in contact with that number. Specifically, Marco Medel's phone (TARGET TELEPHONE 2) and Jayme Congleton's phone exchanged a series of electronic messages beginning at 12:07 PM continuing until 2:42 PM. Aviles-Rogel's phone ("TARGET TELEPHONE 1") was in contact with Jayme Congleton's phone via electronic messages between 1:38 PM and 2:29 PM. Case agents have identified (414) 319-9973 as belonging to Jayme Congleton aka "Jamo," who case agents believe to be associated with the Botello DTO. This number was identified as belonging to Jayme Congleton by TFO Klarkowski who utilized two separate reliable law enforcement databases. TFO Klarkowski has personally used these databases over 25 times in the past for the purpose of identifying the registered user of a specific phone number and have found that they are accurate and reliable. Congleton provided telephone number (414) 319-9973 as being his contact number to the Greenfield Police Department in June 2019 and the Greendale Police Department in May 2016. CHS#2 also told me that Jayme Congleton was one of the drug dealers operating out of El Infierno Bar. Based on CHS#2's general information about Congleton's drug dealing at El Infierno Bar, and his phone contact with Aviles-Rogel's phone (TARGET TELEPHONE 1) and Marco Medel's phone (TARGET TELEPHONE 2) during the timeframe of the controlled buy, I believe it is likely that Congleton communicated with Aviles-Rogel (using TARGET TELEPHONE 1) and Marco Medel (using TARGET TELEPHONE 2) about drug trafficking. For example, based on my training and

experience, I know that it is common for drug dealers, such as Aviles-Rogel, to discuss the status of larger-scale deals with their co-conspirators and to provide updates before, during, and after a drug sale. In this case, while case agents did not intercept any of these communications and are unable to say definitively what they were discussing, the pattern of phone contacts between Aviles-Rogel's phone and Congleton's phone and Congleton's phone and Medel's phone (TARGET TELEPHONE 2) is consistent with Aviles-Rogel letting Congleton know that he had acquired the money from CHS#2 and then Congleton letting Medel know that the deal was progressing. Additionally, TFO Ploch reviewed pen register/trap and trace data for Victoriano Botello's phone (TARGET TELEPHONE 3) and knows that Victoriano Botello's phone (TARGET TELEPHONE 3) is also in contact with Jayme Congleton's phone. Victoriano Botello and Congleton's phones were in contact as recently as February 2, 2024. Finally, I spoke to MPD-VCRT Officer Torres who is familiar with this investigation. Officer Torres has observed Jayme Congleton and his vehicle at El Infierno Bar during prior surveillance in April 2023.

96. On January 15, 2024, case agents conducted physical surveillance around El Infierno Bar **(Target Location 1)**. Case agents monitored court ordered pen register/trap and trace and/or phone location data for various members of the Botello DTO including Aviles-Rogel (TARGET TELEPHONE 1), Marco Medel (TARGET TELEPHONE 2), and Victoriano Botello (TARGET TELEPHONE 3). Case agents noted that between 1:04 PM and 1:14 PM, Aviles-Rogel's phone location data (pings) (847) 641-6044 ("TARGET TELEPHONE 1") showed that his device was in the vicinity of El Infierno Bar and case agents established physical surveillance in that area. At 2:22 PM, case agents observed Medel's vehicle (GMC with Wisconsin plate AJU-6218) arrive and park near El Infierno Bar **(Target Location 1)**. Medel was identified as the driver of the GMC. At 3:00 PM, Medel left in the GMC. At 3:30 PM, Victoriano Botello was observed parking

76

his GMC (ASL-3439) in the vicinity of El Infierno Bar **(Target Location 1)**. Victoriano Botello was the only occupant observed in the vehicle. He exited the vehicle and entered El Infierno Bar. Subsequent location data for Victoriano Botello's phone (TARGET TELEPHONE 3) was consistent with it being at El Infierno Bar. At approximately 3:31 PM, Medel returned to El Infierno Bar in his GMC (AJU-6218). A female exited the GMC and then re-entered the GMC driving away. Surveillance was obstructed briefly, and it was not immediately known whether Medel entered El Infierno Bar or not. Medel was no longer in the GMC when it left moments later. At 3:45 PM, two Hispanic males exited El Infierno Bar and entered a 2014 Silver Silverado (LZ2795). The males were heavy set Hispanic males matching Aviles-Rogel's general description. Aviles-Rogel's phone (TARGET TELEPHONE 1) location data showed that Aviles-Rogel's phone location moved shortly after the males were observed leaving. Aviles-Rogel's phone location was then consistent with his device being in the area of his known home address. At 3:59 PM, the same two males arrived back at El Infierno Bar **(Target Location 1)** in the same vehicle. Case agents were able to confirm that Aviles-Rogel was one of these males. Aviles-Rogel and the unknown male entered the bar. At that time, surveillance confirmed Victoriano Botello, Marco Medel, and Roberto Aviles-Rogel were all in the El Infierno Bar at the same time. Subsequent location data for Aviles-Rogel's phone ("TARGET TELEPHONE 1") was consistent with it being back in the area of El Infierno Bar. At 4:15 PM, TFO Cabral observed Medel exit the bar and conduct a suspected hand to hand drug deal with the unknown occupant(s) of a red Ford Ranger (WI UD7554). Specifically, TFO Cabral observed Medel walk up to the driver side of the Ford Ranger with both hands in his pockets. TFO Cabral observed the driver door open, and Medel immediately leaned in towards the cab of the truck and appeared to place his right hand inside the cab of the truck. TFO Cabral observed Medel quickly place his hands back into his pockets and

77

walk back into El Infierno Bar. Based on my training and experience in drug investigations, I believe this was a hand-to-hand narcotics transaction. Based on my training and experience in drug investigations, I also believe this short-term contact to be consistent with a drug transaction because I have observed previous vehicle hand to hand transactions similar to this which involved a quick transaction at the driver door and then an immediate retreat away from the vehicle. The vehicle listed to a male subject with the initials JGA. Electronically maintained Wisconsin Circuit Court Records (CCAP) show that JGA has a prior criminal case for Possession with Intent to Deliver Cocaine. A review of court ordered pen register/trap and trace data for Marco Medel's phone (TARGET TELEPHONE 2) showed that it was in contact with (414)530-3144 one minute before the suspected hand to hand transaction. Case agents believe that this phone contact between Medel's phone (TARGET TELEPHONE 2) and (414)530-3144 is consistent with JGA (or the person using JGA's vehicle) alerting Medel that he/she was arriving at the buy location so that Medel could exit El Infierno Bar **(Target Location 1)** and consummate the drug deal.

97. Case agents identified El Infierno Bar (2000 W. Mitchell Street) **(Target Location 1)**, Cain Botello, Sr.'s residence (921 W. Walker Street) **(Target Location 2)**, and Victoriano Botello's residence (1118 S. 35th Street) **(Target Location 3)** as locations involved in the trafficking of narcotics. Case agents requested pole cameras for each location. FBI Milwaukee installed pole cameras in the area of 2000 W. Mitchell Street **(Target Location 1)** and 921 W. Walker Street **(Target Location 2)**. There were no viable pole camera locations near 1118 S. 35th Street **(Target Location 3)** because there were no utility poles with both electricity and a line of sight to 1118 S. 35th Street (**Target Location 3**). As such, no pole camera was installed in the area of Victoriano Botello's residence.

**Investigation After Title III Authorization for TARGET TELEPHONE 1**

98. On Monday, February 5, 2024, case agents obtained a Title III order (24-AP-1) authorizing the interception of calls and electronic messages to and from TARGET TELEPHONE 1. The order was served to T-Mobile on the same date and interception began that afternoon. Along with monitoring incepted calls and electronic messages to and from TARGET TELEPHONE 1, case agents continued employing other investigative methods including physical and pole camera surveillance on the TARGET SUBJECTS of this investigation. The surveillance continued to provide useful information on the TARGET SUBJECTS. For example, on February 5, 2024, while monitoring pole camera depicting the area around El Infierno Bar, case agents observed Jayme Congleton, aka Jaymo, conduct several suspected hand-to-hand narcotics transactions around the bar.

**February 9, 2024: Controlled Buy #8**
**(Roberto Aviles-Rogel, Juan Carlos Espinoza, Marco Medel)**
**El Infierno (Target Location 1), 2218 S. 21st Street (Target Location 4)**

99. On February 6, 2024, I met with CHS#2 for the purpose of contacting Roberto Aviles-Rogel at TARGET TELEPHONE 1 in order to obtain prices for crystal methamphetamine. All of the telephone calls and text messages between CHS#2 and TARGET TELEPHONE 1 as detailed in this section were recorded with CHS#2's full knowledge and consent. At 10:51 AM, CHS#2 called TARGET TELEPHONE 1, which was intercepted on the TIII and recorded. This call went to voicemail. CHS#2 left a message. At 10:53 AM, CHS#2 sent an electronic message to TARGET TELEPHONE 1.

**Electronic Messages Exchanged Between CHS#2's Phone and TARGET TELEPHONE 1**

100. CHS #2 sent the following electronic message to TARGET TELEPHONE 1: "Partner of mine needs the big picture window replace how much for the glass." This message was sent in my presence and was in English. I know that "window" and "glass" are both street terms in

reference to crystal methamphetamine. This message was intercepted on the TIII on TARGET TELEPHONE 1.

101. At 12:20 PM, Robert Aviles-Rogel utilizing TARGET TELEPHONE 1 responded to CHS#2, via electronic message:

**Aviles-Rogel:** The size its 23 inches.

102. This message was in English, and I believe based on this message exchange that CHS#2 asked Aviles-Rogel for one pound of methamphetamine and Aviles-Rogel gave a preliminary price of $2,300. This message was intercepted on the TIII on TARGET TELEPHONE 1.

103. Later, at approximately 5:23 PM, Aviles-Rogel contacted CHS#2 utilizing TARGET TELEPHONE 1. The call was intercepted on the TIII and recorded. This call was answered by CHS#2. The following is an approximate translation of that conversation. CHS#2 tells Aviles-Rogel that CHS#2 will see him out front. Aviles-Rogel questions, "El Infierno?" CHS#2 affirms.

104. During that call, Aviles-Rogel and CHS#2 agreed to meet in person out in front of El Infierno Bar (**Target Location 1**). I then met with CHS#2 and provided CHS#2 with audio recording equipment. Physical surveillance was established outside of El Infierno Bar. TFO Kyle Veloz identified Roberto Aviles-Rogel parked in front of El Infierno Bar. At approximately 6:05 PM, CHS#2 arrived and was observed by case agents entering Roberto Aviles-Rogel's vehicle. While in the vehicle, CHS#2 and Aviles-Rogel discussed the price for crystal methamphetamine. This conversation was recorded and was in Spanish and subsequently translated into English. The approximate translation is below. This conversation was recorded with CHS#2's consent:

| CHS#2: | How much for a white one? |
|---|---|
| Aviles-Rogel: | (Questions who CHS is with) |
| CHS#2: | My dad. What about the price for crystal? Can you get Crystal methamphetamine? How much is a pound of that? |

| | | |
|---|---|---|
| **Aviles-Rogel:** | Crystal? | |
| **CHS#2:** | Confirms. What about the price of that. | |
| **Aviles-Rogel:** | 3,500 | |
| **CHS#2:** | That much, damn. That's really not that bad. How much is the cheapest that you can get it for me? | |
| **Aviles-Rogel:** | 3,500 | |
| **CHS#2:** | 35 | |
| **Aviles-Rogel:** | Crystal | |

*\*\*\*CHS#2 and Aviles-Rogel continued discussing the prices as well as unrelated matters.*

105. Based on my training and experience, I believe that during the in-person meeting, CHS#2 asked Aviles-Rogel about the prices for a pound of crystal methamphetamine. Aviles-Rogel replied, "Crystal?" CHS#2 affirmed. Aviles-Rogel replied, "$3,500." I believe that this conversation was a preliminary conversation between CHS#2 and Aviles-Rogel to negotiate a future methamphetamine deal. CHS#2 did not obtain any controlled substances from Aviles-Rogel during this initial meeting.

106. At approximately 6:11 PM, shortly after CHS#2 exited Aviles-Rogel's vehicle, Aviles-Rogel utilizing TARGET TELEPHONE 1 called Marco Medel's phone, TARGET TELEPHONE 2. The call was intercepted and recorded. In the background of the call was music consistent with Medel being at the bar and Medel's phone location data (TARGET TELEPHONE 2) was also consistent with it being at El Infierno Bar **(Target Location 1)**. During the call, Aviles-Rogel asks if Medel is in the bar. Medel affirms that he is in the bar. The below is an approximate translation of the content of the phone call from Aviles-Rogel (TARGET TELEPHONE 1) to Marco Medel (TARGET TELEPHONE 2). This session was approximately six seconds long.

**Aviles-Rogel:** Are you in the bar?

81

**Marco Medel:** Yes buddy.

107. TFO Veloz observed Aviles-Rogel enter El Infierno Bar at approximately 6:12 PM. During this time, TFO Ploch was monitoring Medel's pen register (TARGET TELEPHONE 2). At 6:16 PM, Medel's phone (TARGET TELEPHONE 2) was in contact with Mexico phone number, 52.677.107.3715.

108. From this and based on my training and experience in drug investigations, I believe that Aviles-Rogel called Medel (at TARGET TELEPHONE 2) directly after meeting with CHS#2 to advise him of the potential methamphetamine deal. After learning that Medel was at El Infierno Bar, Aviles-Rogel entered the bar to talk to him in person. I believe that Medel then spoke with his Mexico-based source using TARGET TELEPHONE 2 to advise him/her of the methamphetamine sale.

109. Beginning at 7:24 PM, case agents intercepted the following electronic message exchange between Roberto Aviles-Rogel (TARGET TELEPHONE 1) and CHS#2. These messages were in English:

| | |
|---|---|
| **Aviles-Rogel:** | ??? |
| **Aviles-Rogel:** | I got the glass ready |
| **CHS#2:** | Tomorrow evening I should have enough to cover the labor cost and the cost of the picture window have a good night |
| **Aviles-Rogel:** | Souns good |

110. I know that "glass" is a street term for methamphetamine. I believe this electronic message exchange represents Aviles-Rogel confirming with CHS#2 that he has arranged for, and is available to complete, the methamphetamine sale. Aviles-Rogel did not leave the bar between the time he entered and the time he messaged CHS#2 that the "glass" (methamphetamine) was

82

ready. Based on this, I believe that Medel facilitated this transaction with Aviles-Rogel while inside El Infierno Bar.

111. On February 9, 2024, I met with CHS#2 for the purposes of conducting a controlled buy of crystal methamphetamine from Aviles-Rogel. Based on case agents' knowledge of the investigation, we believed that Aviles-Rogel would contact Medel to source the methamphetamine. I met with CHS#2 prior to the buy. CHS#2 was searched for money and/ or contraband finding none. CHS#2 placed a call to Aviles-Rogel at TARGET TELEPHONE 1. The following is a summary of that call, which was translated by an FBI linguist and intercepted via the TIII on TARGET TELEPHONE 1.

### 10:49 AM (Session 1020-Voice Call)

**CHS#2:** I want to put the glass in the house and get the wooden board out. What time can we meet at Home Depot.

**AVILES-ROGEL**: At 1pm

**CHS#2:** (Affirms.)

### 10:51 AM (Session 1021-Voice Call)

**CHS#2**: Can you do the window right now, 1pm is too late, he is working 2nd shift. Can it be done earlier.

**AVILES-ROGEL**: 12pm?

**CHS#2**: (Affirms.)

112. I believe that these conversations represent Aviles-Rogel agreeing to sell CHS#2 the crystal methamphetamine previously discussed on February 6, 2024.

113. Immediately after the two calls between CHS#2 and TARGET TELEPHONE 1, Aviles-Rogel, utilizing TARGET TELEPHONE 1, called Medel at TARGET TELEPHONE 2. This call was intercepted via the TIII on TARGET TELEPHONE 1. This call occurred at 10:52 AM (session 1022). Medel did not answer the phone. Aviles-Rogel, utilizing TARGET

83

TELEPHONE 1, then sent a series of electronic messages to Medel at TARGET TELEPHONE 2. Below are the electronic messages sent to Medel at TARGET TELEPHONE 2 (which were intercepted via the TIII on TARGET TELEPHONE 1). These messages were in Spanish and translated to English by an FBI translator.

| | |
|---|---|
| **AVILES-ROGEL**: | Fucker |
| **AVILES-ROGEL**: | My buddy wants me to bring the window at 12. |
| **AVILES-ROGEL**: | Talk to me faggot |

114. Following these messages, Aviles-Rogel (TARGET TELEPHONE 1) attempted to call Medel (at TARGET TELEPHONE 2). This call was intercepted via the TIII on TARGET TELEPHONE 1 and occurred at 10:54 AM. I believe that Aviles-Rogel was attempting to pick up methamphetamine from Medel. Based on pen register/trap and trace and ping data for Medel's phone (TARGET TELEPHONE 2) case agents believe Medel was sleeping as he was not answering phone calls.

115. After the numerous attempts to reach Medel at TARGET TELEPHONE 2, Aviles-Rogel (TARGET TELEPHONE 1) contacted (414)688-7554. The user of (414)688-7554 is herein referred to as Juan Carlos Espinoza, aka "Pedrito," aka "Gordo,". That call was intercepted via the TIII on TARGET TELEPHONE 1 and translated from Spanish. The following is an approximate summary of that call.

### 10:58 AM (Session 1030-Voice Call)

**Aviles-Rogel:** (Greets Pedrito)

**UM7554:** I am down listening to music, I got out to run some errands and now I am back.

**Aviles-Rogel:** I am calling fucking Periquillo [note: this is likely a nickname, meaning coke head, that case agents believe is in reference to Medel] but he is not answering. Periquillo was going to give me a pound of window but he is not answering as he got drunk last night. I told him about it last night.

**UM7554:** I have some if you want.

84

**Aviles-Rogel:** What is the price.

**UM7554:** What price was Pariquillo going to give you?

**Aviles-Rogel:** 2.5

**UM7554:** That is fine.

**Aviles-Rogel:** I am coming down because I need to meet the guy at 12

**UM7554:** (Agrees to the price.)

116. I know that this conversation represents Espinoza agreeing to source Aviles-Rogel with methamphetamine because Medel was not answering his phone. This conversation confirms that Aviles-Rogel previously discussed this methamphetamine transaction with Medel. I know that TFO Ploch checked pen register data obtained from TARGET TELEPHONE 1 and TARGET TELEPHONE 2 and noted they both are in frequent contact with 414-688-7554 (Espinoza), the methamphetamine supplier in this controlled buy.

117. Following the series of calls and messages documented above, physical surveillance observed Aviles-Rogel leave 18650 W. Lawnsdale Road, New Berlin, Wisconsin. He was followed directly to the area 2218 S. 21st Street **(Target Location 4)** without making any stops. He arrived on S. 21st Street at approximately 12:10 PM. At 12:20 PM, Aviles-Rogel left that residence and drove directly to the pre-determined meet location where he met with CHS#2. He did not stop or meet with anyone along the way. At 12:30 PM, CHS#2 entered Aviles-Rogel's truck momentarily. At 12:33 PM, CHS#2 exited Aviles-Rogel's vehicle and left the parking lot. Aviles-Rogel was followed directly back to 2218 S. 21st Street **(Target Location 4)**.

118. I again met with CHS#2 who turned over a plastic bag containing a crystal substance suspected to be methamphetamine. CHS#2 was searched for money and/ or contraband finding none. CHS#2 indicated that CHS#2 exchanged the pre-recorded buy money with Aviles-Rogel for the crystal methamphetamine. This buy was recorded with audio and observed by Officer Torres

85

and me. I can identify Aviles-Rogel as the person who met with CHS#2 inside the vehicle. Aviles-Rogel was the driver and sole occupant and was the only person who CHS#2 interacted with prior to returning to me with the methamphetamine.

119. I transported the methamphetamine to the FBI office where Special Agent Shamsi weighed and field tested it. The methamphetamine was tested with TruNarc and tested positive for the probable presence of methamphetamine. The methamphetamine was found to weigh 464.4 grams.

120. At approximately 2:07 PM, case agents intercepted via the TIII on TARGET TELEPHONE 1 a call followed by a series of messages between Aviles-Rogel (TARGET TELEPHONE 1) and Medel (TARGET TELEPHONE 2). The messages were translated by an FBI translator and are indicative of further discussion between the two about the aforementioned methamphetamine deal.

**2:07 PM (Session 1078-Voice Call)**

| | |
|---|---|
| **Marco Medel:** | I was watching a movie with my little daughter. |
| **Aviles-Rogel:** | I texted you earlier because the guy was calling and calling me. He wanted to get the pound. |
| **Marco Medel:** | I did not see anything |
| **Aviles-Rogel:** | I sent you a message. |
| **Marco Medel:** | Where are you. |
| **Aviles-Rogel:** | I went to get breakfast. |
| **Marco Medel:** | I am not going out until 4pm. |
| **Aviles-Rogel:** | I will see you later. |

**2:07 PM-2:10 PM (Session 1079, 1081, 1084-Electronic Messages)**

| | |
|---|---|
| **Marco Medel:** | He no longer wants it? |

| **Aviles Rogel:** | Gordo gave it to me. |
|---|---|
| **Marco Medel:** | Ok, that's fine. |

121. I know that the aforementioned voice and electronic message exchange between Medel (TARGET TELEPHONE 2) and Aviles-Rogel (TARGET TELEPHONE 1) represent the two further discussing the pound of methamphetamine deal. Directly after these messages, TFO Ploch viewed Medel's pen register/trap and trace (TARGET TELEPHONE 2) data. As with the meeting described on February 6, 2024, after this series of messages with Aviles-Rogel, Medel's next phone activity (using TARGET TELEPHONE 2) was electronic messages to/from the Mexico-based phone number 52.677.107.3715. I believe that Aviles-Rogel used TARGET TELEPHONE 1 to contact Medel at TARGET TELEPHONE 2 to discuss this transaction, and that Medel used TARGET TELEPHONE 2 to contact his Mexican source of supply and update him/ her of the sale. At the time, I believed that the methamphetamine previously in "Gordo's" (Espinoza) possession was also owned by Medel, and Medel approved of Aviles-Rogel picking it from "Gordo" (Espinoza) when he responds, "Okay, that's fine." In March 2024, through subsequent interceptions over TARGET TELEPHONE 2, I learned that it is likely that "Gordo" (Espinoza) has additional suppliers in addition to Medel.

**Observations Made on February 14, 2024**
**(Botello, Sr. and Sabo)**

122. On February 14, 2024, while reviewing pole camera activity at 2101 S. 6th Street (Club 6 Street), and monitoring the Pen Register for Cain Botello, Sr., TFO Klarkowski observed Botello, Sr.'s phone (TARGET TELEPHONE 6) in contact with a known phone (later identified as belonging to a known individual, hereafter SUBJECT 1.). TFO Klarkowski noted at least two calls and two electronic messages between the two between 10:15 PM and 10:38 PM. Additionally, Botello, Sr.'s phone called Victoriano Botello's phone (Target Telephone 3) one time at 10:19

87

PM. TFO Klarkowski then observed Botello, Sr. exit the front door of the bar and walk westbound on W. Becher Street at approximately 10:40 PM. He observed Botello, Sr. entering the front passenger seat of a vehicle. A check through D.O.T. revealed it to be registered to SUBJECT 1 at a known address for SUBJECT 1. At approximately 10:46 PM, TFO Klarkowski observed Botello, Sr. exiting the front passenger seat of SUBJECT 1's vehicle and the vehicle was observed leaving the area eastbound on W. Becher Street. TFO Klarkowski observed Botello, Sr. placing something into the front passenger seat of Botello, Sr.'s vehicle and re-entering the Club 6 bar. PO Torres is familiar with SUBJECT 1 and knows him to operate several businesses in Milwaukee.

123. While reviewing pen register data, TFO Klarkowski observed that Cain Botello, Sr.'s phone (TARGET TELEPHONE 6) had been in contact with SUBJECT 1's phone number approximately 489 times since December 12, 2023, and Victoriano Botello's phone number (TARGET TELEPHONE 3) approximately 84 times since December 14, 2023. Further, TFO Klarkowski knows that shortly after receiving a call from the number listing to SUBJECT 1 on February 14, 2024, Botello, Sr. was observed meeting with an occupant inside of a vehicle registered to SUBJECT 1. Case agents suspect that SUBJECT 1 was in the vehicle since he is the registered owner, but they could not see the occupant(s).

124. In my training and experience in conducting narcotics investigations, the contact between Botello, Sr.'s and SUBJECT 1's phones, followed by the observations of the short-term contact, and the speedy concealment of an unknown item into his Jeep as detailed above are consistent with a suspected drug transaction. Specifically, I believe that SUBJECT 1 supplied Cain Botello, Sr. with an amount of drugs.

**Observations Made on February 18, 2024**
**(Botello, Sr. and Victoriano)**
**El Infierno(Target Location 1)**

125. On Sunday, February 18, 2024, TFO Klarkowski was monitoring pole camera activity at the address of 2000 W. Mitchell Street (El Infierno Bar) **(Target Location 1)**. He observed Botello, Sr. walking out the front door of the bar and walking to his vehicle (2011 Jeep Grand Cherokee, Wisconsin Plate ASF-1393). Botello, Sr. was followed by an unknown male (unknown male #1) wearing a gray sweatshirt with a white t-shirt underneath, black jeans, and a black baseball cap. TFO Klarkowski observed Victoriano Botello walk out of the bar towards Victoriano Botello's vehicle. TFO Klarkowski observed Victoriano Botello standing on the corner continually looking around as if he was conducting counter-surveillance and security for Botello, Sr. Due to my training and experience, I know narcotics traffickers often utilize people they know and trust to conduct counter-surveillance and security for their safety during drug transactions to protect against robbery and/or police operations. TFO Klarkowski observed a second unknown male (unknown male #2) wearing a dark jacket, red hooded sweatshirt underneath, and black baseball cap carrying a light-colored backpack walk from the north on S. 20th Street towards the driver side of Botello, Sr.'s Jeep. TFO Klarkowski observed Unknown male #2 hand unknown male #1 the light-colored backpack. TFO Klarkowski observed the front driver door of the Jeep was open, and Botello, Sr. reach into his vehicle and retrieved a large bag filled with a white substance. Case agents believe this to be cocaine and estimate the size of the substance to be approximately the size of a cantaloupe. TFO Klarkowski observed Botello, Sr. place the bag containing the white substance inside the light-colored backpack in the possession of unknown male #1. Unknown male #1 then left the area with the backpack containing the suspected cocaine. Surveillance observed Botello, Sr. and Victoriano Botello return back inside El Infierno Bar (**Target Location 1**) after unknown male #1 left the area with the suspected cocaine.

126. Due to my training and experience in conducting narcotics investigations and my observations of the short-term contact detailed above involving the distribution of a white substance, I believe that these actions are consistent with a suspected drug transaction. More specifically, I believe Cain Botello, Sr. served narcotics to the Unknown Male and Victoriano Botello was acting as a lookout.

### Investigation After Title III Authorization for TARGET TELEPHONE 2

127. On Tuesday, February 20, 2024, case agents obtained a Title III order (24-AP-2) authorizing the interception of calls and electronic messages to and from Marco Medel's phone (TARGET TELEPHONE 2). The order was served to T-Mobile on the same date and interception began that afternoon. Interceptions continued on TARGET TELEPHONE 1 as well. Along with monitoring incepted calls and electronic messages to and from TARGET TELEPHONE 2, case agents continued employing other investigative methods including physical and pole camera surveillance on the TARGET SUBJECTS of this investigation. The surveillance continued to provide useful information on the TARGET SUBJECTS. For example, case agents intercepted communications between Medel (TARGET TELEPHONE 2) and Jayme Congleton confirming Congleton's involvement in the DTO. Aviles-Rogel (TARGET TELEPHONE 1) was not in contact with Congleton's phone and therefore his involvement was not previously positively confirmed.

### Narcotics Talk Involving Medel (TARGET TELEPHONE 2) and Congleton

128. On February 21, 2024, case agents intercepted a series of electronic message between Medel (TARGET TELEPHONE 2) and Jayme Congleton (414)319-9973 which I believe represents Congleton's involvement in drug trafficking. As noted, Congleton frequents El Infierno,

is involved in the "tanda" group chat and is frequently observed on pole camera conducting hand to hand transactions outside of El Infierno **(Target Location 1)**.

| | |
|---|---|
| **Medel:** | Where you at fool? |
| **Congleton:** | Hell [reference to El Infierno] |
| **Medel:** | Fuck need a ride |
| **Medel:** | pick me up hoe |
| **Congleton:** | I can't bro |
| **Medel:** | Why not? |
| **Congleton:** | people on the way n have a lot on me. |

129. I believe this conversation represents that Medel wants Congleton to pick him up and take him to Infierno. Congleton denies the request because he is waiting on people to pick up narcotics from him and has "a lot" of narcotics on him.

**Interception Involving Aviles-Rogel and Medel**

*February 21, 2024*

130. On February 21, 2024, case agents intercepted a series of electronic messages between Marco Medel (TARGET TELEPHONE 2) and Roberto Aviles-Rogel (TARGET TELEPHONE 1). The messages began at approximately 4:20 PM and continued until about 5:19 PM. The messages were a mixture of English and Spanish and were translated by FBI translators:

| | |
|---|---|
| **Medel:** | Where are you? |
| **Aviles-Rogel:** | I came to eat |
| **Medel:** | Where dude I need a ride |
| **Aviles-Rogel:** | 60 y Mitchell |
| **Aviles-Rogel:** | Palmas |

91

| | |
|---|---|
| **Medel:** | Alright! You taking to long faggot |
| **Aviles-Rogel:** | I just arrived |
| **Medel:** | My house |
| **Aviles-Rogel:** | Where are you going? |
| **Medel:** | I need to go to The Infierno |
| **Aviles-Rogel:** | You said you weren't going out dude. |
| **Medel:** | I need to take the Tanda |
| **Aviles-Rogel:** | Hahahaha you're so in a hurry. |
| **Aviles-Rogel:** | I'll stop by right now. |

131. The FBI translator explained that, based on their linguistic expertise, their knowledge of the drug trade, and their understanding of the conversation referenced above, "Tanda" means a pool of money/ a group pulling money together.[6] I believe, based on the context of this conversation and my knowledge of this investigation, that Medel is requesting a ride to El Infierno from Aviles-Rogel in order to bring money to the pool of money used to purchase controlled substances. I believed that multiple DTO members would be meeting at El Infierno to contribute to the pool. Case agents suspected a meeting would occur shortly to discuss a re-up for cocaine. As this case progressed case agents intercepted numerous communications sent via a "group chat" in reference to paying the "tanda." "Tanda" is a rotating savings and/ or credit association formed by a group of people that know one another for the purpose of helping each other save money for a larger goal. The members of the group get together regularly to contribute an agreed-upon amount of money to a pool. Based on case agents knowledge of this investigation we believe that the "tanda" is the members pooling money in order to facilitate their narcotics trafficking

---

[6] This understanding is seemingly consonant with the public usage of the term:
https://en.wikipedia.org/wiki/Tanda_(informal_loan_club)

92

operation. The individuals identified in the group chat discussing the tanda are Victoriano Botello (TARGET TELEPHONE 3), Medel (TARGET TELEPHONE 2), Jayme Congleton aka "Jamo", and Jordan Nerby aka "Playboy". Case agents have also individually intercepted communications between Aviles-Rogel and Medel discussing the "tanda" payments.

132. Shortly after the above intercepted electronic messages, physical surveillance observed Aviles-Rogel arrive at Medel's residence located at 2630 S. 7th St, Milwaukee, Wisconsin **(Target Location 5)**. Surveillance observed that Medel entered Aviles-Rogel's vehicle, and they travelled to El Infierno **(Target Location 1)**. During the time that Medel and Aviles-Rogel were at El Infierno, surveillance also identified Juan Carlos Espinoza, Cain Botello, Sr., Jayme Congleton, and Victoriano Botello all present at the bar.

133. On February 21, 2024, case agents intercepted a voice call between Aviles-Rogel (TARGET TELEPHONE 1) and a phone with subscriber Euglides Dalberto [(414) 501-9012]. The call occurred in Spanish and below is an approximate translation of that conversation. This call occurred at approximately 6:47 PM:

| | |
|---|---|
| **Dalberto:** | How are you doing through the nose. |
| **Aviles-Rogel:** | No. Do you [Dalberto] want something? |
| **Dalberto:** | You owe me 50 dollars. |
| **Aviles-Rogel:** | I do not owe you money. |
| **Dalberto:** | I paid someone else who would settle with you. |
| **Aviles-Rogel:** | Tells Dalberto he paid that guy but that time Dalberto bought from those guys he gave him three. Aviles-Rogel gave him two "50's" and one for him [Dalberto]. |
| **Dalberto:** | He kept them all the next day for the hangover. |

*****Aviles-Rogel and Dalberto continue to discuss if there is a debt owed or if they are settled.*

| | |
|---|---|
| **Aviles-Rogel:** | The truth is I don't have anything and was going to ask "Carlos." |

93

**Dalberto:** Says he owes Carlos 50

**Aviles-Rogel:** This weekend I will be getting something big.

134. I believe this conversation represents Aviles-Rogel and Dalberto discussing a prior drug transaction between the two followed by Dalberto attempting to purchase more narcotics from Aviles-Rogel. Aviles-Rogel is telling Dalberto that he does not have any narcotics currently, but that he will be resupplying that upcoming weekend. This intercepted call (which caused case agents to believe Aviles-Rogel was out of narcotics) coupled with the prior call regarding the pooling of money, led case agents to believe that the DTO members were within El Infierno discussing the resupply of more narcotics for the DTO.

135. At about 7:51 PM, while Aviles-Rogel, Medel, Congleton, Espinoza, Cain Botello, Sr., and Victoriano Botello were all at El Infierno Bar, Cain Botello, Sr.'s phone (TARGET TELEPHONE 6) received a phone call from SUBJECT 1. Cain Botello, Sr. was then seen on surveillance abruptly leaving El Infierno **(Target Location 1)**. Shortly thereafter, Victoriano Botello's phone (TARGET TELEPHONE 3) was also in contact with SUBJECT 1. TFO Klarkowski located Cain Botello, Sr.'s vehicle parked in front of a business in the 1100 block of W. Historic Mitchell Street. This business is known to be operated by SUBJECT 1. It should be noted that the business was closed while Cain Botello, Sr. and SUBJECT 1 were inside meeting. TFO Klarkowski observed both Cain Botello, Sr. and SUBJECT 1 exit the business at 8:42 PM and enter separate vehicles. TFO Klarkowski attempted following both vehicles that were driving in tandem. TFO Klarkowski ultimately lost sight on both vehicles. At 8:56 PM Cain Botello, Sr. is observed on pole camera arriving back at El Infierno Bar **(Target Location 1)**. At 9:47 PM, Victoriano Botello is seen on pole camera exiting El Infierno and leaves westbound on W. Historic Mitchell Street. At 10:09 PM, pole camera footage shows Cain Botello, Sr. exit El Infierno, and he is observed shortly thereafter arriving back at his residence 921 W. Walker Street, Milwaukee,

94

WI **(Target Location 2)**. Pole camera footage at this location showed Botello, Sr. carrying a paper bag into his house **(Target Location 2)**. At 10:56 PM, Congleton is observed on pole camera exiting El Infierno Bar and leaving in his vehicle. At 11:02 PM, Aviles-Rogel and Medel are observed on pole camera exiting El Infierno Bar and leaving together.

136. Case agents believed based on the intercepted communications and the presence of multiple DTO members at El Infierno Bar (Target Telephone 1), that the group either purchased narcotics or put money towards the purchase of more narcotics. Both Botello, Sr. and Victoriano Botello were in contact with SUBJECT 1 during this series of events, leading case agents to believe that SUBJECT 1 is a potential source of supply for this DTO and involved in this deal.

**February 22, 2024: Controlled Buy #9**
**Involving 2218 S. 21st Street (Target Location 4) (Roberto Aviles-Rogel, Marco Medel, Victoriano Botello, and Juan Espinoza)**

137. On February 22, 2024, I met with CHS#2 for the purposes of conducting a controlled evidence purchase of cocaine from Aviles-Rogel. Case agents were attempting to confirm if the meeting at El Infierno Bar on February 21, 2024, was, in fact, for the DTO to resupply with additional narcotics. Prior to the February 21, 2024, meeting at El Infierno, Aviles-Rogel told "Dalberto" that he was out (i.e. did not have drugs) and case agents wanted to determine if Aviles-Rogel had regained access to narcotics after the aforementioned meeting. Case agents suspected that ordering cocaine from Aviles-Rogel would cause a series of phone calls between DTO members as happened during the December 4, 2023, controlled buy for cocaine.

138. I met with CHS#2 and searched CHS#2 for money and/or contraband finding none. I instructed CHS#2 to call Aviles-Rogel (TARGET TELEPHONE 1) and order an amount of cocaine. The call was intercepted on the TIII for TARGET TELEPHONE 1 and occurred at approximately 12:19 PM. The following is an approximate translation of that conversation:

**Aviles-Rogel:** What happened.

95

**CHS#2:** Yeah, can you help me out? I have 65 but I need the battery for the car. Do you understand?
**Aviles-Rogel:** What?
**CHS#2:** You told me that you can get cheap batteries from Autozone with that lady that works there. I have 65. Can you help me?
**Aviles-Rogel:** Yeah
**CHS#2:** Ok. When I need this car.
**Aviles-Rogel:** I don't know I can just see you later.
**CHS#2:** Well call me. I know other people, I can talk to them. I know another guy that can get me a battery, do you understand me? But no one is answering right now. I need the car to drive. It's got to be quick, I need to find my lady at work.
**Aviles-**Rogel: What time do you want me to see you.
**CHS#2:** Right now.
**Aviles-Rogel:** Maybe in an hour.

139.  I know from a conversation with CHS#2 that "batteries" are code utilized to discuss cocaine. I believe this conversation reflects CHS#2 having an initial conversation with Aviles-Rogel to explore the purchase of cocaine.

140.  Physical surveillance was established on Aviles-Rogel. At about 1:11 PM, case agents intercepted an electronic message sent from TARGET TELEPHONE 1 to CHS#2. The message read, "5 minute be there." I met with CHS#2 and searched CHS#2 for money and contraband finding none and provided CHS#2 with pre-recorded buy money. I followed CHS#2 to the pre-determined meet location. CHS#2 did not make any stops prior to meeting with Aviles-Rogel. Physical surveillance followed Aviles-Rogel who arrived at the pre-determined meet location shortly before CHS#2. Upon CHS#2's arrival, case agents observed that CHS#2 entered Aviles-Rogel's vehicle. Below is a summary of the recorded in-person conversation between CHS#2, Aviles-Rogel, and an Unknown Male [UM] who was observed by surveillance inside the vehicle with Aviles-Rogel prior to the meeting with CHS#2.  This initial interaction reflects the CHS ordering an amount of narcotics for a pre-recorded amount of money.   This conversation was in Spanish and translated by PO Torres who is a Spanish speaking officer.

**CHS to Aviles-Rogel:** Open up the hood.  Should we get inside the car, what you think?  Should I sit in the back?

**\*\*\*Sounds like CHS#2 gets into the car\*\*\***

**Aviles-Rogel to CHS:** How much?

**CHS to Aviles-Rogel:** 65

**CHS to UM:** Are you Puerto Rican?

**UM to CHS:** Ya

**CHS to UM:** It's the way you talk. You know one of my Cobra brothers, a younger boy? Are you a Cobra? I don't know about you young guys…you're not a Cobra right.

**UM to CHS:** No, but the Rodriguez, Jon Jon.

**CHS to UM:** I am going way back, I was Mediina's leader. I thought I seen you at…

**UM to CHS:** I don't go out like that.

**Aviles-Rogel to CHS:** It's cause I never told you what it is you wanted me to bring.

**CHS to Aviles-Rogel:** Nah man, I can't let you take the money, you need to give me the money and go get the shit. I can't let you take off like that. You know that man...the dope game is a vicious business. I can't just let you take the money man.

**Aviles-Rogel to CHS:** What do you want me to bring you?

**CHS to Aviles-Rogel:** Ah ya, I am not going to work with Pelon. I was talking with Pelon last night...[unintelligible] with that motherfucker. [unintelligible] spot. He a bum you know. You should give me a rebate, a perk, I be spending money bro, 6500 you can't bring be 9 ounces back?

**Aviles-Rogel to CHS:** You want ounces?

**CHS to Aviles-Rogel:** I need that cocaine bro.

**Aviles-Rogel to CHS:** I will bring it right now.

**CHS to Aviles-Rogel:** Let me get the money, I can't let you take the money. So where are we going to meet at, El Rey or something?

**UM to Aviles-Rogel:** Where are we going to meet each other?

97

**CHS to Aviles-Rogel and UM:** Give me the key to the car because I don't trust nobody.  I gotta make a little bit as a mechanic.  [Unintelligible from UM] you know what I mean man [unintelligible].  We have to blend in.

**UM to CHS:** I just got out.  I am not trying to go back in.

**CHS to UM:** I was there for 10 years.

**CHS to UM:** This dude don't know the dope game.

**UM to CHS:**  You probably know my family, Danny he is a barber.

**CHS to UM:** Ok Ok.

**Aviles-Rogel to CHS:** Give me 10 minutes.

**CHS to Aviles-Rogel:** At Home Depot or El Rey cause it's closer.

**UM to CHS:** See you later, nice meeting you.

**Aviles-Rogel to CHS:** 65?

**CHS to Aviles-Rogel:** At least 8, 9, let them know what's up.

**\*\*\* Car Started\*\*\***

141. I know this conversation represents the CHS ordering cocaine from Aviles-Rogel.  There was no exchange of money or narcotics during this interaction, but the CHS#2 did show the pre-recorded buy money to Aviles-Rogel.  I conducted a search of CHS#2 after this meeting and did not locate any other money, contraband, or weapons.  CHS#2 was still in possession of the pre-recorded buy money.  I instructed CHS#2 to drive to the El Rey parking lot located at 916 S. Cesar E. Chavez Drive and wait for Aviles-Rogel to deliver the cocaine.  PO Torres and I followed CHS#2 from the initial meeting location to the parking lot of El Rey.  PO Torres and I did not lose sight of CHS#2 the entire time.  CHS#2 did not make any stops on the way to El Rey.

142.  After this meeting, case agents followed Aviles-Rogel directly back to his residence located at 2218 S. 21st Street, Milwaukee **(Target Location 4)**. At 1:35 PM, after leaving the

98

meeting with CHS#2, case agents intercepted an attempted phone call from Aviles-Rogel (TARGET TELEPHONE 1) to Medel (TARGET TELEPHONE 2). The call was not answered by Medel. At 1:39 PM, case agents intercepted a call from Aviles-Rogel (TARGET TELEPHONE 1) to the unknown user of number (414)949-2866. The call was answered by a generic message stating, "Cannot accept calls at this time." I believe this message is consistent with a phone being disconnected. Due to my training and experience I know that drug dealers frequently change their phone numbers.

143. At 1:40 PM, Aviles-Rogel, using TARGET TELEPHONE 1, called Medel at TARGET TELEPHONE 2. The call was intercepted on the TIII for TARGET TELEPHONE 1. The call was translated by FBI linguists, below is an approximate translation of that call:

**Medel:** Where are you bro?
**Aviles-Rogel:** Call Victor bro, he is not answering.
**Medel:** Victor, Victor? Cain's brother?
**Aviles-Rogel:** Yes
**Medel:** What do you want me to say?
**Aviles-Rogel:** How much will he give me a corner for?
**Medel:** Alright are you going to leave me something?
**Aviles-Rogel:** We'll see, depends on how much he gives it to me for.
**Medel:** Okay. Let me call him.

144. I believe this conversation represents Aviles-Rogel employing Medel to call Victoriano Botello and obtain prices for cocaine. I know that a corner is in reference to the corner of a kilogram. I know that Victoriano Botello is Cain Botello, Sr.'s brother.

145. At approximately 1:42 PM, case agents intercepted a call from Medel (TARGET TELEPHONE 2) to Victoriano Botello (TARGET TELEPHONE 3). This call occurred in English. It was intercepted on the TIII on TARGET TELEPHONE 2 which confirmed that this phone contact occurred between TARGET TELEPHONE 2 and TARGET TELEPHONE 3. The following is what was recorded on this call:

**Medel**: "What's up?"

99

*\*\*\*The call abruptly ends, as if it dropped\*\*\**

146.  I believe this call represents Medel reaching out to Victoriano Botello (on TARGET TELEPHONE 3) in order to discuss obtaining the cocaine Aviles-Rogel and Medel just discussed.

147.  At approximately 1:42 PM, moments after the dropped call, case agents intercepted an incoming call from (414)406-8785 (TARGET TELEPHONE 4) to Medel (TARGET TELEPHONE 2). This call contained both English and Spanish and was translated by an FBI linguist. This call was intercepted on the TIII on TARGET TELEPHONE 2. Due to the nature of the call, and close proximity to the prior call between Victoriano Botello (on TARGET TELEPHONE 3) and Medel, case agents determined this call was from Victoriano Botello using a different phone number. Below is an approximate translation of that call.

**Medel:** The corner bro, how much is it? The same right?
**Vic Botello:** With the 9?
**Medel:** Yeah
**Vic Botello:** Yeah
**Medel:** Negro says he is calling you but you are not answering.
**Vic Botello:** He does not have my new number.
**Medel:** Oh, let me tell him then to see if he wants it. I'll let you know right now.
**Vic Botello:** Alright.

148.  I believe this call between Victoriano Botello and Medel confirmed the pricing of the cocaine which Aviles-Rogel was asking about.  I believe this call represents Aviles-Rogel, Marco Medel, and Victoriano Botello working together in the Botello DTO. I also believe that this represents Medel contacting Victoriano Botello at TARGET TELEPHONE 3 and then Victoriano Botello calling Medel back from Victoriano Botello's second line.

149.  At approximately 1:42 PM, case agents intercepted a call from Medel (TARGET TELEPHONE 2) to Aviles-Rogel (TARGET TELEPHONE 1). This call occurred in Spanish and was intercepted on the TIII on TARGET TELEPHONE 2. This call was translated by FBI linguists, below is an approximate translation of the conversation.

**Aviles-Rogel:** What up faggot?

100

**Medel:** They have it the same bro, 55.
**Aviles-Rogel:** 55?
**Medel:** Yes.
**Aviles-Rogel:** Okay
**Medel:** Should they get it ready or what?
**Aviles-**Rogel: Wait, wait, wait. Let me call this guy to see how much I'm going to make. I don't want to dive in like an idiot.
**Medel:** All right then.
**Aviles-Rogel:** I'll just call you back. Let me talk to this guy real quick.

150.  I believe this call shows Medel confirming the price of the cocaine with Aviles-Rogel after speaking with Victoriano Botello.  I believe this call demonstrates how Victoriano Botello and Medel work together to set a price for the narcotics, get the order put together, and supply the order.

151.  At approximately 1:45 PM case agents intercepted a call between Aviles-Rogel (TARGET TELEPHONE 1) and Juan Carlos Espinoza (aka "Pedrito" aka "Gordo" who previously supplied Aviles-Rogel with crystal methamphetamine) at 262-224-4619, which is TARGET TELEPHONE 5. This call was intercepted on the TIII on TARGET TELEPHONE 1 and was translated by an FBI linguist. The following is an approximate translation of that conversation.

**Espinoza:** What's up Roberto?
**Aviles-Rogel:** What's up Pedrito. Your other phone is turned off?
**Espinoza:** No the volume was low.
**Aviles-Rogel:** How much are you going to give me a corner for?
**Espinoza:** 56, what do you think?
**Aviles-Rogel:** Leave it to me for 55 so that I can get something off of it.
**Espinoza:** That's fine Roberto.
**Aviles-Rogel:** Put it together, I am going upstairs.

152.  Based upon my training and experience, along with my knowledge of this case, I believe this conversation represents Aviles-Rogel asking Espinoza how much money Espinoza will charge Aviles-Rogel for a literal corner of a kilogram brick of cocaine.  Espinoza asks Aviles-Rogel what he thinks about "56" and Aviles-Rogel negotiates with Espinoza to leave it for him for "55" so he can get something off of it.  Based upon my training and experience, along with my knowledge of this case, I believe that "56" is referring to $5,600.00 and "55" is referring to

101

$5,500.00 dollars. I also believe that Aviles-Rogel is attempting to negotiate the price down to $5,500.00 dollars so he can make a little more profit from the ultimate sale to the CHS. Case agents believe Espinoza agreed to sell Aviles-Rogel the cocaine for $5,500.00 dollars and conducted the narcotics transaction inside to 2218 S. 21st St. **(Target Location 4)** based upon the physical surveillance conducted during this narcotics transaction. I believe that Espinoza used TARGET TELEPHONE 5 to negotiate this drug transaction with Aviles-Rogel.

153. Physical surveillance observed Aviles-Rogel in front of 2218 S. 21st Street (Target Location 4) talking on his cellular phone. Physical surveillance observed Aviles-Rogel stop talking on his cellular phone and immediately enter 2218 S. 21st Street (Target Location 4). This is the residence where case agents know both Aviles-Rogel and Juan Carlos Espinoza live. Physical surveillance observed Aviles-Rogel exit 2218 S. 21st Street **(Target Location 4)** moments later and begin to leave the area in the same vehicle he arrived in. Aviles-Rogel was alone when he left the residence. Physical surveillance followed Aviles-Rogel from 2218 S. 21st Street **(Target Location 4)** to a predetermined meet location (El Rey 916 S. Cesar E. Chavez Drive) where CHS#2 was waiting to obtain the cocaine. Aviles-Rogel did not make any stops on his way to El Rey.

154. I believe the interception between TARGET TELEPHONE 1 and Espinoza shows that Espinoza supplied the cocaine to Aviles-Rogel. This, in turn, means that Aviles-Rogel did not need to obtain cocaine from Medel and Victoriano Botello despite his negotiation to do so.

155. At approximately 1:45 PM, case agents intercepted a call from Victoriano Botello's secondary phone (414)406-8785 (TARGET TELEPHONE 4) to Aviles-Rogel (TARGET TELEPHONE 1). This call was intercepted on the TIII on TARGET TELEPHONE 1 and was translated by an FBI linguist. Below is an approximate translation of that conversation:

**Aviles-Rogel:** Hello?
**Victoriano Botello:** What's up Negro?

**Aviles-Rogel:** What's up?

**Victoriano Botello:** Nothing, Periquillo said you were looking for me. I change my number every month bro. I just changed it yesterday.

**Aviles-Rogel:** Oh, okay. What's happening is I just came with this guy, he wants me to leave it all but he doesn't have it all. I'm not going to compromise myself with money mother fucker.

**Victoriano Botello:** Yeah, I understand you.

**Aviles-Rogel:** What's happening is I can give you what you have but what's happening is he wants the whole corner.

**Victoriano Botello:** I understand. 4?

**Aviles-Rogel:** He wants me to give him the whole thing but I told him no, no, no. I am not going to do it that way. I know him but, no, no. I won't compromise myself like that. If he does not give it to me then I am going to have to pay.

**Victoriano Botello:** Yeah that's true. If not you get fucked.

**Aviles-Rogel:** He told me in a little bit. In about an hour he is going to call me to see if he is going to bring the rest, then I will let you know.

**Victoriano Botello:** Okay that's fine.

156. I believe this interception between Victoriano Botello and Aviles-Rogel confirms they are working together and have an agreement regarding how they conduct narcotics purchases with each other. I believe this interception shows Victoriano Botello is cognizant of the illegal activity he and the Botello DTO are involved in because Victoriano Botello informed Aviles-Rogel that he changed his phone number every month. I believe this interception demonstrates that Aviles-Rogel is informing Victoriano Botello (via TARGET TELEPHONE 4) that CHS#2 wants more narcotics than CHS#2 has money to purchase at that time but will soon contact Aviles-Rogel to see if CHS#2 will bring all of the money. Aviles-Rogel is informing Victoriano Botello that he does not want to be responsible for taking narcotics from Victoriano Botello without being sure that CHS#2 will have the money to pay for all of the narcotics at a later date. As detailed above, I believe that a "whole corner" represents the corner of a kilogram brick of cocaine and that "4" represents $4,000. Due to my training and experience, I know narcotics traffickers commonly change their phone number and have multiple phones in order to hide their illegal activity from law enforcement. Aviles-Rogel attempting to call Victoriano Botello directly, but then having to contact Victoriano Botello through Medel, shows they are all working together in the Botello DTO.

103

157. After the narcotics exchange, I met with CHS#2 and CHS#2 indicated that CHS#2 gave the pre-recorded buy money to Aviles-Rogel in exchange for cocaine. CHS#2 turned over the cocaine to case agents. CHS#2 was kept under constant surveillance from the time that CHS#2 met with Aviles-Rogel until CHS#2 met with case agents and CHS#2 did not interact with anyone other than Aviles-Rogel. I again searched CHS#2 and CHS#2 vehicle for money and contraband finding none. CHS#2 handed PO Torres two clear plastic bags, each containing a white, hard brick-like chunk that I suspected was cocaine. PO Torres and I drove the suspected cocaine back to the FBI building for testing and to place the cocaine on evidence. TFO Larrel Lirette tested the suspected cocaine using the TruNark testing device. The suspected cocaine tested positive for Cocaine HCI with an approximate weight of 196.7 grams (with original packaging).

158. At about 3:13 PM case agents intercepted a call from Medel (TARGET TELEPHONE 2) to Victoriano Botello (TARGET TELEPHONE 3). The call was intercepted on the TIII on TARGET TELEPHONE 2 and was summarized by an FBI linguist. The following is an approximate translation of that call.

> **Victoriano Botello:** Yo.
> **Medel:** So what, it did not happen?
> **Victoriano Botello:** I called him and he never called me back. He said he was going to give me a call. So I guess not.
> **Medel:** Damn, somebody is lying. He told me different right now.
> **Victoriano Botello:** Yeah, I'll call you watch [unintelligible]

159. I believe this interception confirms Victoriano Botello (using TARGET TELEPHONE 3) was waiting for Aviles-Rogel to call him back to complete the sale of the cocaine which was discussed earlier. I believe this conversation involves Victoriano Botello being proactive in calling Medel to find out what happened with the cocaine purchase Aviles-Rogel was previously trying to arrange with Victoriano Botello. I believe Medel believes that Aviles-Rogel got the cocaine sourced from a different person (not Victoriano Botello) due to Medel confirming

with Victoriano Botello that Aviles-Rogel told him something different than Aviles-Rogel told Victoriano Botello. I believe that this interception shows that Victoriano Botello and Medel work together to advance the Botello DTO.

160. At approximately 3:12 PM case agents intercepted a call between Marco Medel (TARGET TELEPHONE 2) and Aviles-Rogel (TARGET TELEPHONE 1). This call occurred in Spanish and was translated by an FBI linguist. Below is an approximate translation of that call.

**Aviles-Rogel:** What's up bitch?
**Medel:** So what happened?
**Aviles-Rogel:** What happened was Victor called me back but what happened was this guy only had 4 bucks but he wanted me to do him a solid with the whole corner. I told him, no man I'm not going to do that because I don't want to look bad with the money. Instead I'll just give you the 4 bucks worth.
**Medel:** So that's what you are going to give him?
**Aviles-Rogel:** Yeah. He wanted me to do him a solid but I told him it is not possible. I told him it's because I just started getting from this guy.
**Medel:** Well I just got fucked. I'm not even going to get 100 out of this mother fucker.
**Aviles-Rogel:** No, he'll call me right now bro. He's going to go and get some more money.
**Medel:** You're going to spot our entire drinking session. We're going to go to Reyna's.
**Aviles-Rogel:** Okay.
**Medel:** I'll see you later.
**Aviles-Rogel:** Okay.

161. I believe this conversation represents Aviles-Rogel and Medel discussing that CHS#2 wanted to get more cocaine than CHS#2 had money to buy. I also believe that Aviles-Rogel told Medel he does not get cocaine in advance from Victoriano Botello due to the fact Aviles-Rogel just started getting cocaine from Victoriano Botello. I believe Medel calling Aviles-Rogel and discussing what occurred after Victoriano Botello called Aviles-Rogel shows Medel, Victoriano Botello and Aviles-Rogel are all in contact with each other in furtherance of Botello DTO objectives. I believe it also shows that Aviles-Rogel does not want to jeopardize the narcotics trafficking relationship between Aviles-Rogel and Victoriano Botello by purchasing cocaine on consignment and not being able to pay for the cocaine.

162.  At approximately 3:14 PM, case agents intercepted a call between Medel (TARGET TELEPHONE 2) and Victoriano Botello's new phone (414)406-8785 (TARGET TELEPHONE 4). This call was intercepted on the TIII on TARGET TELEPHONE 2. The call was summarized by an FBI translator, below is an approximate summary of that conversation.

> **Victoriano Botello:** He is talking that he only had 4 bucks but he did not want to do it. So he had that money. I was like yeah whatever.
> **Medel:** I called him up right now and he just told me the same shit, that he was only going to give me the 4 bucks. Well he is buying my drinks all night.  [Unintelligible]. Bitch ass nigga.
> **Victoriano Botello:** Who?
> **Medel:** Negro.
> **Victoriano Botello:** Oh yeah? So he must have gone through Gordo then.
> **Medel:** No, he said he is going to call you.
> **Victoriano Botello:** Well he has not called me yet.
> **Medel:** He said he was waiting on that dude, whatever paper, he is trying to figure something out.
> **Victoriano Botello:** Yeah well if he gets the majority of it, yeah if he trusts dude, because he said he didn't want them problems if dude doesn't pay him. I'm like yeah shit, yeah that's true because I am not trying to lose money on that shit.
> **Medel:** No that's 1,600 short.
> **Victoriano Botello:** Yup, yup.
> **Medel:** Yeah I just talked to him right now. He said yeah he was going to do it but he told him he was only going to give him the 4g's worth.
> **Victoriano Botello:** So I don't know how he is going to work that out. Maybe he will take the whole thing. Then he will pay the rest.
> **Medel:** I don't know. I'm just getting home. I am going to shower and eat something. I'll be back around 5 or whatever.
> **Victoriano Botello:** Alright.

163.  I believe this conversation represents Medel and Victoriano Botello continuing to discuss the already completed cocaine transaction. Furthermore, I believe this conversation shows that Victoriano Botello also knows Gordo (Juan Carlos Espinoza) to be a narcotics trafficker. I believe this conversation represents that Victoriano Botello thinks Aviles-Rogel was sourced the cocaine that Aviles-Rogel previously contacted Victoriano Botello about from Juan Carlos Espinoza instead.  I believe this conversation confirms that Aviles-Rogel did not want to get any of the cocaine from Victoriano Botello on consignment due to fear of not obtaining the full amount

106

of money for the narcotics from CHS#2; however, I believe Victoriano Botello was willing to provide the narcotics on partial consignment.

164. I believe this shows that Victoriano Botello is using two numbers (TARGET TELEPHONE 3 and TARGET TELEPHONE 4) to facilitate drug deals on behalf of this DTO. Based on my training and experience, I know that it is common for drug dealers to utilize more than one phone and frequently change their phone numbers. I believe that Victoriano Botello is using TARGET TELEPHONE 3 to communicate with trusted DTO members such as Cain Botello, Sr., Cain Botello, Jr. (who has not been intercepted on either TARGET TELEPHONE 1 or TARGET TELEPHONE 2), and Marco Medel. I believe Victoriano Botello's new number, (414)406-8785, (TARGET TELEPHONE 4) is a "burner" phone that will be changed frequently (per his own admission) but is also used to conduct drug transactions on behalf of the DTO.[7]

165. In the above example, case agents believe that Aviles-Rogel tried calling Victoriano Botello's prior "burner" phone ((414)949-2866) after meeting with CHS#2 at Home Depot during Controlled Buy #9, but it appeared to be disconnected. Aviles-Rogel then called Medel and mentioned that he tried to contact Victor. It was later learned from Victoriano Botello that he had just gotten a new phone number. Case agents reviewed pen register/trap and trace data for the prior thirty days on Cain Botello, Sr.'s phone and did not locate any communications between Botello, Sr. and Victoriano Botello's former "burner" phone ((414)949-2866). This supports my belief that Victoriano Botello swaps out his "burner" phones regularly.

**Additional Drug Dealing Evidence Involving Congleton**

---

[7] Based on my training and experience, I know that the term "burner" phone, as used in this affidavit, refers to an inexpensive cell phone for temporary use, after which it is discarded. Oftentimes, a "burner" phone lists to a fictious name or "prepaid customer" instead of the user's true name. I know that drug traffickers use "burner" phones to distance themselves from their drug business and that they frequently rotate "burner" phone numbers in order to thwart law enforcement interceptions and investigations.

166. On February 22, 2024 at about 7:04 PM case agents intercepted a call between Medel (TARGET TELEPHONE 2) and Congleton (414)319-9973. Although the conversation between Medel and Congleton is not explicitly narcotics related, Congleton can be heard in the back ground consummating a drug transaction. Below is the approximate dialog of that background conversation.

> **Congleton:** Did you want to do it like that?
> **UM(background):** Yup
> **Congleton:** Yeah, so that's 110 and then.
> **UM(background):** Ok
> **Congleton:** Alright bro, be smooth bro.

167. It should be noted that at the time of this call, Congleton is observed on pole camera,. on the phone, exiting El Infierno (**Target Location 1**). He walks out of view momentarily however re-enters the bar approximately 30 seconds later. Based on the background conversation and pole camera observations, case agents believe that Congleton sold "110" worth of narcotics to the Unknown Male (UM) that can be heard in the background. This example with the background noise is unique however case agents have observed over 20 examples of Congleton conducting hand to hand transactions outside of El Infierno.

### Identification of the User of Mexico-Based Phone Number
### (Castro Estrada)

168. On February 28, 2024, via the interception of Medel (TARGET TELEPHONE 2), case agents intercepted a phone call between Medel and the user of the Mexico-based phone number 52.677.107.3715 ("Tomas Castro Estrada"). This call was in Spanish and was translated:

> **Estrada**: Hey… What's going on?
> **Medel**: Hello? What are you doing?
> **Estrada**: Nothing, I'm here at work son.
> **Medel**: Oh, what was I going to tell you? It's because there's a friend that was interested, but you know how the packets come in two (2)? A little over two (2), but if I can give it to him for two (2) because that's how they come in excess.
> **Estrada**: How are the two (2)?
> **Medel**: Well, yea he's only going to pay for the two (2), but you know how they come with an extra hundred (100) "points".
> **Estrada**: (unintelligible) … But is he going to buy them in total?

108

**Medel**: Yes bro.

**Estrada**: How many is he going to get or what?

**Medel**: huh?

**Estrada**: How many is he going to get?

**Medel**: Two (2) bro, he's only going to take one (1) package.

**Estrada**: So it would be four thousand (4,000) balls? -balls is a reference to $ US currency

**Medel**: Plus, the other two (2) from the other friend., so it would be six (6) for the end of the weekend.

**Estrada**: Ok, watch, give me a minute let me annotate this… so it's one thousand (1000) … It's four hundred and forty-eight (448) a pound right bro? - 448 in reference to grams to making a pound

**Medel**: Yes, bro it's a hundred (100) in excess, one hundred (100) only bro.

**Estrada**: Well, its half a pound, what is half a pound bro? Like one thousand (1000) balls bro.

**Medel**: No, it's only half, but it's going to be only a hundred (100) over so it'll be about five hundred (500).

**Estrada**: Yea that's true, give it to them fuck it (unintelligible) so you can give them work. Give work to the others.

**Medel**: Yes bro, well what I want is for that shit to get out because it just sitting there waiting, and if he takes this, this same guy may even take the rest of them.

**Estrada**: Yea that's fine, fucking give it to them. (unintelligible), tell them that we are losing and shit, (unintelligible) yesterday I told the owner, "Look." Matter of fact, they're not going to do that shit anymore (unintelligible) in Mexico because whoever does that shit I'm going to kill them, fuck it… That and the blue pills, I don't know what else bro but that's what has fucked the market and we eat that shit always bro. that shit starts from here bro, and the other shit… the other shit, I said "If you would have signed off on my other work, we would have been out of (unintelligible).

**Medel**: Well this is going to happen later, but I don't know if you want to wait until Sunday to pick up everything.

**Estrada**: Yes do that bro, do that and let me know when you have done it bro, then on Sunday we'll pick up the other, it's about six (6) balls.

**Medel**: Ok bro, hey there's eight (8), eight and a half (8.5) so you can take count.

**Estrada**: Yes I have everything written down son, everything written down. Goodbye

**Medel**: Ok, Goodbye.

169.   Case agents believe this conversation on February 28, 2024 represents Medel and the Mexico-based broker negotiating how much narcotics the Mexico-based broker needs to send Medel. I know that "points" is street term used in this context to represent grams of narcotics. I know that they discuss pound quantities of narcotics (for example, the Mexico-based broker's inquires about if it is "448 a pound," which in context as noted above, I believe is an inquiry about

whether there are 448 grams in a pound). In my experience, I know that methamphetamine is typically sold in pound quantities whereas cocaine is sold in kilogram quantities. I also believe that the Mexican broker and Medel are discussing narcotics as the Broker mentions the "blue pills," which I know is a reference to fentanyl pills. In the Milwaukee area, in my experience, fentanyl pills typically mimic 30 milligram oxycodone pills and are blue in color. In this call, the Mexico-based broker is upset about the "blue pills" [fentanyl pills] from Mexico in the market and says if they "signed off on his other work" which I believe means methamphetamine. Based on this conversation, and the totality of the investigation to date, case agents believed this call ultimately ended with Medel and the Mexico-based broker agreeing to a deal for 8.5 pounds of methamphetamine, with some aspect of that transaction set to occur on Sunday, March 3, 2024.

170. On February 29, 2024, case agents intercepted a rich communication services message (RCS) sent from Mexico-based phone number 52.677.107.3715 to Medel (TARGET TELEPHONE 2). The message contained a voice memo that was in Spanish. The message was downloaded from message viewer, transcribed by an FBI linguist, and preserved as pertinent. The following is an approximate translation of that message.

> **Message Viewer Session 646 (2/29/24 12:44 PM):** Hey dude, this man was telling me that if you can tell the woman if she can do a favor with another "peso" [in context, this can mean weight or $]. if she can do a favor just like last time, give her a $100 and she can do a favor by sending $900, then the rest will be the same as (unintelligible) they'll do the same over there to pick up the other (unintelligible) let me know bro, please.

171. Based on this communication, I believed that the user of Mexico-based number 52.677.107.3715 (Tomas Castro Estrada) was requesting Medel to have someone send money to the Mexico broker. Based on my training and experience, I know that there are many financial services that allow money to be sent both nationally and internationally. Case agents suspect, based on the country code and area code affiliated with the Mexico broker, that he is currently in Mexico. I believe this money was, at the least, partly for payment of for the methamphetamine order

discussed between Medel (TARGET TELEPHONE 2) and the Mexico-based narcotics broker on February 28, 2024.

172. A short time after the RCS message between Medel and the Mexico-based broker, case agents intercepted a voice call from Medel to 414-850-1805. Medel spoke to a female identified as Belkis Torres during this session. This call occurred at approximately 12:47 PM. The call occurred in Spanish and was translated and summarized by an FBI linguist. Below is part of that conversation.

> **Torres:** You fucking drunken faggot, what do you want?
> **Medel:** What the fuck are you doing right now?
> **Torres:** Guess what I'm doing with my left hand and what I'm doing with my right hand.
> **Medel:** I don't know, you tell me.
> **Torres:** I have the phone with my left hand and scratching my head with my right hand. What's going on?
> **Medel:** I was wondering if you could send some in a little while.
> **Torres:** You were with that fucking faggot drunk. He left from here and went to his house. How much?
> **Medel:** The same as last time.
> **Torres:** How much!
> **Medel:** 9.
> **Torres:** I'm going to send it right now. Where are you?
> **Medel:** I came to visit Manny here at the restaurant.

173. Based on the context of this conversation and the RCS message prior to this conversation, I believe that Medel is employing Belkis Torres to send money to the Mexico-based broker for the previously discussed narcotics (discussed between Medel and the Mexico-based broker (Tomas Castro Estrada on February 24, 2024) on Medel's behalf.

174. On February 29, 2024, case agents intercepted a call from Belkis Torres to Medel. This call occurred at approximately 3:49 PM. The call occurred in Spanish and was translated by an FBI linguist. Below is an approximate translation of that conversation.

> **Medel:** Hey
> **Torres:** What's the name it should be under.
> **Medel:** Ah, Tomas Castro Estrada.
> **Torres:** What part of Managua, Nicaragua?

**Medel:** Durango.
**Torres:** Canatlan right?
**Medel:** Canatlan, yes.
**Torres:** Ahh, I didn't remember, Castro Estrada.

175. Based on the context of this call, the aforementioned call with Belkis Torres, and the RCS messages from Mexico, I believe that Belkis Torres is asking Medel who and where to send the money. I believe that Medel instructed her to send the money to Tomas Castro Estrada in the City of Canatlan, State of Durango, Country of Mexico. Therefore, I believe that the Mexico-based broker supplying Medel and this DTO with controlled substances (suspected to be methamphetamine) is Tomas Castro Estrada. I believe that Medel used TARGET TELEPHONE 2 to arrange with Belkis Torres to send a payment to Tomas Castro Estrada in Mexico related to a drug order.

176. On March 3, 2024, case agents conducted surveillance at El Infierno Bar (**Target Location 1**) and observed Medel interact with the occupants of a black Chevrolet Silverado 13586WS (Illinois Plate). Medel made a motion as if he was exchanging some unknown item with the vehicle's occupant and then he returned inside the bar. The vehicle was then followed to Joliet, Illinois, where surveillance was ultimately terminated. Case agents suspect that this was a money drop wherein Medel provided payment for the methamphetamine which would then be received at a later date. Before and after his interaction with this vehicle, Medel (via TARGET TELEPHONE 2) was in phone contact with the suspected Mexican supplier. Specifically, Medel received a series of "Rich Communication Messages" (RCS), a form of electronic messages, from Mexico-based number 52.677.107.3715. The messages were voice memos sent to TARGET TELEPHONE 2 and were in Spanish. The messages were translated by an FBI linguist:

> **Message Viewer Session 946 (3/3/24 9:51 AM):** What's up bro, how are you? I'm just now waking up.
> **Message Viewer Session 947 (3/3/24 9:51 AM):** Let me know when you get up to see what is up with your guy (unintelligible). They can swing by for the "piquillo" (can mean

money or drugs) that they gave you and for the other amount your guy was going to give you.

**Message Viewer Session  954 (3/3/24 9:53 AM):** Yea bro, I know its early bro. I'm waking up as well (unintelligible) I'm sending you a message so you can see it, I've sent you a message earlier, but I know its early now , later bro.

**Message Viewer Session  958 (3/3/24 10:10 AM):** No bro, when you wake up and call me when come to an agreement.

**Message Viewer Session  984 (3/3/24 10:53 AM):** Yea bro, I'm calling you but its going straight to voicemail, sends me to voicemail. What was I going to tell you? Lets give them the 4 bro, we'll give them those 4, I just need you to call me so I can tell you how the situation will be. They're out in front of the bar, the guys are by where you enter bro.

177. I believe this series of messages represents the Mexico-based narcotics broker requesting that Medel contact him so that they can arrange for shipment of additional money for the narcotics discussed on February 28, 2024.  More specifically, I believe the Mexico-based broker is requesting $4,000, which he will further discuss with Medel after Medel receives these messages. Finally, I believe the messages show that the Mexico-based narcotics broker intends to have this money picked up by a courier rather than wired as he tells Medel, "They're out front of the bar."

178.  Also on March 3, 2024, case agents intercepted voice calls between Tomas Castro Estrada at number 52.677.107.3715 and Medel. Based on the context of the calls, it was apparent that Medel was continuing to negotiate this narcotics-related transaction with the Tomas Castro Estrada. The conversations intercepted below occurred in Spanish via TARGET TELEPHONE 2. The following are approximate translations:

**Session 1629- Voice call- March 3, 2024:**

*TARGET TELEPHONE 2 and 52.677.107.3715*

**Tomas:** Hey.
**Medel:** What's up bro?
**Tomas:** What's up bro? Did you get up already?
**Medel:** Just now.
**Tomas:** Are you sick or hungover?
**Medel:** A little bit
**Tomas:** That's fine you're getting better compared to how you were last year.
**Medel:** Yeah that was different.

113

**Tomas:** I'm almost at three months bro.
**Medel:** That's awesome!
**Tomas:** Not one beer, no cocaine, nothing bro. Work only!
**Medel:** Work only?
**Tomas:** Yes
**Medel:** Yeah that's good bro.
**Tomas:** We need to change it up, to work well and be all drunk, it's a mother fucker.
**Medel:** My friend has not sent me a message bro but I have the other that I already had. Until [cut off]
**Tomas:** Do you believe he is going to answer you or not? It is early bro.
**Medel:** Yeah but the thing is I already used it.
**Tomas:** What?
**Medel:** The other "Milpa". [Milpa is a reference to either "half" or "thousand"]
**Tomas:** But how much do you have with you now?
**Medel:** The 4.
**Tomas:** Okay.
**Medel:** Maybe 4 and half if he answers me. The thing is that I used something to get half an onion so that I could work it.
**Tomas:** From the other guy?
**Medel:** Uh huh.
**Tomas:** Let me I believe the guys are out there in Milwaukee right now that is why I called you earlier. They were doing something in the area. Let me tell them.
**Medel:** Well let me know so that I can take it.
**Tomas:** I'm going to call him, hang up, I'm going to call you back.
**Medel:** Ok

179. I believe this conversation represents Medel and the Mexico-based narcotics broker, Tomas Castro Estrada discussing the money pick up previously mentioned in the messages. I believe Medel has $4,000 to give the Mexico-based broker, but was anticipating having more money. More specifically, Medel expected money from someone else, but that person has not answered him. Medel also bought a "half an onion" which is a street reference for half of an ounce, with some of the money he intended to give the Tomas Castro Estrada. I believe that Tomas Castro Estrada then confirms the courier(s) are in Milwaukee and ready to meet with Medel to pick up the money on behalf of Castro Estrada.

**Session 1662- Voice Call- March 3, 2024, 11:25:42**:

*TARGET TELEPHONE 2 and 52.677.107.3715*

[Music can be heard in the background]

**Medel:** Hey [unintelligible]

**Tomas:** What up son? Do you want them to enter the bar or not? Go give it to them, approach the truck and give it to them.

**Medel:** All right then. It's a black Silverado right?

**Tomas:** Yes. Keep talking so that I can hear what's going on.

**Medel:** All right, I'm on the way. [In the background] "I'll be right back"

[Loud music in the background]

**Tomas:** Hello? Hello? I can hear you.

**Medel:** Oh wait, I'm coming out now. I'm on the way outside. [Unintelligible] Georgie.

[Marco is heard in the background talking with a third party]

[Horn heard honking in the background]

**Medel:** They are here. [Unintelligible]

[Another male in the background says, "On behalf of Tommy"]

**Medel:** Yes. They are there the four.

**Tomas:** Yes it's done. Thank you bro!

180. I believe this conversation represents the Mexico-based narcotics broker (believed to be Castro Estrada) instructing Medel to go and pay the courier(s). The Mexico-based narcotics broker (believed to be Castro Estrada) indicates that the couriers are there and outside. At the end of the conversation, Medel can be heard saying "They are there, the four" which I believe represents Medel giving the courier the $4,000 he agreed to give to Castro Estrada for narcotics.

181. Case agents conducting physical surveillance observed Medel exit El Infierno Bar and lean into the front passenger window of a black Chevrolet Silverado with Illinois license plate "13586WS." TFO Martinez observed a motion as if Medel was handing something to the occupants of the vehicle but could not see what was exchanged. Medel then re-entered El Infierno Bar after meeting briefly with the occupants of the Silverado. Case agents followed the Silverado to Joliet, Illinois. Based on the physical surveillance in conjunction with the intercepted communications between TARGET TELEPHONE 2 and the Mexico-based phone number, I believe that Medel paid the occupants of the black Chevrolet Silverado for a narcotics shipment previously discussed. More specifically, I believe Medel gave the occupants of the Silverado $4,000 because that is what Medel told Castro Estrada he had to give during the call. I further

believe that the occupants of the truck are working on behalf of Tomas Castro Estrada, the Mexico-based narcotics trafficker.

**Additional Use of TARGET TELEPHONE 3 and TARGET TELEPHONE 4**

182.  In addition to the events described above during Controlled Buy #9, case agents also intercepted additional calls between TARGET TELEPHONE 2, TARGET TELEPHONE 3, and TARGET TELEPHONE 4 showing that Victoriano Botello is using both TARGET TELEPHONE 3 and TARGET TELEPHONE 4 interchangeably.

183. For example, on March 3, 2024, case agents intercepted the following communications via the interception on TARGET TELEPHONE 2. Prior to this conversation, case agents intercepted communications between TARGET TELEPHONE 2 and the user of the Mexico-based phone number 52.677.107.3715, Tomas Castro Estrada in which Medel arranged the apparent money drop at El Infierno as detailed above.

**Identification of Cain Botello, Sr.'s First Burner Phone Number**
**(224)595-8469**

184.  On February 28, 2024, case agents intercepted communications between TARGET TELEPHONE 2 and phone number (224)595-8469. This number was previously unknown to case agents but was identified as belonging to Cain Botello, Sr. Below is the series of messages and calls involving (414)585-8496 that circumstantially show it is a phone used by Botello, Sr. These are approximate translations:

**Incoming call from (224)595-8496 to Medel-TARGET TELEPHONE 2**
(February 28, 2024, at 2:57 PM)

**Medel:** Hello.

**Botello, Sr.:** What are you doing periquilo?

**Medel:** Nothing bro. where are you?

**Botello, Sr.:** Where are you?

116

**Medel:** Picking up the kids from school.

**Botello, Sr.:** Look, I wanted to talk with you. I am picking up the grandkids right now. One gets out at three the other at about 3:30 so I have about 20 minutes. Where are you going to be?

**Medel:** I have to pick up mine at 3 and the other at 3:15.

**Botello, Sr.:** Well we are basically on the same fucking schedule. Look, I'll call you at about 3:40 after I pick up my second grandson.

**Medel:** Okay.

**Botello, Sr.:** Alright then.

185. I believe this conversation represents Cain Botello, Sr. wanting to speak with Medel about something in person. I further believe that they were agreeing to meet up later because both were busy at the moment.

### Electronic Message from TARGET TELEPHONE 2 to (414)499-6999
### (February 28, 2024 at 3:15 PM)

**Medel:** Am dropping them of make some food for Atziri! But am getting pick up by cain to go see a small job.

186. I believe this conversation represents Medel acknowledging that he is going to meet with Cain Botello, Sr. to discuss a small job. Over several months of surveillance, case agents have not observed Medel and/or Cain Botello, Sr. working a legitimate job. Case agents believe they are working together in narcotics trafficking. Therefore, case agents believe their future discussion will be about drug trafficking.

### Voice call from (224)595-8496 to TARGET TELEPHONE 2
### (February 28, 2024, at 3:44 PM)

**Medel:** Hey.

**Botello, Sr.:** Come outside. You are on Harrison right?

117

**Medel:** Yeah but give me a minute. You got me taking a shit.

**Botello, Sr.:** Quit fucking around and meet me outside. I have to take one of them to get a haircut.

**Medel:** Okay. I am coming.

***Physical surveillance was following Cain Botello, Sr. at this point and observed him driving in the alley way across the street from Medel's residence.***

187. Case agents believe this conversation represents Cain Botello, Sr. finally being ready to meet with Medel and that Botello, Sr. is either at or near Medel's residence.

**Outgoing call from TARGET TELEPHONE 2 to (224)595-8469**
**(February 28, 2024, at 3:47 PM)**

**Medel:** Where you are at?

**Botello, Sr.:** I'm lost. I be dropping you off at fucking night. Are you between 6th and 7th?

**Medel:** Yeah. I be towards the dead end.

**Botello, Sr.:** Oh fuck, I'm going through 8th through 7th, 8, 9, 7, 8, okay I'm almost there.

***Physical surveillance was still following Cain Botello, Sr. and observed him meeting with Medel in the alley behind Medel's residence located at 2630 S. 7th Street **(Target Location 5)**, Milwaukee, Wisconsin, at approximately 3:46 PM***

188. Case agents believe that Botello, Sr. was lost and asking Medel for more specific directions to Medel's residence. Medel provided directions to assist Botello, Sr. in finding Medel.

189. FBI linguists compared the voice on intercepted calls involving Cain Botello, Sr.'s known number (414)366-6544 (TARGET TELEPHONE 6) and the voice utilizing (224)595-8469 and believe them to be the same voice. Based on the voice comparison, content of the communications and physical surveillance, case agents know that both (414)366-6544 (TARGET TELEPHONE 6) and (224)595-8469 are being utilized by Botello, Sr. Case agents also know that after this meeting, Medel began negotiating a drug transaction with his Tomas Castro Estrada via TARGET TELEPHONE 2. For these reasons case agents believe that these calls between Medel

118

and Botello, Sr. were to discuss this transaction in person and that at least a portion of the narcotics ordered from the Mexican broker were intended for the Botello's.

190. As previously mentioned, case agents know that (414)366-6544 (TARGET TELEPHONE 6) is being utilized by Botello, Sr., in part, by voice comparison of intercepted calls involving TARGET TELEPHONE 6 and (224)595-8469. For example, on February 9, 2024, at approximately 3:36 PM, case agents intercepted a call between Aviles-Rogel (via the interception of TARGET TELEPHONE 1) and Botello, Sr. (at TARGET TELEPHONE 6). The call occurred in Spanish and was translated by Officer Justin Torres. The following is an approximate translation of that conversation.

**Botello, Sr.:** Hello, Hello.

**Aviles-Rogel:** Let me know

**Botello, Sr.:** Are we going to the house soon?

**Aviles-Rogel:** I'll get there in about… son of a bitch…. Like 40 minutes.

**Botello, Sr.:** That's fine. Call me when you're down here.

**Aviles-Rogel:** Okay that's fine.

**Botello, Sr.:** Give me like 10 minutes. Uh, Call 10 minutes before.

**Aviles-Rogel:** Okay.

**Botello, Sr.:** Bet.

191. Case agents believe based on our knowledge of this investigation, Aviles-Rogel's involvement in narcotics trafficking, and Botello, Sr.'s suspected involvement in narcotics trafficking that this conversation represents Aviles-Rogel and Botello, Sr. agreeing to meet up for a narcotics transaction. Case agents believe that since both Aviles-Rogel and Botello, Sr. frequent El Infierno, the specific details of the narcotics transaction was likely discussed previously in person.

192. I also know, based on toll analysis for (224)595-8469, that Botello, Sr. is communicating with the user of (414) 399-9990. I know that TFO Ploch is involved in a separate FBI investigation involving Andrew A. Sabo and knows Sabo to use phone number (414)399-9990. More specifically, TFO Ploch, utilizing CHS#4, has conducted prior controlled narcotics purchases of crystal methamphetamine and cocaine from Andrew Sabo. Andrew Sabo was also intercepted numerous times using phone number (414)399-9990 on a prior FBI Title III investigation that occurred between March 28, 2022, and May 11, 2022. Based off the prior intercepted communications, TFO Ploch knows that Sabo has been using phone number (414)399-9990 since at least 2022 and that he was using that phone number to facilitate narcotics transactions during the interception period (March 2022 to May 2022).

193. TFO Ploch also knows that on February 28, 2024, at about 3:56 PM, shortly after speaking with Cain Botello, Sr. in the alley behind 2630 S 7th Street **(Target Location 5)**, Medel (via TARGET TELEPHONE 2) contacted Juan Carlos Espinoza at TARGET TELEPHONE 5. The call occurred in Spanish and was translated by an FBI linguist. Below is an approximate translation of that conversation.

**Espinoza:** Hey

**Medel:** Are you going to go out today dude or not?

**Espinoza:** Yes, why dude?

**Medel:** About what time?

**Espinoza:** Around 5:00 dude.

**Medel:** Ok so you can take the half over there?

**Espinoza:** I'll take all of the half over there right now dude. Are you already over there?

**Medel:** No, I'm at home but I need a ride.

**Espinoza:** If you want I'll take it to your house dude.

**Medel:** In about how long dude?

**Espinoza:** In about 15 minutes. I'm about to go out to the store.

**Medel:** In 15 minutes?

**Espinoza:** Yeah dude.

**Medel:** Alright then.

**Espinoza:** All right.

194. I believe based on the timing and context of this call that Botello, Sr. had a narcotics-related conversation with Medel in person behind Medel's residence **(Target Location 5)**. I believe that Medel then called Espinoza (at TARGET TELEPHONE 5) to bring Medel the narcotics requested by Botello, Sr. According to phone tolls later obtained for (224)595-8469, Botello, Sr.'s burner phone, was in contact with Sabo's phone ((414)399-9990) before and after the meeting between Botello, Sr. and Medel. I suspected that Botello, Sr. would later supply Sabo with narcotics via Medel and Espinoza. Specifically, a "half" is a commonly used street term representing a quantity of narcotics. Based on my knowledge of this investigation, I believe "half" represents either a half kilo of cocaine or half pound of methamphetamine. I believe that this call represents Espinoza agreeing to take this quantity of controlled substances (referred to as "it" and "the half") to Medel's residence. I believe that Espinoza used TARGET TELEPHONE 5 to arrange the drug transaction with Medel. I specifically believe that this transaction involves methamphetamine since Medel and Espinoza appear to be methamphetamine sources of supply for the DTO, while Botello, Sr. appears to be the cocaine source of supply. Case agents know that Sabo is involved in the sale of both cocaine and methamphetamine. I believe that Sabo ordered an amount of methamphetamine and Botello, Sr. intended to obtain that methamphetamine from Medel.

195. Physical surveillance continued to monitor Medel's residence **(Target Location 5)** while Pole camera monitored Espinoza's residence **(Target Location 4)**. At 4:17 PM Espinoza exits 2218 S 21st St, Milwaukee (Target Location 4) and enters his silver Jeep. At 4:25 PM, Espinoza was observed driving his silver Jeep in the vicinity of Medel's residence **(Target Location 5)**. Surveillance then observed Medel enter Espinoza's Jeep. Medel was not carrying anything in his hands when he entered the Jeep. Medel and Espinoza were followed directly to El Infierno **(Target Location 1)**, arriving at 4:35 PM. Medel exited the Jeep, now carrying a bag, and entered El Infierno. At 5:53 PM, Botello, Sr. arrived at El Infierno **(Target Location 1)**, Medel was still inside the bar. At 6:04 PM, Botello, Sr. exited El Infierno **(Target Location 1)** via the side door. He was carrying a bag that is believed to be the same bag Medel carried into El Infierno. Specifically, TFO Klarkowski observed that the bag carried into El Infierno was off white or tan and that the bag carried out of El Infierno by Botello, Sr. was also off white or tan. TFO Ploch also reviewed pole camera footage of Medel carrying the bag into the bar and Botello, Sr. carrying the bag out of the bar and believes that it was the same bag. Botello, Sr. entered the passenger door of an occupied GMC Yukon bearing WI license plate AWJ-7565 with the bag at 6:04 PM. Botello, Sr. exited the GMC at 6:11 PM, no longer in possession of the bag and re-entered El Infierno **(Target Location 1)**. The GMC left the area.

196. A Wisconsin Department of Motor Vehicles inquiry of that plate revealed it listed to Motorcated Lyfe LLC with an address of 6056 W. Dodge Place, Milwaukee, Wisconsin. It should be noted that TFO Ploch knows that this is the address that Andrew Sabo has used in the past for vehicle registrations and is the address that Sabo has provided to law enforcement previously. Case agents know that Sabo does not live at that address, but that he actually resides at 5089 W. Colonial Court, Greenfield, Wisconsin **(Target Location 6)**. Furthermore, after the above-described observations on February 28, 2024, TFO Ploch contacted CHS#4 and asked what kind of vehicle

CHS#4 knows Andrew Sabo to be most recently operating. At that time, CHS#4 indicated that CHS#4 most recently observed Andrew Sabo to be driving a black GMC Yukon. Further, on March 6, 2024, case agents viewed the pole camera showing Botello, Sr.'s residence **(Target Location 2)** and observed Sabo arrive in a red RAM pick-up truck and enter Botello, Sr.'s residence confirming for case agents that Botello, Sr. and Sabo are associated. Case agents later checked the red RAM pick-up truck's license plate and learned that it is listed to Motorcated Lyfe LLC with an address of 6056 W. Dodge Place, Milwaukee, Wisconsin (the same LLC and address as the black GMC). Based on all of this, case agents believe that Sabo was the person in the GMC Yukon when Botello, Sr. entered on February 28, 2024.

197. On February 28, 2024, after this suspected drug deal involving Medel, Espinoza, Botello, Sr., and Sabo, TFO Martinez drove to Sabo's most recent known address, 5089 W. Colonial Court, Greenfield, Wisconsin **(Target Location 6)**. TFO Martinez observed the same black GMC Yukon bearing Wisconsin license plate AWJ-7565 parked at the residence, further confirming for case agents that Sabo was in possession of that vehicle and resides at 5089 W. Colonial Court, Greenfield **(Target Location 6)**.

198. I believe based on the totality of the intercepted communications, tolls, and observations on February 28, 2024, that Botello, Sr. requested either a half kilogram of cocaine or a half pound of methamphetamine from Medel while at Medel's residence **(Target Location 5)**. Medel, in turn, contacted Espinoza, who agreed to put the order together. Espinoza then left **(Target Location 4)** and picked up Medel at **(Target Location 5)** and drove him to El Infierno **(Target Location 1)**. During the ride, Espinoza gave Medel a bag containing the narcotics, which Medel then carried into El Infierno **(Target Location 1)**. While inside El Infierno **(Target Location 1)**, Medel provided the bag of narcotics to Botello, Sr. Botello, Sr. later exited El Infierno **(Target Location 1)** with that bag and gave the bag containing the narcotics to Sabo inside the

GMC Yukon that was parked outside of El Infierno. Sabo then transported the narcotics in his GMC Yukon to his residence at 5089 W. Colonial Court **(Target Location 6)**.

### Suspected drug transaction involving Victoriano Botello

199.  While conducting surveillance at a birthday party for Cain Botello, Sr. on Saturday, March 2, 2024, case agents observed Victoriano Botello conduct a suspected hand-to-hand drug transaction with the occupant of a silver Jeep Compass SUV (Wisconsin Plate AKF3820). TFO Klarkowski conducted a check through the Wisconsin Department of Transportation, which revealed the registered owner of the vehicle is T.L.C. at the address 8124 W. Lincoln Avenue, #2, West Allis, Wisconsin. TFO Klarkowski also observed that Carrizales was on parole for two counts of Manufacture/Deliver Cocaine (>5-15 grams) and one count of Possession with Intent to Deliver Cocaine (>15-40 grams). TFO Klarkowski later reviewed pen register data for Victoriano Botello's phones (TARGET TELEPHONE 3 and TARGET TELPHONE 4) and noted that prior to this apparent drug transaction with the occupant of Carrizales' vehicle, TARGET TELEPHONE 4 was in contact with (414)630-0549 via both voice calls and electronic messages.

200.  TFO Klarkowski conducted a query of a law enforcement database which revealed that (414) 630-0549 is registered to T.L.C.  Based on this information and the physical surveillance, TFO Klarkowski believes that Victoriano Botello utilized TARGET TELEPHONE 4 to consummate this drug transaction with T.L.C.

### Continued Communication Between Medel and Castro Estrada

201. I know based on intercepted communications that Medel is using TARGET TELEPHONE 2 to contact and facilitate drug transactions on behalf of the Botello DTO. Medel remains in direct communication with his Mexico-based narcotics broker, Tomas Castro Estrada.

### Session 2435-Incoming call to TARGET TELEPHONE 2 from 52.677.107.3715

### (**Tomas Castro Estrada)** *(March 9, 2024, at 1:15 PM)*

**Medel:** Hey.

**Tomas:** Where are you?

**Medel:** I'm at the bar man. What's up?

**Tomas:** Are you already messed up fucker?

**Medel:** Yeah, man. I'm getting drunk. [Background: Unknown Male: How are you doing? MEDEL: What's up?]

**Tomas:** No, what-what was I going to... Didn't your buddy give you anything?

**Medel:** Of what?

**Tomas:** Of money?

**Medel:** M-m-m no man, he still hasn't given me anything man. No kidding.

**Tomas:** He hasn't given you anything?

**Medel:** No. I haven't asked him for anything so how is he going to give me [anything]

**Tomas:** Oh. And don't you have anything?

**Medel:** Well only what you wanted dude, but well I'm telling that I'm getting drunk.

**Tomas:** Oh fucking little drunk dude. No well no problem. No well tomorrow hopefully-hopefully the other dude will give you something.

**Medel:** Uuuh, well... I'll call him later man. Well you know how the dude agreed that on Sundays, man.

**Tomas:** Yeah. Yes, no that's fine man. Go for it.

**Medel:** Alright.

202. I believe that this conversation represents Medel and Tomas Castro Estrada discussing additional money owed to Castro Estrada for narcotics. I further believe that Medel is waiting on payment from at least one additional member of the DTO. Tomas Castro Estrada specifically references "money" in this call as the object that the thing Medel was waiting for his

125

"buddy" to provide. I believe this is consistent with Medel expecting to receive money from Espinoza to provide to the Castro Estrada, but Espinoza failing to provide the money. I believe this call is also consistent with Medel telling the Castro Estrada that Medel will call Espinoza later.

203. I know that FBI Special Agent Christopher Colla served grand jury subpoenas to Western Union, a financial service used to send money both nationally and internationally. Included in the information request, Special Agent Christopher Colla requested records specific to Tomas Castro Estrada. Special Agent Christopher Colla received a return from Western Union that showed money was transferred to Tomas Castro Estrada DOB:12/21/1975. In reviewing the records, Special Agent Christopher Colla noted Western Union money transfers dating back to 2015, with the most recent Western Union transfer to Tomas Castro Estrada occurring on September 21, 2023. Special Agent Colla informed me that Tomas Castro Estrada was receiving money originating in San Antonio, Texas; North Richland Hill, Texas; Milwaukee, Wisconsin; New Berlin, Wisconsin; Arleta, California; Chicago, Illinois; Bolingbrook, Illinois; and Elgin, Illinois. Agent Colla informed me that the money from these locations was being sent to both Durango, Mexico, and Sonora, Mexico. I know through my training and experience that money transfers related to drug payments are typically sent in fairly low dollar amounts and from various people to avoid detection. These smaller transactions can represent down payments or broker fees and the bulk of the narcotics are later paid for in cash. In fact, this is consistent with what case agents believe occurred in this case. Medel had Belkis Torres send a smaller money transfer to Tomas Castro Estrada and then also appeared to do a money drop with the occupants of the black Chevrolet Silverado on March 3, 2024, in front of El Infierno **(Target Location 1)**.

204. Case agents conducted a Department of Transportation inquiry on Tomas Castro Estrada DOB: 12/21/1975 and learned that he previously held a State of Wisconsin ID card and had a prior address at 1028 Superior Avenue, Sheboygan, WI. There fore I believe that Tomas

126

Castro Estrada at one point lived in Wisconsin and therefore would have connections to Narcotics traffickers in Wisconsin. Based on the name given for money shipments (Tomas Castro Estrada), the birthday obtained via financial documents obtained pursuant to Grand Jury Subpoenas, and the connection to Wisconsin, I believe that case agents have sufficiently identified Tomas Castro Estrada DOB: 12/21/1975 as the narcotics trafficker working with Marco Medel.

**Additional DTO Member Joel Bustos—Money Courier**

205. On March 11, 2024, case agents intercepted a series of calls between Tomas Castro Estrada and Medel (via TARGET TELEPHONE 2). Additionally, and in conjunction with those calls, case agents intercepted calls between TARGET TELEPHONE 2 and the user of phone number (414)526-8591. These calls were in Spanish and translated by an FBI linguist. Based on the context of the calls, and case agents' knowledge of this investigation, case agents believe these conversations involve Tomas Castro Estrada trying to obtain additional money from Medel. Below are approximate translations of this series of conversations.

**Session 2829-Outgoing call to 52.677.107.3715 (Tomas Castro Estrada) from TARGET TELEPHONE 2 (March 11, 2024, at 2:41 PM)**

**Tomas:** Hello.

**Medel:** Hey dude send the –

**Tomas:** [talking over one another] Yeah

**Medel:** --Guys to come here and I'll give them 2,000 bucks, dude. This lady cannot send often dude. She has been sending often. She can only send 500.

**Tomas:** Let's see who I can send to pick them up.

**Medel:** Yeah dude, because I gave her the 1,000 already and she can only send fucking 500. No, send somebody dude and I'll give you the 2 bucks.

**Tomas:** Alright then.

**Medel:** Alright.

206. I believe this conversation represents Medel agreeing to give the Tomas Castro Estrada $2,000 via a courier. I further believe that Medel attempted to wire money Tomas Castro Estrada via a third party, but the female (Belkis Torres) was unable to send the $1,000 that Medel gave her ("This lady cannot send often dude;" "She can only send 500"). I believe Tomas Castro Estrada is agreeing to find someone to pick up the money from Medel in person ("Let's see who I can send to pick them up.").

**Session 2846-Incoming call from 52.677.107.3715 (Tomas Castro Estrada) to TARGET TELEPHONE 2 (March 11, 2024, at 3:13 PM)**

**Medel:** Yeah

**Tomas:** Hey dude.

**Medel:** What's up dude?

**Tomas:** Right now at 4 o'clock, Joel will pass by for them dude.

**Medel:** What?

**Tomas:** At 4 o'clock Joel will pass by for the paper.

**Medel:** Okay, I'll wait.

207. I believe this conversation represents Tomas Castro Estrada telling Medel that he located someone, "Joel", to pick up the money ("paper" which I know is a common term used for money) from Medel. I also believe this conversation involves Medel agreeing to meet with "Joel" and agreeing to wait for "Joel" to pick up the money.

**Session 2850-Incoming call from (414) 526-8591 (believed by case agents to be Joel Bustos) to TARGET TELEPHONE 2 (March 11, 2024 at 3:31 PM)**

**Medel:** What do you want dude?

**Joel:** Don't yell at me dude.

**Medel:** Don't talk to me like that. Why do you call me if you don't want me to yell at you faggot?

**Joel:** Okay, yell at me as much as you want.

**Medel:** Bye, what's up?

**Joel:** Where are you bro?

**Medel:** The Infierno.

**Joel:** Oh that dude wants me to pass by for some tacos.

**Medel:** Oh are you going to stop by for them?

**Joel:** Yes.

**Medel:** Okay, it's 2,000 what I'm going to give you.

**Joel:** Alright then.

**Medel:** I'm here at the Infierno.

**Joel:** Alright dude, I'm on my way dude.

**Medel:** Alright.

208.  I believe that this conversation represents "Joel" confirming a location to meet Medel. They agree to meet at El Infierno bar **(Target Location 1)**. Medel confirms with "Joel" that he will be giving Joel $2,000 ("Okay, it's 2,000 what I'm going to give you."). I believe Joel is acting on behalf of the Mexico-based narcotics broker Tomas Castro Estrada as a money courier as Joel indicates that "that dude" wants him to pass by for the "tacos". Finally, I believe based on the context of these conversations and my training and experience that "tacos" is a code word used by Joel to refer to money.

**Session 2852-Outgoing call to 52.677.107.3715 (Tomas Castro Estrada) from TARGET TELEPHONE 2 (March 11, 2024 at 3:32 PM)**

**Tomas:** Hello.

**Medel:** Is Bustos going to stop by for the 2,000?

**Tomas:** Yeah dude.

**Medel:** Okay, he already called me right now. Okay, I'm going to give them to him. Bye.

129

**Tomas:** Yeah dude. Bye.

**Medel:** Bye bye. Don't fucking call me anymore until next month, fag.

**Tomas:** I hope you die fag.

**Medel:** No, no, fucking go to hell. I'm going to give them…

**Tomas:** [Overlap] I hope some fucking worms get you over there by the curve.

**Medel:** Don't fucking call me until next month.

**Tomas:** [Laughs]

**Medel:** Bye bye.

209.    I believe this conversation represents Medel confirming with Tomas Castro Estrada that "Bustos" is the person that will pick up the $2,000 ("Is Bustos going to stop by for the 2,000?"). Tomas Castro Estrada confirms and Medel agrees to give him (Bustos) the money. Further, I believe this confirms that the person Medel spoke to at 3:31 PM was the courier sent by Tomas Castro Estrada because Medel mentions that this person just called him ("Okay, he already called me right now."). Based on the context of these conversations, I believed that the courier is "Joel Bustos."

**Session 2862-Incoming call from (414) 526-8591 (believed by case agents to be Joel Bustos) to TARGET TELEPHONE 2**
**(March 11, 2024 at 3:50 PM)**

**Medel:** Yeah.

**Joel:** I'm outside dude.

**Medel:** No, come in. I'm not going to go outside.

**Joel:** No, you're going to have to come out.

**Medel:** No, come inside or there isn't anything.

**Joel:** Come outside or what's up?

**Medel:** Come inside or there isn't anything. Yeah send a message to that dude also. If you don't come in…

210.    I believe this conversation is an argument between Joel Bustos and Medel about where they are going to meet. Medel wanted Bustos to come inside El Inferno **(Target Location 1)** to pick up the money, but Bustos did not want to do so.  Medel told Bustos to come inside or else the payment won't occur ("Come inside or there isn't anything") and encouraged Bustos to message "that dude" (believed, in context, to be the Mexico-based narcotics broker).  At this time physical surveillance was established at El Infierno **(Target Location 1)**. At approximately 3:50 PM, TFO Martinez observed a dark colored GMC Acadia bearing WI license plate ADT-6000 park near El Infierno **(Target Location 1)**. A Wisconsin Department of Motor Vehicles inquiry for that plate revealed it lists to Joel Bustos. Based upon that, and the fact that Medel/Castro Estrada referred to the individual as "Joel" and "Bustos," case agents believe that Joel Bustos was the person coming to pick up money from Medel on behalf of Castro Estrada.  Case agents then observed the person they believe to be Joel Bustos exit the driver's seat of the Acadia and enter into El Infierno **(Target Location 1)** at approximately 3:50 PM.

**Session 2864-Outgoing call to 52.677.107.3715 (Tomas Castro Estrada) from TARGET TELEPHONE 2 (March 11, 2024, at 3:54 PM)**

**Tomas:** Yeah.

**Medel:** He took them already dude.

**Tomas:** It's set man. Thank you!

**Medel:** Bye faggot, and really don't call me until next month.


***At approximately 3:55 PM, surveillance observed Joel Bustos exit El Infierno and reenter the Acadia.  Surveillance officers followed the Acadia to 1636 W. Forest Home Avenue, Milwaukee, Wisconsin. Bustos entered a business called Realmex Envios de Dinero. An FBI Linguist assigned to this investigation translated that name as Realmex money transfers. Realmex Envios de Dinero is a financial facility used to wire money both nationally and

internationally. Bustos remained inside for approximately five minutes before exiting and leaving the area.

211. I believe based on this series of calls, the overall context of those calls, and my knowledge of this investigation that Castro Estrada was requesting additional money from Medel. Belkis Torres who Medel typically used to send the money had conducted too many transactions and was limited in how much money she could send. I know that large money wires and/ or frequent money wires can trigger suspicious money reports alerting law enforcement. I believe that Castro Estrada then contacted Bustos to pick up the money from Medel and that Bustos sent Castro Estrada the money via a wire transfer at Realmex Envios de Dinero. Finally, I believe that this money was either money owed for a prior narcotics shipment or payment for an upcoming narcotics shipment or both.

### Suspected Drug Transaction- March 13, 2024

212. On March 13, 2024, case agents intercepted a call between Victoriano Botello (TARGET TELEPHONE 4) and Cain Botello, Sr. at (224)595-8469. This call occurred at approximately 2:22 PM. The call occurred in English and is transcribed below.

Victoriano: I'm gunna stop by

Botello, Sr.: Yup

Victoriano: Alright bye

213. I believe this conversation represents Victoriano Botello telling Botello, Sr. that he was going to stop at Botello, Sr.'s residence **(Target Location 2)**. The reason for the meeting was unknown at the time.

214. Case agents reviewed pole camera footage showing the exterior area of Botello, Sr.'s residence on March 13, 2024. At 2:25 PM, case agents observed Victoriano Botello arrive at

132

Botello, Sr.'s residence **(Target Location 2)** located at 921 W. Walker Street. Victoriano Botello retrieved an item from within Botello, Sr.'s Jeep and then entered Botello, Sr.'s residence.

215. At approximately 2:45 PM, case agents intercepted a phone call between Victoriano Botello at TARGET TELEPHONE 3 and the unknown male user of 715-701-4808 (UM-4808). Below is an approximate transcript of that call:

**Victoriano:** What happened?

**UM-4808:** What's up Victor? Everything alright?

**Victoriano:** Yeah, I'm just here.

**UM-4808:** Is everything good with business?

**Victoriano:** Yes.

**UM-4808:** Give me like 15 minutes then I'll stop by and pick some up.

**Victoriano:** Give me time.

**UM-4808:** A little more?

**Victoriano:** Yeah, I am doing something but 3:30 would be better.

**UM-4808:** Damn, that's a little late because I was going to take it to the mechanic. I was on my way from work. You know what I'll get there around 3:15 or 3:20. Okay I am by Oak Creek now.

**Victoriano:** Yes.

**UM-4808:** (unintelligible) All right.

216. I believe this conversation represents UM-4808 requesting to meet Victoriano Botello for narcotics. Specifically, I believe the reference to "business" means Victoriano Botello's narcotics trafficking business, and I believe "I'll stop by and pick some up" means that UM-4808 will pick up some drugs. I believe that the conversation shows that Victoriano Botello was not available at the moment and but would meet with UM-4808 around 3:30.

217. At 2:51 PM, Victoriano Botello was observed on the pole camera footage exiting Botello, Sr.'s residence **(Target Location 2)** in possession of a bag that he did not carry into Botello, Sr.'s residence. Victoriano Botello then left the area and drove to El Infierno **(Target Location 1)**, where pole camera footage showed him arriving at 2:58 PM. At 3:02 PM case agents observed a Toyota Highlander park near Victoriano Botello's vehicle near El Infierno **(Target Location 1)**. The driver exited the Toyota and entered the passenger seat of Victoriano Botello's vehicle. Within about one minute, the male exited Victoriano Botello's vehicle and left in his Toyota. Based on these observations, I believe that Victoriano Botello obtained narcotics from Botello, Sr.'s house **(Target Location 2)** in a plastic bag. I believe that he then drove to El Infierno **(Target Location 1)** where he conducted a drug transaction.

218. Surveillance observed that directly after the suspected deal, Victoriano Botello drove directly back to Botello, Sr.'s residence located at 921 W. Walker Street **(Target Location 2)**. He arrived at approximately 3:08 PM. I believe Victoriano Botello took proceeds from the transaction back to Botello, Sr.'s residence **(Target Location 2)**.

219. At approximately 3:17 PM, case agents intercepted a phone call between Victoriano Botello at TARGET TELEPHONE 3 and the unknown male user of 715-701-4808 (UM-4808). Below is an approximate transcript of that call:

**Victoriano:** Give me a bit. I'll head over in a bit.

**UM-4808:** Okay, I'll be there about 3:30 either way. I'm coming down, I'm a lot closer, I'm by Walmart on 27th.

220. I believe this call involved Victoriano Botello and UM-4808 further discussing the timing of their meeting to acquire the drugs ordered in the earlier call (when UM-4808 indicated that he would stop by to pick "some" up, I believe that "some" referred to narcotics).

221. At 3:19 PM, Victoriano was observed leaving Botello, Sr.'s residence **(Target Location 2)**. At approximately 3:22 PM, case agents intercepted another phone call between Victoriano Botello at TARGET TELEPHONE 3 and the unknown male user of 715-701-4808 (UM-4808). Below is an approximate transcript of that call:

**UM-4808:** Hello.

**Victoriano:** Where are you right now?

**UM-4808:** I'm right over here off of 25th.

**Victoriano:** Alright man, I'm on 11th and Greenfield. I'll be there shortly.

**UM-4808:** Okay.

222. Case agents believe this call represents Victoriano Botello and UM-4808 confirming where and when to meet for the previously discussed narcotics transaction. At approximately 3:27 PM, Victoriano was observed via pole camera arriving at El Infierno **(Target Location 1)**.

223. At approximately 3:28 PM, case agents intercepted another phone call between Victoriano Botello at TARGET TELEPHONE 3 and the unknown male user of 715-701-4808 (UM-4808). Below is an approximate transcript of that call:

**UM-4808**: What's up?

**Victoriano:** I'm here outside.

**UM-4808:** Me too (unintelligible) by the business.

**Victoriano:** I'm right here in front. You're at Infierno right?

**UM-4808:** Yes.

**Victoriano:** Well I am here.

**UM-4808:** I see you, I see you.

**Victoriano:** Okay.

224. I believe this conversation represents Victoriano Botello and UM-4808 acknowledging that they are at the same place and will soon meet to consummate the drug deal discussed during the original call.

225. At about 3:20 PM, surveillance agents observed a male, believed to be UM-4808, walk to the passenger side of Victorino Botello's Tahoe outside near El Infierno (**Target Location 1**). Victoriano Botello appeared to hand the male something. The male then walked away out of view and entered a parked 2001 Nissan Xterra.

226. Case agents believe that Victoriano Botello again conducted a drug transaction directly after leaving Botello, Sr.'s residence **(Target Location 2)**. Case agents believe that Victoriano Botello did not have narcotics at his residence, 1118 S 35th Street, Milwaukee **(Target Location 3)** the moment and contacted Botello, Sr. in the morning to confirm that Botello, Sr. was home at **(Target Location 2)** so that Victoriano Botello could pick up narcotics from Botello, Sr.'s residence. Although this conversation between Victoriano Botello (TARGET TELEPHONE 4) and Botello, Sr. (at (224)595-8469) did not explicitly mention narcotics, based on the context, timing, other interceptions via TARGET TELEPHONE 4, and the observed apparent drug transactions, I believe it shows that Botello, Sr. and Victoriano Botello were utilizing TARGET TELEPHONE 4 and (224)595-8469 in furtherance of the TARGET OFFENESES.

### Drug Transaction- March 16, 2024
### (Botello, Sr., Medel, Sabo, Congleton)

227. On March 16, 2024, I was monitoring the pen register trap and trace for (224)595-8469 (Botello, Sr.'s "burner" phone). At about 5:18 PM and 5:19 PM, I noted that Sabo's phone, (414)399-9990, was in contact with Botello, Sr. at (224)595-8469 via electronic messages. Based on my knowledge of this investigation along with prior observations, I suspected that Botello, Sr. and Sabo were going to engage in another drug transaction.

136

228.  Minutes later, at approximately 5:20 PM, case agents intercepted an incoming call to Medel (TARGET TELEPHONE 2) from Botello, Sr. (via (224)595-8469). The conversation was mixture of Spanish and English and was translated by an FBI linguist. Below is an approximate translation of that intercepted call.

**Medel:** What's up?

**Botello, Sr.:** What are you doing Periquillo?

**Medel:** I'm playing dominoes, just in Hell. (in context "Hell" likely refers to El Infierno)

**Botello, Sr.:** Can you help me again?

**Medel:** Yea buddy!

**Botello, Sr.:** Yea?

**Medel:** The same right?

**Botello, Sr.:** Yea.

**Medel:** Ok, let me go get it.

**Botello, Sr.:** Ok, call me when you're done, like in how long do you think?

**Medel:** what time is it? Before 6.

**Botello, Sr.:** Ok, I'll tell him 6:30.

**Medel:** Yea, 6:30 or 7 to make sure.

229.  I believe that this conversation represents Botello, Sr. asking Medel for narcotics. More specifically, I believe Botello, Sr. was asking Medel for the same amount as the deal involving Sabo that occurred on February 28, 2024 ("Can you help me again?" and "The same right?").  I believe Medel agreed to provide these narcotics to Botello, Sr. ("Ok, let me go get it"), and that they would meet later to consummate this transaction. I believe that Medel supplies methamphetamine obtained via Castro Estrada. Therefore, I believe that Botello, Sr. was requesting the same amount of methamphetamine as last time.

137

230. At approximately 5:55 PM, physical surveillance observed Medel exit El Infierno **(Target Location 1)** with Jayme Congleton. Case agents knew Medel was at El Infierno as they were monitoring the location data for TARGET TELEPHONE 2. Medel and Congleton both entered Congelton's Jeep and were followed directly to Medel's residence, 2630 S. 7th Street, Milwaukee, Wisconsin **(Target Location 5)**. They did not make any stops or interact with anyone on the way. Upon their arrival, Medel exited the Jeep and entered his residence. I believe this surveillance represents Congleton driving Medel to Medel's residence **(Target Location 5)** to pick up the narcotics that Botello, Sr. requested from Medel.

231. At approximately 6:07 PM and 6:08 PM, Botello, Sr.'s phone ((224)595-8469) and Sabo's phones exchanged additional electronic messages, which I viewed on the pen register/trap and trace for (224)595-8469. I believe these contacts between (224)595-8469 and Sabo's phone represent a follow up conversation confirming the deal after Botello, Sr. spoke with Medel.

232. At approximately 6:07 PM, physical surveillance observed Medel exit his residence **(Target Location 5)**. TFO Veloz observed that Medel was now in possession of a bag. He entered Congleton's Jeep and was followed directly back to El Infierno **(Target Location 1)**. They did not stop or interact with anyone between Medel's residence and El Infierno. When Medel entered El Infierno **(Target Telephone 1)** he carried the bag obtained at his residence into the bar. The bag was captured on pole camera and appeared to be yellow over turquois in color.

233. At approximately 6:10 PM, case agents intercepted an electronic message between Medel (via TARGET TELEPHONE 2) and Botello, Sr. (at (224)595-8469). Below is the message from Medel to Botello, Sr.

**Medel:** 30min

234. I believe this message represents Medel telling Botello, Sr. that he had the narcotics order and would be ready to meet in 30 minutes.

138

235.  At approximately 6:32 PM, physical surveillance and pole camera captured Botello, Sr. arriving at El Infierno **(Target Location 1)**. When he exited his vehicle, Botello, Sr. retrieved an unknown light-colored object from the center console area of his Jeep and placed that item in his front right jacket pocket. He then entered El Infierno **(Target Location 1)**.

236.  At approximately 7:05 PM, I was still monitoring the pen register trap and trace for (224)595-8469 and observed that it was again in contact with Sabo's phone via electronic messages. At 7:08 PM, physical surveillance observed a known vehicle for Sabo, a red Dodge Ram bearing license plate FB54999, arrive at El Infierno **(Target Location 1)**. At approximately 7:10 PM, surveillance observed Botello, Sr. exit El Infierno **(Target Location 1)** carrying the same bag that Medel carried into the bar earlier. Botello, Sr. entered the passenger seat of Sabo's vehicle. At 7:26 PM, surveillance observed Botello, Sr. exit Sabo's vehicle carrying the bag. Botello, Sr. then placed the bag into his Jeep and re-entered El Infierno **(Target Location 1)**.

237.  Physical surveillance followed Sabo's vehicle directly back to Sabo's known address, 5089 S. Colonial Court, Greenfield, Wisconsin **(Target Location 6)**. During that surveillance, Sabo was observed to be the only occupant of the vehicle.

238.  I believe based on the prior investigation involving Sabo, my knowledge of this DTO, information from CHS#4 about Sabo, intercepted calls, data from the pen register trap and trace, and surveillance that Sabo (using (414)399-9990) contacted Botello, Sr. (at (224)595-8469) and placed an order for narcotics. Case agents know that Sabo is involved in sales of both cocaine and methamphetamine. Case agents believe that Botello, Sr. is a cocaine supplier, but he needed to contact Medel for methamphetamine. I believe that Medel, using TARGET TELEPHONE 2, agreed to give Botello, Sr. (using (224)595-8469) methamphetamine. I believe that Congleton drove Medel from El Infierno **(Target Location 1)** to Medel's residence **(Target Location 5)**, where Medel obtained a bag containing methamphetamine. I further believe that Congleton then

drove Medel and the methamphetamine back to El Infierno **(Target Location 1)**, where Medel carried the bag into the bar. I believe that while inside the bar Medel gave the narcotics to Botello, Sr. who, in turn, consummated a drug transaction with Sabo outside of El Infierno **(Target Location 1)**. I believe Sabo took the recently obtained narcotics to his residence **(Target Location 6)** and Botello, Sr. placed the proceeds from the sale with Sabo in his Jeep. This deal represents that TARGET TELEPHONE 2 and (224)595-8469 were being utilized to facilitate the TARGET OFFENSES of this investigation. It further shows multiple known DTO (Medel, Congleton, Botello, Sr., and Sabo) members operating together.

**Drug Transaction March 18, 2024**
**(Botello, Sr., Medel, Castro Estrada, Sabo, Espinoza)**

239. On March 18, 2024, case agents were monitoring pen register activity for Botello, Sr.'s "burner" phone--((224)595-8469). Between 12:26 PM and 4:20 PM, Botello, Sr.'s phone ((224)595-8469) and Sabo's phone (414)399-9990 exchanged a series of electronic messages. Based on case agents' knowledge of this investigation, we believed that Sabo and Botello, Sr. were likely discussing a narcotics transaction. This was confirmed moments later when Botello, Sr. (using (224)595-8469) called Medel (TARGET TELEPHONE 2). The call occurred in Spanish and was translated by an FBI linguist. Below is an approximate translation of that voice call.

**Medel:** What's up, what's up?

**Botello, Sr.:** Become a man, what are you doing?

**Medel:** I've been in hell since 7 am. (in context "hell" is believed to be El Infierno)

**Botello, Sr.:** No fucking kidding bro.

**Medel:** What's up bro?

**Botello, Sr.:** Again, I have your backpack.

**Medel:** The same?

**Botello, Sr.:** Yea I have your backpack.

140

**Medel:** What time?

**Botello, Sr.:** Let me see you in a little bit to give you the backpack back and then...

**Medel:** Ok then bring back the same one?

**Cain SR:** Yea

**Medel:** Ok that's fine, I'll wait for you here.

240. I believe that Botello, Sr. ordered the same amount of narcotics from Medel as the prior two Sabo-related deals mentioned in this affidavit ("Ok then bring back the same one?"). I further believe that Botello, Sr. ordered crystal methamphetamine as Medel has been identified as a methamphetamine source of supply for this DTO and Medel is supplied with Methamphetamine from his Mexico-based broker, Tomas Castro Estrada.

241. Seconds after the call between Medel (TARGET TELEPHONE 2) and Botello, Sr. (at (224)595-8469) my belief was confirmed as Medel (TARGET TELEPHONE 2) immediately called Mexico-based phone number 52.677.107.3715 utilized by Tomas Castro Estrada. The call occurred in Spanish and was translated by an FBI linguist. Below is an approximate translation of that conversation.

**Medel:** I won't be a witness to when Ruben kills him to shit.

**Castro:** Who are you going to kill?

**Medel:** I was currently working on it, she was going to come here and I was going to tell you that I just got another one so I'm going to give you 5 apart from that.

**Castro:** So you're going to send me the money, then send me another 5?

**Medel:** Yes, because I just got another one, yes.

**Castro:** Ok, who are you going to kill?

**Medel:** Ha ha quit fucking around. No, my guy just called me, the one I told you was helping me with those packs, they're 2 bucks. He just called me saying they want another

141

one for today. When I return… and they bring it to me, when you send the guys that are coming, I'm going to give them 5.

**Castro:** Ok

**Medel:** 2 and the 3 and the ones that I'm going to send you when Belkis comes.

**Castro:** Ok so it's 5 apart from the Belkis ones?

**Medel:** Yes because I have 4, one thousand and…

**Castro:** And the rest.

**Medel:** Yes

**Castro**: It's done

242. I believe that this conversation represents Medel advising Castro Estrada that he was selling an additional amount of methamphetamine (to Botello, Sr.) and would have additional money for Castro Estrada after the deal is complete. Specifically, Medel indicates that "my guy" (in context, Botello, Sr.) just called Medel saying "they" (in context, Sabo) want "another one for today" (in context, one more "pack" of methamphetamine). Further, "Belkis" was later identified by case agents as Belkis Torres, another money courier for Castro Estrada and so, in this conversation, Medel and Castro Estrada are discussing payment for prior drug transactions ("the Belkis ones") and how this purchase would be additional payment ("apart from the Belkis ones"). Finally, I believe this call represents that Tomas Castro Estrada was sending an additional money courier to pick up cash from Medel ("when you send the guys that are coming"), and that Medel would pay them for "5" (which means, in context, $5,000, including the amount owed for the one "pack" that Medel gave to Botello, Sr.).

243. Immediately after Botello, Sr. and Medel's conversation, Botello, Sr. ((224)595-8469) and Sabo ((414) 399-9990) continued to exchange additional electronic messages and a

voice call, as observed on the pen register/trap and trace for (224) 595-8469. I believe this exchange of messages represents Botello, Sr. confirming the narcotics deal with Sabo.

244. At about 5:11 PM, surveillance observed Botello, Sr. exit his neighbor's residence 919 W. Walker Street **(Target Location 7)**. He exited **Target Location 7** carrying a cooler and a bag (919 W. Walker Street is a suspected stash location utilized by Botello, Sr. More information regarding this will be included later in this affidavit). He drove to El Infierno Bar **(Target Location 1)** and entered the bar carrying the bag. The bag appeared to be the same yellow over turquois bag observed during the March 16, 2024, deal involving Sabo described above. Shortly after Botello, Sr. arrived at approximately 5:28 PM, Medel and Espinoza exited El Infierno **(Target Location 1)** and entered Espinoza's Jeep. Medel was now carrying the same yellow over turquois bag. Medel and Espinoza arrived at Medel's residence at 2630 S. 7th Street **(Target Location 5)** at approximately 5:36 PM. They did not make any stops or interact with anyone between El Infierno and Medel's residence. At approximately 5:41 PM, Medel and Espinoza were observed leaving Medel's residence **(Target Location 5)** in the Jeep and they drove directly back to El Infierno **(Target Location 1)**, making no stops along the way. At 5:48 PM, Medel entered El Infierno carrying what appeared to be an item of clothing which case agents believe was used to conceal the narcotics. At 5:50 PM, case agents observed on the pen register/trap and trace that (224)595-8469 sent an electronic message to Sabo.

245. I believe this series of events represents Botello, Sr. leaving 919 W Walker Street **(Target Location 7)** with an amount of narcotics and/ or money and arriving at El Infierno **(Target Location 1)** and giving Medel the bag used to facilitate the narcotics deal on March 16, 2024. I believe this bag was previously inside of 919 W Walker Street **(Target Location 7)**. This is consistent with Botello, Sr. and Medel's conversation earlier that day wherein Botello, Sr. told Medel "…I have your backpack" and "Let me see you in a little bit to give you the backpack

143

back…" and Medel indicated that he would bring back the same amount of drugs as the last time ("bring back the same one?"). I believe that Medel then employed Espinoza to drive Medel to his residence to pick up methamphetamine ordered by Botello, Sr. for Sabo. I believe that Medel picked the methamphetamine up from his residence **(Target Location 5)** and transported it back to El Infierno **(Target Location 1)** where it was turned over to Botello, Sr. inside the bar and that Botello, Sr. then messaged Sabo informing him that the order was ready.

246. At 6:25 PM, physical surveillance observed Sabo's vehicles parked near his known residence, 5089 W. Colonial Court, **(Target Location 6)**. At 6:28 PM, physical surveillance observed Sabo in his black GMC leaving the area of 5089 W. Colonial Court **(Target Location 6)**. At 6:34 PM, Sabo arrived at El Infierno **(Target Location 1)**. Also, at 6:34 PM, Sabo sent Botello, Sr. ((224)595-8469) an electronic message. At 6:35 PM, Botello, Sr. was observed exiting El Infierno **(Target Location 1)**. He appeared to be concealing an object in his front hoodie pocket. He entered Sabo's vehicle and the two drove around in circles for some time but did not stop or meet with anyone. At 6:49 PM, Botello, Sr. exited Sabo's vehicle and re-entered El Infierno **(Target Location 1)**. Sabo was followed back to his residence, 5089 W. Colonial Court **(Target Location 6)**. He stopped briefly at a gas station but did not meet with anyone.

247. I believe this entire event represents Sabo ordering methamphetamine and/ or cocaine from Botello, Sr. via phone. I believe that Botello, Sr. entered 919 W Walker St **(Target Location 7)** to retrieve cocaine and/ or money to pay Medel for methamphetamine he intended to purchase from Medel and give to Sabo. I believe Botello, Sr. drove to El Infierno **(Target Location 1)** after leaving 919 W Walker **(Target Location 7)** and met with Medel. I believe Medel employed Espinoza to drive him to 2630 S. 7th Street (Target Location 5) where Medel picked up Methamphetamine. I believe Espinoza then drove Medel back to El Infierno **(Target Location 1)** where Medel gave Botello, Sr. methamphetamine inside of the bar. I believe Botello, Sr. then met

with Sabo outside of El Infierno and conducted the drug transaction. I believe Sabo then transported that narcotics to his residence 5089 Colonial Court **(Target Location 6)**.

<b>Continued Use of TARGET TELEPHONE 6</b>

248. Based on my knowledge of this investigation and my experience in prior drug investigations, I believe that Botello, Sr. was using both (224)595-8469 and TARGET TELEPHONE 6 to facilitate the TARGET OFFENSES of this investigation. This is a tactic frequently employed by drug deals in attempt to avoid detection by Law Enforcement.

<b>Dropped Burner Lines:</b><br><b>TARGET TELEPHONE 4 (Victoriano Botello) and (224)595-8469 (Cain Botello, Sr.)</b>

249. On or about March 20, 2024, case agents know that Victoriano Botello stopped using TARGET TELEPHONE 4 and that Botello, Sr. stopped using his burner phone, (224)595-8469. Case agents were intercepting Victoriano Botello's burner phone (TARGET TELEPHONE 4) pursuant to a TIII court order. On or around March 20, 2024, case agents stopped intercepting communications, and pen register data was consistent with the phone no longer being in use. Furthermore, case agents intercepted a communication prior to March 20, 2024, indicating that Victoriano Botello and Botello, Sr.'s "burner" phones would be dropped.

250. On March 17, 2024 case agents intercepted a call between Victoriano Botello's burner phone, TARGET TELEPHONE 4 and Botello, Sr.'s burner phone, (224)595-8469. The conversation occurred in English. The following is the relevant portion of that conversation.

**Victoriano:** When are you guys leaving to Texas?

**Botello, Sr.:** 20th

**Victoriano:** When?

**Botello, Sr.:** 20th

**Victoriano:** When is that?

**Botello, Sr.:** This week.

145

**Victoriano:** Okay. Alright.

**Botello, Sr.:** Why?

**Victoriano:** Because these run out on the 19th I believe.

**Botello, Sr.:** On the 20th, it says the 19th but it doesn't run out until the 20th.

**Victoriano:** I know but you're leaving on the 20th dude. So I'd rather…

**Botello, Sr.:** I leave on the 20th in the evening.

**Victoriano:** Well, it doesn't fucking matter.

**Botello, Sr.:** I'll talk to you in a second. Where are you at, the bar?

**Victoriano:** No, I'm at the crib still. I'm watching this game.

251. Case agents believe that this conversation involved Botello, Sr. (using his then-existing burner phone—224-595-8469) telling Victoriano Botello that the burner phones will end service on March 20th ("these run out on the 19th" and "it says the 19th but it'll run out on the 20th TARGET TELEPHONE 4 is no longer in service and is no longer being intercepted. Case agents know that it is common practice for drug traffickers to change their numbers frequently in order to avoid detection from law enforcement. Pursuant to pen register orders served on Botello, Sr.'s phones TFO Ploch learned that although Botello, Sr. is changing his phone number, he is utilizing the same physical device. This is known as the IMEI number for Botello, Sr.'s phones has remained the same despite the changing phone numbers. TFO Ploch knows that the IMEI number is essentially a serial number unique to the phone/ device itself. TFO Ploch learned via administrative subpoena that the IMEI number used by Botello, Sr.'s burner phone has been assigned at least 4 different phone numbers over the past 6 months. This is a common tactic utilized by narcotics traffickers in attempt to avoid detection by law enforcement. TFO Ploch does not believe this to be consistent with lawful everyday use of a phone.

146

252. It should be noted that on or about March 21, 2024, Botello, Sr. and Botello, Jr. traveled to Texas. Case agents know they were in Texas based on intercepted communications, social media posts, and location data obtained via Botello, Sr.'s phone (TARGET TELEPHONE 6). Because the trip to Texas occurred in close proximity to the "burner" phones being dropped, case agents were not aware whether Botello, Sr. obtained a new phone/phone number prior to leaving.

253. While in Texas, case agents continued to monitor pen register data for Botello, Sr.'s phone (TARGET TELEPHONE 6). Case agents know that between March 21, 2024, and March 25, 2024, Botello, Sr.'s phone (TARGET TELEPHONE 6) was in contact with phone number (414)243-7275. Case agents recognized this number as it was also in contact with Botello, Sr.'s number (TARGET TELEPHONE 6) while Botello, Sr. was in Mexico in December 2023 according to phone records for TARGET TELEPHONE 6. At that time, case agents submitted an administrative subpoena to US Cellular to include subscriber data for (414)243-7275. Upon reviewing the return from US Cellular, case agents learned that Andrew Sabo is the primary account holder for (414)243-7275. From this, case agents believe that Sabo was in contact with Botello, Sr. (via TARGET TELEPHONE 6) while Botello, Sr. was in Texas.

254. Case agents believe that, similar to how Victoriano Botello used his phones (TARGET TELEPHONE 3 and TARGET TELEPHONE 4) interchangeably, Botello, Sr. also uses two phones interchangeably (his "burner" phone and TARGET TELEPHONE 6). Botello, Sr.'s prior burner phone ((224)595-8469) was in contact with a known number for Sabo, (414)399-9990. Botello, Sr.'s other number (TARGET TELEPHONE 6) is also in contact with a known number for Sabo, (414)243-7275. Therefore, case agents know that both of Botello, Sr.'s phones are in contact with Sabo, a TARGET SUBJECT of this investigation.

**Dropped Burner Line:**
**(414)688-7554 (Espinoza)**

147

255. Case agents obtained a pen register trap and trace order and location warrant for Espinoza's phone, (414)688-7554. On or about March 2, 2024, it appeared as though Espinoza dropped this line. Case agents noticed that after March 2, 2024, this phone no longer answered any calls, made any calls, or responded to any electronic messages. Furthermore, the phone no longer provided any location data. This is consistent with this phone being dropped. Therefore, case agents believe that 414-688-7554 is no longer used by Espinoza.

256. Case agents note that TARGET TELEPHONE 5 has continuously been used and is still currently being used by Espinoza. Case agents noticed continued incoming and outgoing activity on the pen register and continued to intercept calls involving Espinoza using TARGET TELEPHONE 5 via the interception over TARGET TELEPHONE 2. Case agents obtained a location warrant for TARGET TELEPHONE 5, which is serviced by US Cellular. US Cellular does not automatically send location data on a timed schedule like T-Mobile (the service provider for TARGET TELEPHONES 1-4 and TARGET TELEPHONES 6 and 7). In order to obtain location data for TARGET TELEPHONE 5, case agents are required to call US Cellular and request that they ping the phone. That process takes significantly longer to obtain phone location information.

**Juan Carlos-Espinoza Continued Narcotics Trafficking**

257. As previously mentioned in this affidavit, case agents know that Espinoza has been involved in numerous confirmed and suspected narcotics transactions with this DTO. For example, during Controlled Buy 9, as detailed in this affidavit, Aviles-Rogel contacted Medel, Victoriano Botello, and Espinoza to source this cocaine deal. Ultimately, the cocaine was supplied by Espinoza. Again, on March 18, 2024, case agents believe that Botello, Sr. conducted a narcotics transaction with Sabo at El Infierno, and that Botello, Sr. employed Medel to obtain the narcotics. Medel was given a ride from Espinoza to Medel's residence to pick up the narcotics.

148

258. On or about March 21, 2024, case agents received preserved text messages to and from Espinoza's phone (TARGET TELEPHONE 5) from US Cellular pursuant to a federal warrant. The messages were mainly in Spanish and were translated by MPD Officer Justin Torres. In viewing the messages, Officer Torres observed messages to and from Espinoza's phone (TARGET TELEPHONE 5) that were not only indicative of drug dealing but also identified other phone numbers involved in narcotics trafficking. These numbers are not in contact with other DTO members (including TARGET TELEPHONES 1-4 and TARGET TELEPHONES 6 and 7) and have not been previously intercepted. Several examples are documented below.

**March 13, 2024, Message Exchange**
**TARGET TELEPHONE 5 and the Unknown User of (414)795-5007 ("U-5007")**

U-5007: Where are you fatty

U-5007: Head over to the house one hand

Espinoza: im just leaving the store I'll stop by in 10 minutes

Espinoza: through the rear

U-5007: Ok

259. Case agents believe "one hand" is a street reference for a quantity of narcotics. In this example, I believe U-5007 was requesting that Espinoza deliver an amount of narcotics, and Espinoza agreed ("I'll stop by in 10 minutes"), informing U-5007 that he would deliver the narcotics to the rear of the residence ("through the rear"). I believe that Espinoza used TARGET TELEPHONE 5 to arrange this drug transaction.

**March 15, 2024, Message Exchange**
**TARGET TELEPHONE 5 and U-5007 via (414)795-5007**

U-5007: Ok where are you fatty

Espinoza: I'm here at the store and you

U-5007: at home

Espinoza: What do you need?

U-5007: One 20, I'll get more cash tomorrow

U-5007: I'm being real with you so you don't get upset.

Espinoza: ok I'll stop by in about 20 minutes

U-5007: Ok fatty

U-5007 Where are you

Espinoza: I'm on the way

260. I believe this conversation yet again represents U-5007 wanting a quantity of narcotics ("One 20") from Espinoza. I further believe the unknown user did not have cash to pay, and Espinoza agreed to give the unknown user the narcotics on consignment ("I'll get more cash tomorrow" and "I'm being real with you so you don't get upset"). I believe that Espinoza agreed to meet U-5007 ("ok I'll stop by in about 20 minutes" and "I'm on the way"). I believe that Espinoza used TARGET TELEPHONE 5 to arrange this drug transaction.

### Surveillance at 2055A N 31st Street (Target Location 11)
### (Cain Botello, Jr.)

261. On March 15, 2024, at approximately 6:58 PM, case agents were monitoring pole camera at 2055A N 31st Street **(Target Location 11)** and observed Botello, Jr. arrive at the residence in his white Jeep bearing WI license plate ARH-8573. Botello, Jr. parked in the driveway near the access door to his residence. Botello, Jr. exited his Jeep and opened the rear driver side door to the Jeep. He removed several packages from the back seat. The packages appeared to black on the bottom and clear on the top. Due to my training and experience I believe these packages were 1 pound packages of marijuana. I have seen marijuana packaged in this manner before. Botello, Jr. carried the packages into his residence.

### Intercepted Calls Concerning Narcotics at 1118 S. 35th Street (Target Location 3)
### (Victoriano Botello)

150

262. Case agents have conducted surveillance numerous times at 1118 S 35th Street (**Target Location 3**) the known address for Victoriano Botello. Case agents suspect that Victoriano Botello has a roommate because, in addition to observing Victoriano's vehicle frequently parked in the driveway, case agents frequently see another vehicle parked in the driveway. An example of a conversation leading case agents to suspect that Victoriano stores narcotics at his residence **(Target Location 3)** occurred on March 19, 2024. This conversation began on Victoriano's personal phone (TARGET TELEPHONE 3) and continued on his burner phone (TARGET TELEPHONE 4). Below is a summary of those conversation between Victoriano and his suspected roommate (user of 414-795-5257).

### Call #1  Victoriano Botello (Target Telephone 3) and (414)795-5257

### 3/19/24 at 7:03 PM

**Victoriano:** Yeah

**Roommate:** Are you going to be home at all?

**Victoriano:** Not until later:

**Roommate:** You want to call me back real quick?

**Victoriano:** Yeah.

### Call #2 Victoriano (TARGET TELEPHONE 4) and (414)210-9791

### 3/19/24 at 7:04 PM

**Roommate:** Do you have one downstairs?

**Victoriano:** Uh, you're gunna have to make it. It's in the bag.

**Roommate:** It's behind your door.

**Victoriano:** Yes.

**Roommate:** Alright.

**Victoriano:** Alright.

263. Case agents know that the "roommate" voice is the same in both calls despite the different phone numbers. Case agents believe that the first call about whether Victoriano Botello was going to be home was not expressly discussing something illegal in nature and therefore, the conversation occurred on both participants' personal phones. When the roommate learned Victoriano Botello was not going to be home and the conversation was going to turn into a drug related conversation, and they switched to their respective burner phones. I believe the user of both (414)795-5257 and (414)210-9791 is Victoriano Botello's roommate because he asks if Victoriano Botello will be home. Furthermore, based on the context of the call, case agents believe the user is in the house and has access to the bag behind Victoriano Botello's door. I further believe that when the roommate asks Victoriano Botello if he has "one" he is referring to an amount of narcotics. Victoriano Botello replies "…you're going to have to make it" which I believe represents Victoriano Botello acknowledging he has the narcotics, but it is only packaged in bulk quantity and the roommate will have to cut, weigh, and/or package it into the "one" the roommate wants. I believe this is an example of Victoriano Botello storing bulk narcotics at his residence, 1118 S 35th Street (**Target Location 3**). I also believe this is an example of Victoriano Botello and his roommate using 1118 S 35th Street (**Target Location 3**) to maintain and package the narcotics due to Victoriano Botello telling his roommate he will have to make it.

**March 20, 2024 Drug Transaction Involving El Infierno and 2218 S 21st Street (Medel, Castro Estrada, Espinoza)**

264. On March 20, 2024, at about 5:18 PM, case agents intercepted a call between Medel (via TARGET TELEPHONE 2) and Castro Estrada at 52.677.107.3715. This call occurred in Spanish and was translated by an FBI linguist. The following is an approximate translation of that conversation. Case agents know based on intercepts between Castro Estrada and Medel prior to this that Castro Estrada arranged for someone to pick up money from Medel for Castro Estrada. More specifically, prior to this conversation, case agents intercepted calls between Castro Estrada

152

and Medel in which Castro Estrada tells Medel that he has sent people for money. In context, they continue to discuss getting the money in order prior to Castro Estrada sending additional narcotics. He later confirms that the couriers working on behalf of Castro Estrada are outside of the El Infierno. Physical surveillance later confirms the couriers are at El Infierno.

**Castro:** Hey

**Medel:** Huh?

**Castro:** They are parked there, right in front, in a gray little shoe Ford.

**Medel:** A gray little shoe

**Castro:** Yeah. Would you happen to have one of the other ones by chance?

**Medel:** No man, for them?

**Castro:** Yeah. It's just that they didn't explain themselves well. They wanted one of those and well, they didn't explain themselves. I said to myself, well if you have it so you can sell it them.

**Medel:** No well I don't. How much do they want? Well, I could bring it to them right now. How much would I…

**Castro:** But…

**Medel:** How much should I give it to them for?

**Castro:** Well I don't know how much it's going for. How much is it at so that we could also earn something for ourselves.

**Medel:** Well, they let me have it for 7 man. 7 and a half and I could give it to them for 9.

**Castro:** But you can get it right away?

**Medel:** Uh, well let me see now. Let me call Gordo and see where he is at, my buddy alright.

**Castro:** Okay. You just give them that and don't say anything to them.

153

**Medel:** Yeah. Then not the other kind?

**Castro:** Which one?

**Medel:** Of crystal?

**Castro:** Yes. Give it to them anyway man.

**Medel:** But, okay, they are going to pay for the other one right, because that one is not coming from over here.

**Castro:** No, no. no, yes, they would pay you for that one right away but.

**Medel:** But what is the most we can get for the guy so that.

**Castro:** Well, well, how much if we give it to them for 900 how much do we make?

**Medel:** We make 100 and 100 man, well what the fuck.

**Castro:** Well where was that man? 100 and 100?

**Medel:** But

**Castro:** Call your buddy and tell him in how long?

***Call ends***

265. I believe this conversation represents Castro Estrada instructing Medel to obtain both cocaine and methamphetamine ("crystal") for the unknown males who Castro Estrada sent to El Infierno **(Target Location 1)**. From this conversation, case agents believe that Castro Estrada had dispatched unknown males to obtain a bulk cash payment from Medel for previously supplied narcotics, but that Castro Estrada did not realize that the males also wanted to obtain narcotics at the same time and so Castro Estrada asked Medel to supply the narcotics ("Would you happen to have one of the other ones by chance?" and "Yeah. It's just that they didn't explain themselves well. They wanted one of those and well, they didn't explain themselves. I said to myself, well if you have it so you can sell it them."). I believe that this call showed that Medel did not have the narcotics on hand but was willing to contact another DTO Member ("Gordo" and "my buddy") to

154

obtain the narcotics and sell them to the unknown males (in the "little gray" Ford). Based on this, case agents suspected that Medel would then call "Gordo" (which is a known alias for Espinoza).

266. Immediately after Medel and Castro Estrada disconnected, Medel (via TARGET TELEPHONE 2) called Espinoza at TARGET TELEPHONE 5. This call occurred at approximately 5:18 PM. The call was in Spanish and translated by an FBI linguist. The following is an approximate translation of that call.

**Medel:** Where are you dude?

**Espinoza:** Here at the house dude.

**Medel:** Oh, could you bring me one right away dude?

**Espinoza:** Um what kind?

**Medel:** The kind that you use dude, the kind that you work.

**Espinoza:** Yeah dude.

**Medel:** All right then, because these dudes that I'm going to give the money to are already here and they wanted one.

**Espinoza:** Where? Where should I see you?

**Medel:** Here at Infierno, I just arrived.

**Espinoza:** All right, I'll arrive in about 15 minutes dude.

**Medel:** 15?

**Espinoza:** Yes.

**Medel:** Let me tell him then… Let me tell him.

**Espinoza:** No, I'll get there right away. Well its 15 minutes dude. Let me get dressed and I'll head over dude.

**Medel:** But, alright then.

**Espinoza:** All right.

267. I believe this call represented Medel contacting Espinoza to have Espinoza source the narcotics that Castro Estrada asked Medel to supply to the males in the gray Ford. Medel asked Espinoza to bring the drugs ("…bring me one right away…" and "The kind that you use…") because the males in the gray Ford that Medel was going to provide the bulk cash wanted the narcotics ("…because these dudes that I'm going to give the money to are already here and they wanted one."). Based on this, I believe that Espinoza used TARGET TELEPHONE 5 to facilitate this drug transaction with Medel and the unknown males.

268. On March 20, 2024, at about 5:20 PM, case agents intercepted a call between Medel (TARGET TELEPHONE 2) and Mexico based phone number 52.677.107.3715 (believed to be Castro Estrada). The call occurred in Spanish and was translated by Officer Torres. The following is an approximate translation of that conversation.

**Castro:** Hello.

**Medel:** Don't tell them I'm here yet. They have to wait regardless until my guy gets here.

**Castro:** No, no, no, no. I have not told them yet. I'm calling them to see if they're going to want it. 5 minutes (unintelligible)

**Marco:** Well I already ordered it faggot. You told me to order it.

269. I believe this conversation represents Castro Estrada and Medel discussing the potential drug transaction involving the males in the gray Ford. I believe Castro Estrada was in contact with the males to see if they want the narcotics ("…I'm calling them to see if they're going to want it…"), and Medel was waiting for Espinoza to arrive ("They have to wait regardless until my guy gets here.")

270. On March 20, 2024, at about 5:26 PM, case agents intercepted another call between Medel (TARGET TELEPHONE 2), and Mexico based number 52.677.107.3715 (believed to be

156

Castro Estrada). The call occurred in Spanish and was translated by Officer Torres. The following is an approximate translation of that conversation.

**Medel:** Hey

**Castro:** Hey bro. So there is no confusion I set the price at 950. That's how they wanted it.

**Marco:** How much?

**Castro:** 950

**Medel:** Okay

**Castro:** With that same money there, give them 2050 so there is no more issue.

**Medel:** Okay then, I'll only give them 2050.

**Castro:** Then the rest we will split 125 and 125.

**Medel:** You're going to want me to send that today?

**Castro:** Well yeah so I can fuck up some shrimp, since there is extra today.

**Medel:** Okay let me…. How much is it going to be for over there, 125?

**Castro:** 125 son.

**Medel:** Well let me call you when it is done. How about the other? Should I give it to them or not?

**Castro:** Yes give it to them as well.

**Medel:** You sure?

**Castro:** Yes.

**Medel:** If not so I can take it out of here.

**Castro:** Let me ask them.

**Medel:** Either way my guy is not far from getting here since he lives around the corner.

**Castro:** Hey, but you did see the small car out front correct?

**Medel:** Yes I saw it already.

157

**Castro:** Okay so there is no more issues give it to them all together.

**Medel:** Okay then.

**Castro:** Just ask if they are there on behalf of Manny. Once they say yes it is done.

**Medel:** Ok

271.  Case agents believe this conversation represents Medel owing money to his Mexico based broker. The two negotiate for an amount of money to be sent via a courier that was outside El Infierno (ultimately settling on $2050, "2050"). I also believe the conversation represents Castro Estrada instructing Medel to supply with couriers with cocaine and methamphetamine as well for $950 ("…I set the price at 950…"), and that Castro Estrada and Medel will each earn $125 from that transaction ("Then the rest we will split 125 and 125").  It is clear from this conversation that Medel and Castro Estrada are discussing two different quantities of drugs as they discuss one quantity, and then Medel inquires if he should give the males "the other." Finally, case agents believe that one of the quantities of drugs will be supplied by Espinoza, who had not yet arrived ("…my guy is not far from getting here since he lives around the corner…").

272.  It should be noted that physical surveillance observed a gray Ford occupied by two Hispanic males parked outside of El Infierno **(Target Location 1)** at the approximate time of these phone calls. At approximately 5:26 PM, surveillance observed the front passenger of the Ford sedan enter El Infierno Bar. At 5:32 PM, they also observed Espinoza leave his residence, 2218 S. 21st Street **(Target Location4)** and drive to El Infierno **(Target Location 1)**. When Espinoza arrived, he exited his vehicle and checked his pockets as if he forgot something. He then returned to his vehicle and drove back to his residence **(Target Location 4)**.

273.  On March 20, 2024, at about 5:40 PM case agents intercepted a call between Medel (TARGET TELEPHONE 2) and Espinoza (TARGET TELEPHONE 5). The call occurred in

Spanish and was translated by Officer Torres. The following is an approximate translation of that conversation.

**Espinoza:** Hey

**Medel:** Where are you bro?

**Espinoza:** I'm about 3 minutes away bro.

**Medel:** We'll I've seen you pass by twice already.

**Espinoza:** Yes, but I forgot this shit because I was rushed when you called me.

**Medel:** Quit fucking around, they want to leave already.

**Espinoza:** Well yeah, you're calling and calling me fucker, that is why I forgot it where I was weighing it. I'm on my way back.

**Medel:** All right.

274. I believe that this conversation represents Medel (TARGET TELEPHONE 2) and Espinoza (TARGET TELEPHONE 5) continuing to discuss this drug deal. I believe that Espinoza intended to supply Medel the narcotics, however he forgot the narcotics at his residence **(Target Location 4)** ("…that is why I forgot it where I was weighing it…") and needed to return home and retrieve the narcotics. I believe this conversation shows that the intended recipient of the narcotics (in context believed to be the males in the gray Ford) were waiting and want to depart ("…they want to leave already…").

275. Shortly after, at approximately 5:41 PM, Espinoza arrived back at 2218 S. 21st Street **(Target Location 4)**. An unknown female (believed to Samara Rodriguez) exited 2218 S. 21st Street **(Target Location 4)** with a black plastic bag, walked up to the front passenger side of the vehicle, and handed Espinoza the bag. Espinoza then walked into 2218 S. 21st Street **(Target Location 4)**, exited, and drove off.

159

276. On March 20, 2024, at approximately 5:46 PM, case agents intercepted another call between Medel (TARGET TELEPHONE 2) and Mexico based phone number 52.677.107.3715 utilized by Tomas Castro Estrada. The call was in Spanish and translated by Officer Torres. Below is an approximate translation of that conversation:

**Medel:** Hey.

**Castro:** Your guy not there yet?

**Medel:** He won't take long. He's around the corner and I am here with the guy already bro.

**Castro:** You gave it to the guy already or what?

**Medel:** The other one yes, the difference of that one too. My guy is already turning the corner.

**Castro:** Okay good, let me know when it's done.

**Medel:** I wanted to talk to you bro. I wanted to also talk to you about this guy wanting 2 whole ones per week he said.

**Castro:** What friend?

**Medel:** Huh?

**Castro:** What friend?

**Medel:** The guy you sent.

**Castro:** You don't say a thing, because they were sent by another guy and I don't know what the fuck.

**Medel:** That is why I wanted to talk to you first.

**Castro:** Okay.

**Medel:** Then if you were to say yes, then I'll tie it up.

**Castro:** Two of which ones (unintelligible)?

**Medel:** Of the other one. Not the one we got now.

160

**Castro:** The ones we are waiting on right?

**Medel:** Yes, this guy said he can move two a week.

**Castro:** The thing is I don't know them. They were sent by a friend.

**Medel:** Ok well it will stay at a green light and once you guys discuss it let me know.

**Castro:** (unintelligible)

**Medel:** huh?

**Castro:** Your guy has some?

**Medel:** Yes bro, there's some there. If they like it they can come by tomorrow for one, so we can at least get something bro.

**Castro:** Okay yeah that's fine.

**Medel:** My guy is here and he is leaving bro. I'll call you back.

**Castro:** Call me back (unintelligible).

**Medel:** Yes.

**Castro:** (unintelligible)

**Medel:** You know it.

277. I believe this conversation represents Castro Estrada checking to see if the deal between the couriers and Medel was complete ("…You gave it to the guy already or what?"). I believe that Medel indicated that he had supplied one quantity of drugs to the courier ("… The other one yes, the difference of that one too…"),  but he was waiting on Espinoza to deliver the rest of the narcotics for the courier ("…My guy is already turning the corner…").  Medel questioned whether he should continue business with these couriers, who were claiming they can move two kilograms a week ("….I wanted to also talk to you about this guy wanting 2 whole ones per week he said..."), and that it would be two kilograms of drugs they were waiting for Espinoza to deliver ("…Two of which ones (unintelligible)?" "Of the other one. Not the one we got now…"

161

"The ones we are waiting on right?" and "…Yes, this guy said he can move two a week."). Castro Estrada then asked if Espinoza ("your guy") had kilograms ("some"). Medel replied that he did("…Yes bro, there's some there. If they like it they can come by tomorrow for one …"). I believe that Espinoza arrived during this call ("…My guy is here and he is leaving…"). I believe that the kilograms of cocaine belonged to Espinoza and not Castro Estrada because Castro Estrada asked Medel if they wanted "the ones they are waiting on," implying the narcotics were being sourced by Espinoza.

278. At 5:47 PM, Espinoza arrived at El Infierno **(Target Location 1)** and entered. At approximately 5:54 PM, the unknown male re-entered the gray Ford. The Hispanic males in the Ford left the area and were followed to Aurora, Illinois. While in Illinois, they stopped at a business, "Checks Cashed."

279. Based on the totality of the circumstances, I believe that Castro Estrada sent the two Hispanic males in the Ford to El Infierno (**Target Location 1**) in order to pick up money from Medel for previously supplied narcotics. In addition to giving the Hispanic males the money, Castro Estrada asked Medel to give them an amount of cocaine and methamphetamine. Medel did not have the cocaine and contacted Espinoza to bring over cocaine. Espinoza agreed and later left his house **(Target Location 4)** bringing the narcotics to Medel at El Infierno **(Target Location 1)**. It began becoming apparent that Espinoza's role in this DTO was not merely a stash house operator. He apparently has his own source of narcotics and always seems to have large amounts on hand.

280. On March 23, 2024, at about 10:15 AM case agents intercepted a call between Medel (TARGET TELEPHONE 2) and Espinoza (TARGET TELEPHONE 5). This call occurred in Spanish and was translated by MPD Officer Justin Torres. The following is an approximate translation of that conversation.

**Espinoza:** Hey!

**Medel:** You still in hell? (in context, hell is believed to be El Infierno)

**Espinoza:** I'm here and you?

**Medel:** No I'm at home, but I was wondering if you could take me a (unintelligible)

**Espinoza:** What?

**Medel:** If you could bring me another one today, but, I was going to ask if I could pay for the one yesterday with crystal meth so we can be even.

**Espinoza:** Well I have a fuck load of crystal meth.

**Medel:** Well yeah, I'll give you a 28 for 14, sell at 4. No?

**Espinoza:** Well I already have a fuck load bro.

**Medel:** Regardless bro I'm not jerking you around bro. Either way you'll be able to save some cash.

**Espinoza:** Yeah, but I get it much cheaper bro. Give me two.

**Medel:** For 4? Get the fuck out of here.

**Espinoza:** Well bro I get it for like 150.

**Medel:** Okay (unintelligible)

**Espinoza:** Alright.

**Medel:** I'm going to need it.

**Espinoza:** Alright.

**Medel:** (unintelligible) I'm guessing in about, well how much longer are you going to be there?

**Espinoza:** I'm here but I'll be home in half of a hour.

**Medel:** At 11 I have an appointment to get my taxes done. I'm going to grab something and send it. After 11 or around 1 I will call you.

**Espinoza:** All right bro.

**Medel:** Alright.

281.  As previously mentioned, it appears Espinoza has his own source(s) of supply and is more than merely a runner/ stash house operator for this DTO. This call makes it clear that Espinoza has a source of supply for crystal methamphetamine ("crystal meth") and that provides the drug cheaper than Medel is able to supply it ("Yeah, but I get it much cheaper bro").  I believe this conversation specifically shows that Medel owes Espinoza money for the cocaine that Espinoza supplied previously and that Medel also wants more cocaine from Espinoza ("If you could bring me another one today, but I was going to ask if I could pay for the one yesterday with crystal meth so we can be even. "). Medel offered to trade Espinoza crystal methamphetamine in order to pay his debt and obtain cocaine. Espinoza claimed he gets it (contextually, the methamphetamine) cheaper, which I believe shows that he has his own cocaine and methamphetamine source(s) of supply. Espinoza ultimately agreed to discuss this further with Medel later. I believe that Espinoza used TARGET TELEPHONE 5 to discuss this upcoming drug transaction with Medel.

### Identification of Botello, Sr.'s New Burner Phone
### (224)795-9899

282.  As previously mentioned in this affidavit, case agents know that Botello, Sr. dropped his prior burner line on or about March 20, 2024. This is a common practice amongst drug traffickers in order to avoid detection from law enforcement. In order to identify new lines, law enforcement utilize toll analysis to identify the new number. In this case, TFO Brian Ploch and FBI Tactical Analyst Meyer analyzed toll data for Botello, Sr.'s dropped line ((224)595-8469). In doing so, they identified the top three contacts for Botello, Sr.'s dropped line ((224)595-8469). Those numbers were identified as (414)399-9990 (Andrew Sabo), (414)745-5946 and (414)759-3441. In order to identify the new burner number utilized by Botello, Sr. case agents

164

administratively subpoenaed toll records for those three numbers to include a time frame both before (224)595-8469 was dropped and then after the new phone is believed to have been acquired (March 20, 2024). On March 27, 2024, the tolls were received for the three above-mentioned numbers.

283. In analyzing the tolls for Botello, Sr.'s top three contacts, case agents noted that all three of these numbers were in contact with (224)795-9899 beginning on or after March 20, 2024. They were not in contact with that number prior to March 20, 2024. More specifically, Sabo's phone ((414)399-9990), the prior top caller of ((224)595-8469), first had contact with (224)795-9899 on March 20, 2024, the day case agents believe that Botello, Sr. dropped his burner line ((224)595-8469). Phone number (414)745-5946 (the second top caller of (224)595-8469) first had contact with phone number (224)795-9899 on March 20, 2024, which was the day case agents believe that Botello, Sr. dropped his line ((224)595-8469). Finally, phone number (414)759-3441 (the third top caller of (224)595-8469) first had contact with (224)795-9899 on March 20, 2024, which was the day Botello, Sr. is believed to have dropped (224)595-8469. It should be noted that none of these numbers had contact with (224)795-9899 prior to March 20, 2024, and none of these three numbers had mutual contacts other than (224)795-9899. Based on this information case agents are confident that (224)795-9899 was the replacement burner number for Botello, Sr.

284. Additionally, Botello, Sr.'s prior phone began with area code "224" which is not an area code native to Wisconsin. Case agents believe that he chooses burner phone numbers with an out of state area code to mislead law enforcement should they identify the number as being linked to narcotics trafficking. I believe the toll analysis and use of the "224" area code shows this phone number was the replacement line for Botello's Sr.'s now defunct burner phone ((224)595-8469).

285. After identifying (224)795-9899 as the replacement line for Botello, Sr.'s burner phone, TFO Ploch analyzed the pen registers of other DTO members because case agents knew

that Botello, Sr.'s prior burner phone was in contact with other DTO members such as Medel (TARGET TELEPHONE 2) and Botello, Jr.'s burner phone (414)460-5121. Upon reviewing that data, TFO Ploch noted that (224)795-9899 was in contact with Medel (TARGET TELEPHONE 2) on March 20, 2024, via one encrypted RCS electronic message. The content of that RCS session was not unencrypted by the FBI interception system and therefore the content of that message is unknown. Additionally, (224)795-9899 was in contact with Botello, Jr.'s burner line (414)460-5121 on March 25, 2024, via one voice call.

286. Therefore, case agents believe that Botello, Sr. replaced his burner phone number (224)595-8469 with (224)795-9899. (224) 795-9899 is in contact with the top tree callers from Botello, Sr.'s prior number, is in contact with Medel (TARGET TELEPHONE 2) another DTO member, and is in contact with Botello, Jr., his son and fellow DTO member. All these contacts began on or after March 20, 2024, the day Botello, Sr. apparently dropped his prior phone number, and none were in contact with this number prior to March 20, 2024.

287. Finally, on March 27, 2024, TFO Cabral was monitoring the pole camera at El Infierno while simultaneously monitoring the pen register for Sabo's (414)399-9990 phone number. This number had previously been in contact with Botello, Sr.'s new burner phone ((224) 795-9899). At 7:08 PM, TFO Cabral observed Botello, Sr. talking on a phone as he walked into El Infierno. TFO Cabral noted that beginning at 7:07 PM Sabo's phone ((414)399-9990) was in contact with (224) 795-9899 and was still on an active call with (224) 795-9899 at the time TFO Cabral observed Botello, Sr. on the phone. TFO Cabral knows that Botello, Sr. also uses TARGET TELEPHONE 6. So, to rule out that Botello, Sr. might have been using TARGET TELEPHONE 6 at the time he was observed on the phone, TFO Cabral checked the pen register for TARGET TELEPHONE 6. TARGET TELEPHONE 6 did not show any activity at the time Botello, Sr. was observed talking on the phone. Case agents believe that at approximately 7:07 PM, Botello, Sr.

166

was on the phone with Sabo, a known DTO member, via (224) 795-9899 as Botello, Sr. entered El Infierno.  This further confirms that (224) 795-9899 was used by Botello, Sr.

288.    On March 28, 2024, case agents served a Pen Register Trap and Trace for (224) 795-9899 to T-Mobile. On March 29, 2024, case agents began receiving data from T-Mobile pursuant to the order. TFO Ploch compared registration data obtained via the pen register between (224) 795-9899 and Botello, Sr.'s prior burner phone, (224)595-8469. TFO Ploch noted that (224) 795-9899 and the prior burner phone (224)595-8469 both shared the same International Mobile Equipment Identity (IMEI) number. TFO Ploch identified that IMEI number associated to (224) 795-9899 and Botello, Sr.'s prior burner number as 359188100511963.[8] TFO Ploch knows through his training, experience, and conversations with other law enforcement officers, that the IMEI number is a serial number assigned to the physical phone or device. TFO Ploch also knows that the IMEI number is unique to a specific phone. Based on this information, TFO Ploch knows that the IMEI number assigned to (224) 795-9899 and prior number (224)595-8469 are both assigned to the same physical phone. Based on this information, case agents know that when Botello, Sr. "drops" his line he is simply changing the SIM card to the phone but is still using the same physical device.

**Drug Transaction April 1, 2024**
**(Medel and Congleton)**

289.    On April 1, 2024 case agents intercepted a call from Congleton (414)319-9973 to Medel (TARGET TELEPHONE 2). This call occurred in English, below is an approximate transcription of part of that conversation between Medel and Congleton.

**Medel:** What time are you coming out?

**Congleton:** Probably around 4

---

[8]  (224)595-8469 and/or (224) 795-9899 are referred to herein as Botello Sr.'s "prior" burner number and (224)595-8469/(224) 795-9899/TARGET TELEPHONE 7 are framed as separate phones for the sake of clarity and ease of understanding of how Botello Sr. cycles through different telephone numbers.  However, the communication facility (the device itself) is the same for TARGET TELEPHONE 7, (224) 795-9899, and (224)595-8469.

167

**Medel:** Can you spot me 7 points so I can work?

**Congleton:** Um yeah.

**Medel:** By 4?

**Congleton:** Yeah.

290. I believe this conversation represents Medel asking Congleton to front him "7 points" (a street term for 7 grams of narcotics) so that Medel can "work" (i.e. sell the drugs). I further believe that Congleton agreed and would bring the narcotics to El Infierno **(Target Location 1)** around 4:00 PM. Physical surveillance was established at Congleton's residence of 5946 S. Honey Creek Drive **(Target Location 8)**. Congleton's vehicle, a black Jeep Cherokee (WI license plate "JAYM0") was located in the parking lot. At 3:50 PM, surveillance observed Jayme Congleton exit 5946 S. Honey Creek Drive **(Target Location 8)**. He was followed to a grocery store where he entered momentarily. After leaving the grocery store, Congleton drove directly to El Infierno **(Target Location 1)** and entered the bar. I believe that Congleton is storing amounts of narcotics at his residence **(Target Location 8)** and transported the "7 points" ordered by Medel from his house 5946 S honey Creek Drive **(Target Location 8)** to El Infierno **(Target Location 1)**. This is merely an example of conversations intercepted between Medel and Congleton consistent with drug trafficking.

**TARGET TELEPHONE 7- Number Change**

291. On April 4, 2024, case agents obtained location data and a Title III order for TARGET TELEPHONE 7's prior number ((224) 795-9899 and IMEI 359188100511963). The phone did not report location data which TFO Ploch knows is consistent with the phone being powered off. Furthermore, case agents did not intercept any answered calls or outgoing messages from TARGET TELEPHONE 7 pursuant to the April 4 order. Through toll analysis and other

168

investigative methods documented below Case agents confirmed he dropped this phone and identified his new burner line.

292. TFO Ploch notes that since case agents became aware of Botello, Sr.'s use of (224) 795-9899 on March 20, 2024, Sabo and Botello, Jr. (via ((414)399-9990 and (414)460-5121)) have been in frequent and consistent contact with (224) 795-9899. Sabo (via 414-399-9990) was in phone contact with (224) 795-9899 on March 26, 2024, March 27, 2024, March 28, 2024, and March 29, 2024. Botello, Jr. (via 414-460-5121) was in phone contact with (224) 795-9899 on March 25, 2024, March 28, 2024, and March 29, 2024; (b) both Sabo and Botello, Jr. ((414)399-9990 and (414)460-5121) ceased all contact with (224) 795-9899 on March 29, 2024 and there has been no contact between either number and (224) 795-9899 after March 29, 2024; (c) I believe that this break in patterns of contacts is significant because it suggests that Botello, Sr. is now communicating with Sabo and Botello, Jr. via a different telephone number; (d) consistent with that, both Sabo and Botello, Jr. ((414)399-9990 and (414)460-5121) received incoming messages from TARGET TELEPHONE 7 on the morning of March 30, 2024 and, thereafter, continue to be in contact with TARGET TELEPHONE 7 and not (224) 795-9899; (e) This timing is consistent with all outgoing calls and messages ending on (224) 795-9899; and (f) I know based on pen register and toll data that Botello, Jr.'s burner and Sabo's phone do not have any other common contacted numbers. In the last 30 days, their only two common contacts are (224) 795-9899 and now TARGET TELEPHONE 7.

293. Further, I know that both of Botello, Sr.'s prior burner phones utilized a "224" area code. This area code is not consistent with a Wisconsin based area code. It is apparent that Botello, Sr. chooses burner numbers with the 224 area code, which I believe is a tactic utilized to mislead law enforcement. Finally, I know that both of Botello, Sr.'s prior burner phones ((224)595-8469 and (224) 795-9899) were serviced by T-Mobile. It is apparent that he prefers to use T-Mobile

169

service for his burner phones. This new burner number identified, (224)713-6938 (TARGET TELEPHONE 7), is also serviced by T-Mobile.

294. Finally, on April 6, 2024, TFO Brian Ploch analyzed pen register data obtained for TARGET TELEPHONE 7 and learned that when the phone registered with T-Mobile's network they obtained the IMEI number associated with the phone number. That IMEI number for TARGET TELEPHONE 7 is 359188100511963. This is the same IMEI number associated with (224) 795-9899 (which was the subject of 24-AP-6) and Botello, Sr.'s prior burner number (224)595-8469. Therefore, TFO Ploch believes that Botello, Sr. is continuing to use the same physical phone every time he changes his burner phone number. An amended affidavit and Title III wiretap order (24-AP-6 amended) was approved and served ultimately allowing case agents to intercept Botello, Sr.'s communications on his latest burner phone.

**Medel's Involvement with 2436 S. 8th Street (Target Location 12)**

295. Case agents became aware that Medel sometimes stays at his mother's residence and interceptions over TARGET TELEPHONE 2 and TARGET TELEPHONE 5 led case agents to believe that Medel stores drugs at this location as well. In a series of text messages between TARGET TELEPHONE 2 and a suspected drug customer on March 28, 2024, the customer asks if Medel has taco around. Case agents know that "taco" and "tostada" are terms used by this DTO to discuss quantities of cocaine. Medel asks what time the customer will be ready and they agree to meet in a half hour at Medel's mother's residence. Surveillance later observed the customer's vehicle park on the northeast corner of 8th and Hayes. In a series of text messages that same day between TARGET TELEPHONE 2 and this customer, the customer indicates that he is close to Medel's house. Medel indicates that he is ready and that the customer should let him know when he is outside Medel's mother's house and the customer indicates he is already there. Surveillance observed the customer drive into the alley behind Medel's mother's residence **(Target Location**

**12**). Surveillance did not observe a hand to hand with Medel as the view was obstructed in the alley way. However, case agents believe that a drug transaction occurred.

296. On April 4, 2024, case agents intercepted a call between Medel and Espinoza. The following is a translated summary of this call and not a direct transcription. Medel asks where Espinoza is and Espinoza says he's at Oklahoma with Espinoza's brother. Medel says that's fine and agrees for tomorrow. Medel asks when Espinoza is going to pick up that stuff, Medel says didn't Espinoza need the stuff. Espinoza says tomorrow and adds that Medel has never asked for Espinoza to come by, that Medel is always drunk. Medel says he told Espinoza the other day, when Medel asked for stuff for Papa and then returned them to Espinoza. Medel says he now has them at his mom's house, in case they don't let Medel into his house. Espinoza says he'll come by and pick up Medel tomorrow around 11:30 - 12:00. Medel affirms and says he'll be free by then.

297. On April 10, 2024, Medel and Espinoza exchanged text messages which are translated as follows showing that Medel has access to both his residence and his mother's residence:

Medel: When you get a chance 7 points!

Espinoza: Ok I'll get there in 4 minutes so that you come out

Medel: I'm at my house

Espinoza: Ok ay boy

Espinoza: Yours or you mom's

Medel: Mine

298. On April 12, 2024, at approximately 11:00 AM, case agents intercepted a phone call between Medel and Espinoza in which, in sum, Espinoza says he is sleeping. Medel says he is at La Esperaza having breakfast. Medel wants to know what time Espinoza wants to meet. Espinoza and Medel will meet at noon there. Medel says bring the scale. Medel says he needs to meet on time because he has to take his daughter to school at 1:00. Case agents intercepted another call between Medel and Espinoza at 11:40 AM, in which, in sum, Espinoza asks Medel if

171

he is at home.  Medel tells Espinoza he said at noon.  Medel says he is at Buckshots having a beer.  Medel says it is only five minutes there. Espinoza says to head over.  Espinoza says he is on his way.  Medel says he will see him there.

299.    On April 12, 2024, at approximately 11:25 AM, case agents intercepted a phone call between Medel and Aviles-Rogel in which, in sum, Medel says he is going to Buckshots for a while because at noon Medel says he is meeting Gordo [Espinoza]  because he [Espinoza] is going to stop by for what is there at the house.

300.    On April 12, 2024, at approximately 11:54 AM, case agents intercepted a phone call between Medel and Espinoza in which, in sum, Medel asks where Espinoza is and Espinoza says, "Here at your mom's house, dude."  Medel asks if in front.  Espinoza is in the parking lot in the back.  Medel says, "Okay, you're parked."  At 11:57 AM, TFO Lirette observed Espinoza's Toyota parked in the alley behind Medel's mother's house at 2436 S. 8th Street (**Target Location 12**). Based on intercepted calls, Medel and Espinoza were scheduled to meet there for a narcotics related transaction. PO's Antoniak and Kuspa did a drive down the alley and observed Medel's black Yukon parked near Espinoza's vehicle in a slab behind Medel's mom's house. (Case agents learned, based on later interceptions, that Medel gave Espinoza the remaining narcotics that Medel had from Castro Estrada).

301.    Case agents are monitoring precision location data (pings) for Medel's phone which shows that Medel's phone sometimes pings overnight in the area of his residence (Target Location 5) and sometimes pings overnight in the area of his mother's residence (Target Location 12).  Case agents looked at this data for the days just prior to this affidavit (April 23, 2024, to April 29, 2024).  In those seven nights, Medel's phone pinged in the area of his residence (Target Location 5) on 5 nights and in the area of his mother's residence (Target Location 12) on one night, April 29, 2024.  This shows that Medel is likely still able to access Target Location 12.

172

**Narcotics Trafficking by Espinoza at 2040 S 20th Street
(TARGET LOCATION 9)**

302. Over the course of this investigation, case agents have identified a second address that Espinoza uses to conduct narcotics transactions. This residence has been identified as 2040 S. 20th Street **(Target Location 9)**. Throughout the interceptions on Espinoza's phone (TARGET TELEPHONE 5), case agents have learned that Espinoza's friend ("Leo") resides at the house. "Leo" has not yet been further identified. An example of Espinoza selling narcotics from that location occurred on April 8, 2024. This is merely an example of numerous similar transactions where Espinoza directed someone to meet him at **Target Location 9** to consummate a drug transaction.

303. On April 8, 2024, TFO Veloz observed Espinoza exiting and entering 2040 S. 20th Street **(Target Location 9)**. At about 12:32 PM, Espinoza (via TARGET TELEPHONE 5) spoke with Miguel Perez at (414)366-5493. In the phone call, Espinoza told Perez that he (Espinoza) is over on 20th. Perez says that he does not get money until Wednesday and will owe Espinoza "one" and asks Espinoza if he can give him (Perez) another "two."  Perez indicates that if Espinoza can do that, Perez will pay Espinoza on Wednesday. Espinoza agrees. Based on the context of this call, case agents know that Espinoza is agreeing to give Perez narcotics on consignment and that Perez will arrive to pick up the narcotics from Espinoza at 2040 S. 20th Street. **(Target Location 9)**. At 12:55 PM, case agents conducting surveillance observed Espinoza exit 2040 S 20th Street **(Target Location 9)** and walk to a dark colored F150 listing to Perez. Espinoza briefly entered the passenger seat of the vehicle before exiting. At 12:57 PM, the truck left and Espinoza went back inside 2040 S. 20th Street **(Target Location 9)**. Based on the intercepted call and short-term contact, case agents believe that Espinoza conducted a narcotics transaction with Perez outside of 2040 S. 20th Street **(Target Location 9).**  Espinoza exited directly from **Target Location 9** before entering into Perez's vehicle to conduct the drug transaction.  Therefore, it is clear to case agents that Espinoza had the

173

drugs within **Target Location 9**. It should be noted this is merely an example of a single narcotics transaction involving 2040 S. 20th Street **(Target Location 9)** that occurred on April 8, 2024.

304.    Another example of Espinoza engaging in narcotics transactions at 2040 S. 20th Street **(Target Location 9)** occurred on April 14, 2024. Espinoza received an incoming call from (414)688-1016 (UM-1016). In the call, Espinoza tells UM-1016 that he is at "Leo's" house. UM-1016 says he will stop by "Leo's" house and asks if Espinoza can prepare a "hand" for him. Espinoza agrees. Case agents know that a "hand" is a street term for one ounce of narcotics based upon training and experience and prior interceptions. In a later call, UM-1016 and Espinoza again agreed to meet at 2040 S. 20th Street **(Target Location 9)**. Shortly thereafter, TFO Martinez observed a Black GMC Yukon pull into the alley and stop behind 2040 S. 20th Street **(Target Location 9)**. Case agents believe that this was the user of (414)688-1016 who Espinoza instructed to meet Espinoza at 2040 S. 20th Street **(Target Location 9)** for the drug deal. Again, this is merely an example of other narcotics related transactions interceptions and observations involving Espinoza at 2040 S 20th Street **(Target Location 9)**.

**Additional Information Involving 921 W. Walker/ 919 W. Walker Street**
**(Target Location 2 and Target Location 7)**

305.    Over the course of this investigation, case agents have monitored a pole camera that captures the front of Botello, Sr.'s residence, 921 W. Walker Street **(Target Location 2),** and 919 W. Walker Street **(Target Location 7)**. In doing so, case agents have observed Botello, Sr. carrying a blue handheld cooler to and from both residences almost daily. This occurs in both the daytime and nighttime. I know that Special Agent Shamsi has attended a Cartel Narcotics Trafficking Training in which SA Shamsi learned that a common trend utilized by narcotics traffickers is to transport their narcotics in coolers. SA Shamsi specifically learned that this is done because the coolers can be quickly discarded or concealed in various ways without damaging the narcotics and/ or money contained within. By example, the cooler could be buried, thrown into the trash or thrown

174

into water and the contents would be protected and could be retrieved at a later time. The fact the Botello, Sr. consistently carries this cooler both too and from his house **(Target Location 2)** and his neighbor's house **(Target Location 7)** leads me to believe that: (a) that the cooler contains narcotics and (b) that narcotics are being stashed in both Botello, Sr.'s house **(Target Location 2)** and his neighbor's house, 919 W. Walker Street **(Target Location 7)**.

306. By example, case agents intercepted communications on April 10, 2024, confirming the belief that Botello, Sr. is utilizing 919 W. Walker Street **(Target Location 7)** as stash location for narcotics. More specifically, at about 8:54 PM, Botello, Sr. received a call from (414)349-9918 (UM-9918). In that call, UM-9918 tells Botello, Sr. that he needs "100." Based on the context and my knowledge of Botello, Sr., I suspected UM-9918 was ordering 100 grams of cocaine. Botello, Sr. agreed to the deal and told UM-9918 that he will bring it already packaged, further confirming my belief this was going to be a narcotics related transaction. Botello, Sr. told UM-9918 to give him about 15 minutes.

307. At 9:12 PM, Botello, Sr. left El Infierno **(Target Location 1)** and drove to the area of 921 W Walker Street **(Target Location 2)** and 919 W Walker Street **(Target Location 7)**. He was observed entering the alley, however physical surveillance was not able to follow Botello, Sr. into the alley for fear of being identified as law enforcement. At about 9:28 PM, case agents intercepted a call from Botello, Sr. to (414)458-2023. In that call, Botello, Sr. told a female to open the back door right away. Case agents suspected that Botello, Sr. was speaking with an occupant of 919 W. Walker St **(Target Location 7)** rather than his house **(Target Location 2)** because he would have the keys to access his own residence and would not need to ask someone to open the door for him. TFO Klarkowski utilized Clear, a Law Enforcement Database case agents have utilized to identify the user of phone numbers and learned that (414)458-2023 is associated with a female named Rosio Garcia with a listed address of 919 W. Walker St. **(Target Location 7)** confirming our

belief that Botello, Sr. was picking up the "100" for UM-9918 from 919 W Walker Street **(Target Location 7)**. Furthermore, I know that SA Shamsi reviewed a return provided by WE Energies for the energy subscriber at 919 W Walker Street **(Target Location 7)** and learned the energy subscriber is Mario Garcia and the phone number for the account is (414)458-2023.

308. At about 9:41 PM, Botello, Sr. received another call from UM-9918. In that call Botello, Sr. told UM-9918 that he will be there shortly. Botello, Sr. instructed UM-9918 to meet him at El Rey located on S. 13th Street. They both agree to meet there. At about 9:47 PM, TFO Boyd observed Botello, Sr. leaving the area near his residence/his neighbor's residence (**Target Location 2/Target Location 7**). At about 9:48 PM, case agents intercepted another call between Botello, Sr. and UM-9918. In this call, the meet location was changed from El Rey to a bar. Botello, Sr. says that he will arrive and will go inside for one drink. UM-9918 tells Botello, Sr. that his guy is dying and Botello, Sr. responds that he will be revived shortly. They both laugh and the call ends. I believe that UM-9918 is middling the deal between Botello, Sr. and his "guy" who is "dying." I believe the reference that his guy is "dying" is in reference to his guy being out of narcotics and that Botello, Sr.'s response is further confirmation he will arrive soon with the narcotics. At 9:53 PM, Botello, Sr. was observed by TFO Veloz parking near the bar. Botello, Sr. entered the bar consistent with his agreement with UM-9918.

309. In summary, I believe the events described above represent Botello, Sr. agreeing to source UM-9918 with 100 grams of cocaine. Botello, Sr. then left El Infierno **(Target Location 1)** and traveled to a stash house at 919 W. Walker Street **(Target location 7)** to obtain and package the cocaine. Botello, Sr. then left **Target Location 7** and traveled to the agreed on meet location, where he entered to consummate the drug deal with UM-9918. Case agents further believe these specific intercepts and observations provide context for why Botello, Sr. is frequently observed carrying a cooler in and out of both 921 W. Walker Street **(Target Location 2)** and 919 W.

176

Walker Street **(Target Location 7)**. I believe that both locations contain quantities of narcotics accessible to Botello, Sr. Due to my training and experience, I know narcotics traffickers will use many different locations to stash their money, narcotics, and firearms because they do not want to get caught with all the contraband in a single location.

**April 12, 2024: Controlled by #10**
**(Sabo and Botello, Sr.)**

310.     On April 12, 2024, at about 12:05 PM, TFO Brian Ploch contacted CHS#4 in order to discuss a controlled evidence purchase from Andrew Sabo. TFO Ploch asked CHS#4 to contact Sabo and inquire about the price for 1 pound of methamphetamine. CHS#4 agreed to contact Sabo and ask for the price. TFO Ploch suspected this would spark communication between Sabo and Botello, Sr. (via TARGET TELEPHONE 7). AT 12:09 PM, case agents began intercepting a series of messages between Sabo and Botello, Sr. (TARGET TELEPHONE 7). Below are the messages exchanged between Sabo and Botello, Sr.:

**Sabo:** Yo

**Botello, Sr.**: Get up wyu this evening

**Sabo:** Okay

311.     Shortly after this text exchange, CHS#4 contacted TFO Ploch and advised that the price for 1 pound of methamphetamine would be $3,400. I believe that when CHS#4 informed Sabo that CHS#4 would likely need 1 pound of methamphetamine, Sabo quickly contacted his methamphetamine supplier, Botello, Sr. Botello, Sr. was careful with his phone, however the two agree to meet later ["Get up wyu this evening" I believe is misspelling for get up with you this evening]. I believed that at this later meeting, Sabo and Botello, Sr. would discuss this methamphetamine transaction.

312.     On April 13, 2024, I met with CHS#4 in order to for CHS#4 to consummate this methamphetamine transaction with Sabo. I met with CHS#4 at a predetermined location and asked

177

that CHS#4 call Sabo to conduct the deal. I observed CHS#4 call Sabo at phone number (414)949-2727. Below is the approximate conversation between CHS#4 and Sabo which occurred in my presence and with the consent of CHS#4.

**Sabo:** What up?

**CHS#4:** I just talked to my guy and they want to know if you got that "P" [P is a street term for pound].

**Sabo:** Ya

**CHS#4:** Alright, give me a… I am going to have the cash, I am trying to figure out where he at right now. They just called me they just got into town early so. I am going to find out where he at right now and get the cash and come holler at you.

**Sabo:** You got to let me know so I can grab it, I got it in my house so I can leave with it. Until you have the cash, I am not leaving with it.

\*\*\*CHS#4 and Sabo continue to discuss the logistics of this transaction.\*\*\*

313. I believe this conversation represents that Sabo had already obtained the pound of methamphetamine ordered on April 12, 2024 and admits that it is stored at his residence. I know that Sabo lives at 5089 W. Colonial Court (**Target Location 6**) based on CHS#4 reporting and physical surveillance of Sabo and his vehicles at this location.

314. I later conducted a search of CHS#4 and CHS#4's vehicle for money and or contraband finding none. I provided CHS#4 with the pre-recorded by money and instructed CHS#4 to contact Sabo again. CHS#4 and Sabo agreed to meet at a gas station near S. 35th Street and W. Oklahoma Avenue. CHS#4 also notified me that Sabo would be there in his black Jeep. TFO Martinez observed Sabo arrive in a black Jeep bearing WI license plate G0TME1 listing to Sabo. CHS#4 arrived shortly thereafter and entered the front passenger seat of Sabo's vehicle. Moments later, CHS#4 exited Sabo's vehicle and left the area. I followed CHS#4 to a new location and did

not lose sight of CHS#4. At this location, CHS#4 turned over a black bag containing a clear plastic baggie containing suspected methamphetamine. CHS#4 told me that CHS#4 exchanged the buy money with Sabo for the suspected methamphetamine. I again searched CHS#4 for money and/ or contraband finding none.

315. I then transported the suspected methamphetamine to the FBI where it was weighed and tested by TFO Boyd. TFO Boyd utilized the TruNarc Narcotic analyzer and received a positive reaction for the probable presence of methamphetamine. The methamphetamine was then weighed and found to weigh 454.7 grams. The methamphetamine was entered into FBI property.

316. I reviewed covert recordings made by CHS#4 of the transaction with Sabo inside Sabo's vehicle and confirmed that Sabo provided the black bag to CHS#4.

317. Case agents next intercepted communications between Sabo and Botello, Sr. (TARGET TELEPHONE 7) on April 14, 2024. The following is an approximate transcription of those communications.

**Message Exchange**

**Sabo:** U okay

**Botello, Sr.:** Yes… Call u n a lil…

**Botello, Sr.:** U?

**Sabo:** Yeah. You ain't responded in a while so that's why I was asking.

**Botello, Sr.:** Where u b I am actually in the area of ur guys shop… leavin thou.

318. After that message exchange, case agents intercepted a voice call between Sabo and Botello, Sr. (TARGET TELEPHONE 7). In that call, Botello, Sr. says that he has been seeing a lot of roaches [derogatory reference to law enforcement] and asks if Sabo has as well. Sabo says no and brags that he has multiple vehicles and switches them frequently making him difficult to follow. Sabo tells Botello, Sr. that he has money for Botello, Sr., and they agree to meet up later.

179

319.  I believe this call represents that Sabo has Botello, Sr.'s money at least in part from the 1 pound methamphetamine deal with CHS#4. Furthermore, I believe that Botello, Sr. believes he is being followed by Law Enforcement and Sabo brags that he is surveillance conscious by utilizing multiple vehicles in order to avoid detection. I believe this conversation also represents more than a buyer seller relationship between Botello, Sr. and Sabo for several reasons: (a) I believe Sabo telling Botello, Sr. that he has his money represents Botello, Sr. giving Sabo narcotics on consignment. (b) I believe Botello, Sr. is warning Sabo that he has been noticing Law Enforcement so Sabo can be careful; and (c) I believe Sabo discussing that he drives 5 different cars daily represents Sabo sharing countersurveillance tactics with Botello, Sr. Should one or both be arrested by Law Enforcement it would affect their drug dealing operation.

**April 17, 2024: Controlled Buy #11**
**(Botello, Jr. and Target Location 11)**

320.  On April 17, 2024, TFO Klarkowski and TFO Veloz met with CHS#3 in order to facilitate a controlled evidence purchase from Botello, Jr. In sum, CHS#3 contacted Botello, Jr. at (414)460-5121 the day prior and Botello, Jr. agreed to sell CHS#3 an amount of cocaine. Botello, Jr. specifically said he doesn't carry that on him, but will get it. This led case agents to suspect that Botello, Jr. stores the cocaine at his residence or another DTO stash location. This call was witnessed by TFO Klarkowski. On April 17, 2024, CHS#3 received a message from Botello, Jr. via Instagram to meet at the Aldi's located at 1441 S. 35th Street. TFO Klarkowski then met with CHS#3 in order to conduct a controlled evidence purchase from Botello, Jr.  TFO Klarkowski searched CHS#3 for contraband and/or money finding none. CHS#3 then drove with TFO Veloz in an undercover vehicle towards Aldi's. At about 5:40 PM, case agents observed Botello, Jr. exit 2055A N 31st Street (**Target Location 11)** in his white Jeep bearing WI license plate ARH-8573. TFO Boyd located Botello, Jr.'s vehicle in the Aldi parking lot at approximately 6:07 PM. TFO Boyd continued surveillance on Botello, Jr. while waiting for CHS#3 and TFO Veloz to arrive.

180

321. At 6:16 PM, prior to CHS#3 and TFO Veloz arriving, TFO Boyd observed a white male enter the front passenger seat of Botello, Jr.'s vehicle for a few seconds before exiting. Due to her training and experience, TFO Boyd suspected this was a narcotics transaction. Case agents believe that Botello, Jr. facilitated a drug deal separate from the controlled evidence purchase with CHS#3.

322. At about 6:45 PM, TFO Veloz and CHS#3 arrived at Aldi's parking lot. CHS#3 exited TFO Veloz's vehicle and entered the front passenger seat of Botello, Jr.'s vehicle. Moments later, CHS#3 exited Botello, Jr.'s vehicle and re-entered TFO Veloz's vehicle. CHS#3 turned over a clear plastic bag containing a white substance suspected to be cocaine to TFO Veloz. CHS#3 stated that he/she exchanged the buy money for the suspected cocaine with Botello, Jr. CHS#3 was again searched for money and/or contraband finding none. TFO Veloz transported the suspected cocaine to the FBI where it was weighed and tested. The suspected cocaine was tested with the TruNarc and reacted positively for the probable presence of cocaine. The cocaine was found to weigh 56.6 grams and was placed on FBI inventory.

323. I reviewed covert recordings made by CHS#3 of the transaction with Botello, Jr. inside Botello, Jr.'s vehicle and confirmed that Botello, Jr. provided the bag (later found to contain the cocaine) to CHS#3.

324. I believe that Botello, Jr. left 2055A N 31st Street **(Target Location 11)** in possession not only of the cocaine purchased by CHS#3 but also any additional narcotics likely provided to the other potential customer in the Aldi's parking lot. Therefore, I believe that 2055A N 31st Street **(Target Location 11)** will contain evidence of the TARGET OFFENSES.

**Narcotics Transactions on April 20, 2024**
**(Espinoza, Reyes Delgado)**
**(Target Location 10)**

325.  On April 20, 2024, case agents intercepted a series of messages followed by a phone call between Espinoza and the user of (414)242-3514 later identified as Jaime Reyes Delgado. The messages were indicative of a large drug transaction which was later confirmed by surveillance. The following is an approximate translation of the communications coupled with surveillance observations.

**Messages between Espinoza and (414)242-3514**
**April 20, 2024 2:23 PM- 2:27 PM**

**Delgado:** Buddy, can you come

**Espinoza:** Yes, what do you need

**Delgado:** Half of a big one.

**Espinoza:** Ok buddy I'm coming

**Delgado:** By the garage buddy

**Espinoza:** Ok buddy

326.  I believe this exchange represents Delgado ordering a significant amount of cocaine or methamphetamine from Espinoza. Due to my training and experience, I know that a "big one" is a reference to a kilogram and therefore Delgado ordered half of a kilogram from Espinoza. TFO Lirette utilized Clear, a Law Enforcement database to try and identify the likely user of (414)242-3514. TFO Lirette learned the number listed to Jaime Reyes Delgado with an address of 1639 S 12th Street, Rear, Milwaukee, Wisconsin **(Target Location 10)**. A Department of Transportation inquiry also showed Jaime Reyes Delgado's address as 1639 S. 12th Street, Rear **(Target Location 10)**. Surveillance was established in the rear of 1639 S. 12th Street, Rear **(Target Location 10)** and 2218 S. 21st Street **(Target Location 4)**.

327.  At about 2:38 PM, Espinoza is observed on pole camera and physical surveillance exiting 2218 S. 21st Street **(Target Location 4)** and entering his silver Jeep. It appeared as though he had something heavy weighing down the front of his sweatshirt pocket. Espinoza was followed to the area of 1639 S. 12th Street (**Target Location 10**), the address associated with Jaime Reyes

Delgado. At 2:42 PM, case agents intercepted a call between Espinoza and Jaime Reyes Delgado. In that call, Espinoza says that he is on the corner of 12th Street. Around that time, Detective Nick Stachula observed Espinoza arrive in the alley behind 1639 S. 12th St **(Target Location 10)**. Detective Stachula observed a short Hispanic male walk from the garage associated with **Target Location 10** towards Espinoza's vehicle. The male remained near Espinoza's vehicle for less than one minute before returning back into the garage. Detective Stachula could not observe if the male remained in the garage or entered the residence from his point of view. Espinoza left in his Jeep. A photograph of that male was compared to a booking photograph for Jaime Reyes Delgado and case agents confirmed that Jaime Reyes-Delgado was in fact the male that conducted that suspected half kilogram transaction with Espinoza. At about 2:54 PM, Espinoza arrived back at 2218 S. 21st Street (**Target Location 4**).

328. Case agents believe that Espinoza left 2218 S. 21st Street **(Target Location 4)** in possession of a half kilogram of cocaine or methamphetamine and drove to 1639 S. 12th Street **(Target Location 10)** and delivered this large amount of narcotics to Jaime Reyes-Delgado in the alley and then drove back to his residence, 2218 S 21st Street **(Target Location 4)**.

329. Case agents have intercepted additional narcotics related communications between Espinoza and Reyes-Delgado. Based on my training and experience and the communications in the intercept, I know that Espinoza and Reyes Delgado have discussed both ounce quantity deals and kilo quantity deals. In one of those communications, Reyes Delgado requests a "big one" on consignment and Espinoza agrees. I believe a "big one" represents a kilogram.

330. On April 22, 2024, TFO's Martinez and Veloz conducted physical surveillance at 1639 S. 12th Street, Milwaukee, WI. Parked in the rear slab of the residence was a 2016 Ford Escape with WI license plate 730-XKZ. A Department of transportation inquiry for that plate revealed that it is registered to Jaime Reyes Delgado with a listed address of 1639 S 12th Street,

Milwaukee, WI. As they continued physical surveillance, they then observed a 2013 Ford F-150 with WI license plate ST7670 arrive and park in front of 1639 S 12th Street. A department of transportation inquiry on that plate revealed it listed to 1639 S. 12th Street. A female exited that vehicle and entered the front door of 1639 S 12th Street. As surveillance continued, TFO Martinez observed Jaime Reyes Delgado exit the front door of the residence momentarily and then re-enter the residence. Finally, at about 2:35 PM TFO Martinez observed Jaime Reyes Delgado exit the front door of 1639 S. 12th Street. He entered a black Nissan Titan and left the residence. Continued physical surveillance has observed Reyes Delgado exiting and entering the front door of the residence numerous times within the past week.

**Additional Narcotics Transaction on April 10, 2024**
**(Botello, Sr. and Unidentified Neighbor)**

331. On April 20, 2024, Case agents intercepted a series of calls between Botello, Sr. (TARGET TELEPHONE 7) and two unknown males. One of those unknown males, the user of phone number (414)803-4976 (hereinafter referred to as UM-4976) was identified as a cocaine customer of Botello, Sr. The other unknown male, the user of phone number (414)406-7322 (hereinafter referred to as UM-7322) was identified as a runner, delivering the narcotics on behalf of Botello, Sr. The following is a summary of that chain of events.

332. At about 5:21 PM Case Agents intercepted a call between Botello, Sr. and UM-4976. UM-4976 asks Botello, Sr. where he is at. Botello, Sr. responds that he is on 9th. [Case agents know that Botello, Sr. lives close to the intersection of S 9th Street and W Walker St.] UM-4976 tells Botello, Sr. to come over to the house so we can go over accounts, UM-4976 tells Botello, Sr. to bring a "50" with him. They agree to meet in a half of an hour.

333. At about 5:52 PM Case Agents intercepted another call between Botello, Sr. and UM-4976. In this call Botello, Sr. tells UM-4976 that he is there. UM-4976 says that he is in a small gray Honda right by the "School Day's." Botello, Sr. affirms. At about 5:53 PM UM-4976 asks

184

Botello, Sr. why Botello, Sr. parked all the way over there? Botello, Sr. says that he did not see a gray one. UM-4976 says he is by the red van pulling out. Botello, Sr. says that he see's it and is going around.

334. I believe these first two conversations represent Botello, Sr. and UM-4976 meeting up to go over outstanding drug debts. I believe UM-4976 requests Botello, Sr. to bring a "50" which I believe represents an amount of narcotics. Finally, I believe that the two did in fact meet up per there last discussion they were in the same area and saw each other.

335. Next, at about 8:44 PM, Case agents intercepted a call between Botello, Sr. and UM-7322. IN this call Botello, Sr. tells UM-7322 that the same guy is going to come by again. UM-7322 asks Botello, Sr. for how many. Botello, Sr. instructs UM-7322 to bring out two to be sure. Botello, Sr. says that he will call UM-7322 back. UM-7322 asks Botello, Sr. to let him know when the guy is outside so he can give it to him.

336. At about 9:00 PM Case Agents intercepted another call between Botello, Sr. and UM-7322. In this call Botello, Sr. tells UM-7322 that they are there and tells UM-7322 "two." UM-7322 affirms and Botello, Sr. says "Penco" just dropped by. UM-7322 already said that he can not drive and can not go out. Botello, Sr. says okay and says he will call back. At about 9:03 PM Botello, Sr. tells UM-7322 that he sent "Penco" for one and that "Penco" already paid for it. Botello, Sr. asks UM-7322 if he has "Penco's" number. UM-7322 asks about the other guy which Botello, Sr. responds he is already there and needs "two." Botello, Sr. tells UM-7322 that he is already there at the door.

337. At about 9:08 PM Case Agents intercepted a call between Botello, Sr. and UM-4976. UM-4976 tells Botello, Sr. that he is in the alley where the "bone" is at. UM-4976 asks Botello, Sr. to tell a third party (based on context believed to be UM-7322) to come out now. Botello, Sr.

185

Affirms. Moments later, also at 9:08 PM Botello, Sr. attempts to call UM-7322 however UM-7322 did not answer the phone.

338. Finally, at 9:13 PM Case Agents intercepted a call between Botello, Sr. and UM-4976. In this call Botello, Sr. questions, "Did he come out yet?" UM-4976 says he already picked up the "Pase." [Pase is a street term for cocaine.] Botello, Sr. asks if he already left? UM-4976 affirms and says we are even, no debt. Botello, Sr. says that it is all set and UM-4976 says that next time he will ask for credit. Botello, Sr. says not to worry. UM-4976 says that is why he loves Cain and asks if there is money there. Botello, Sr. asks that UM-4976 call him.

339. Based on this whole chain of events I believe that UM-4976 is a cocaine customer of Botello, Sr. I believe that UM-4976 originally met in person so he could pay Botello, Sr. what is owed on an outstanding drug debt and request "50" which I believe is an amount of cocaine. I believe that UM-4976 later needed additional cocaine. Rather than consummate the deal himself, Botello, Sr. contacted UM-7322 and instructed him to give UM-4976 additional cocaine. I believe this cocaine transaction occurred as UM-4976 tells Botello, Sr. that he already picked up the cocaine. I believe the user of phone number (414)406-7322 has access to an amount of Botello, Sr.'s narcotics and is conspiring with Botello, Sr. to deliver the cocaine on Botello, Sr.'s behalf.

340. Case agents obtained a ping warrant for (414)406-7322, Botello, Sr.'s drug runner. Based on physical surveillance and ping data, case agents were able to identify that the user (414)406-7322 making deliveries on Botello, Sr.'s behalf is Botello, Sr.'s neighbor (resident of 919 W. Walker Street (**Target Location 7**). Case agents have tentatively identified the neighbor as Mario Garcia-Puentes (a/k/a Luis Garcia). Case agents have observed Botello, Sr. and his neighbor (Mario Garcia-Puentes (a/k/a Luis Garcia)) interacting numerous times throughout this surveillance including outside of their respective residence. Case agents also know that Mario Garcia-Puentes (a/k/a Luis Garcia) was present during a birthday party for Botello, Sr. Case agents

186

know that the neighbor (Mario Garcia-Puentes (a/k/a Luis Garcia)) operates a black GMC which he typically parks on Walker Street near his address. Case agents have observed this neighbor (Mario Garcia-Puentes (a/k/a Luis Garcia)) exiting and entering the front door of **Target Location 7** on numerous occasions throughout this investigation and as recently as April 26, 2024.

341. Case agents know that the energy subscriber for 919 W. Walker Street is "Marcio Garcia." Furthermore, case agents know that the neighbor/resident at 919 W Walker Street (Mario Garcia-Puentes (a/k/a Luis Garcia)) drives a black GMC listing to Mario Garcia-Puentes. Case agents conducted a Wisconsin Department of Transportation query for Mario Garcia and learned that his identity was flagged as potentially being stolen by Luis Garcia. Case agents compared DOT photographs of Mario Garcia-Puentes and Luis Garcia and noted that the photographs associated to both identities depicted the same individual. Case agents contacted El Paso, Texas Sheriff's Office and learned that Luis Garcia is in custody in Texas, leading case agents to believe that Botello, Sr.'s neighbor/runner is Mario Garcia-Puentes. Case agents know that the neighbor working on behalf of Botello, Sr. has tattoos and scars consistent with the individual in the photographs on file for Mario Garcia -Puentes and Luis Garcia. Therefore, case agents believe that the neighbor/Botello, Sr. drug runner is Mario Garcia-Puentes (a/k/a Luis Garcia).

342. Mario Garcia-Puentes has been observed leaving 919 W. Walker Street on numerous occasions. Case agents followed him to his apparent employer, Woodway Industries, located at W234N700 Busse Road, Waukesha, Wisconsin ("**Target Location 13**") on two separate occasions; at both times, Mario Garcia-Puentes was driving his GMC Yukon. Case agents anticipate executing the warrants contemplated here on a day when they anticipate Garcia-Puentes will be driving to **Target Location 13** in his GMC Yukon. Given Garcia-Puentes' history of trafficking narcotics, my knowledge that drug traffickers often use their vehicles to facilitate narcotics trafficking, and my related understanding that records and instrumentalities associated

with drug trafficking can often be found in drug traffickers' vehicles, case agents are asking for permission to enter onto the property of Target Location 13 to access and search the Yukon.

**Vehicles, Basements and Outbuildings**

343. I know based upon my training and experience that controlled substances and evidence of narcotics trafficking can be secreted in any part of a residence including garages, storage areas related to the premises, vehicles on and associated with the premises, and on persons engaged in drug trafficking within the residence; that through personal training and experience in investigating drug trafficking, affiant knows controlled substances are frequently stored with drug proceeds and other drug paraphernalia at drug traffickers residences; that the execution of a search warrant usually results in the seizure of such items of personal property as utility bills, canceled mail envelopes, bank statements, keys, photographs, videotapes, and other items or documents which establish the identities of persons residing in or having control of the premise; and that these items can be stored in various locations accessible to the target residence including vehicles and garages. Therefore, I believe it is reasonable to believe that an individual engaged in drug trafficking would conceal evidence related to drug trafficking in multiple areas associated with their residence including vehicles, garages and basements.

**Computers, Electronic Storage and Forensic Analysis**

344. As described above and in Attachment B, this application seeks permission to search for records that might be found on the **TARGET PREMISES**, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive, cellular telephone, or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

188

345. *Probable cause.* I submit that if a computer, cellular telephone, or storage medium is found on the **TARGET PREMISES**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

346. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe

189

that this forensic electronic evidence will be on any storage medium in the **TARGET PREMISES** because:

e. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data

190

typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

j. I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer

191

was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

347. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

   k.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.
   .
   l.  Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

192

m.     Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

348. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC UNLOCK

349. The warrant I am applying for would permit law enforcement to obtain from the display of physical biometric characteristics (such as fingerprint, thumbprint, facial, or iris characteristics) to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

350. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to use.

351. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called

"Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

352. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

353. If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device through his or her irises. For example, Samsung offers an Iris Scanner, which uses the biometric information of an individuals' irises to identify the user.

354. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

355. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would

194

unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

356. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered within a certain period of time. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

357. Due to the foregoing, with respect to any person who is located in the PREMISES during the execution of the search and who is reasonably believe by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of this warrant, it is requested that law enforcement personnel may (1) press or swipe the fingers (including thumbs) of the person to the fingerprint scanner of the device found at the premises; or (2) hold the device in front of the person's face to activate the facial and/or iris recognition features, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

358. Because several people share the TARGET LOCATIONS as a residence, it is possible that the TARGET LOCATIONS will contain storage media that are predominantly used,

and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## IX.      CONCLUSION

359.   Based on the foregoing, I believe there is probable cause to believe that the following individuals are committing violations of federal law, including the Target Offenses: Roberto Aviles-Rogel, aka "Negro," Victoriano Botello, aka "Vic," Cain Botello, Sr., Cain Botello, Jr., Marco Medel, Jayme Congleton, aka "Jamo," Juan Carlos Espinoza, aka "Pedrito," aka "Gordo," Tomas Castro Estrada, Andrew Sabo, Jaime Reyes Delgado, Mario Garcia-Puentes aka "Luis Garcia," and others yet un-identified.  I further believe that there is probable cause to believe that located at and in the TARGET PREMISES described in Attachment A, there is evidence of the Target Offenses. Case agents believe there are currently documents and records showing dominion and control of the TARGET PREMISES and vehicles, cellular telephones, electronic devices, and other computers, and other evidence evincing the TARGET SUBJECTS' involvement in the drug trafficking offenses described above, located within the premises, vehicles, and persons described in Attachments A. For all of the foregoing reasons, I request authorization to search the premises, vehicles, and persons more fully described in Attachments A for the things described in Attachment B.

196

<u>ATTACHMENT A-1</u>

**Place To Be Searched**

The place to be searched pursuant to this warrant is 2000 W. Historic Mitchell Street, Milwaukee, Wisconsin (El Infierno Bar) ("**Target Location 1**"), more fully described below:

- 2000 W Historic Mitchell Street is the address for El Infierno Bar. The building itself is located on the northwest corner of the intersection S. 20th Street and W. Historic Mitchell Street. The building is a multi-purpose building consisting of a bar, "El Infierno," on the ground level and living units on the ground level and above the bar on the second floor. There is a sign above the front door of the bar identifying it as El Infierno. The siding is off white with brown trim. The numbers "2000" are affixed in white lettering above the front door (See figure 1). This warrant does not authorize case agents to search the residential units, but case agents are permitted to search any basements or common areas accessible to the bar and its occupants. Case agents are also allowed to search the garage that connects to the rear of the bar through an added mud room. This mud room is maroon in color and has a white pedestrian door that opens onto S. 20th Street. The mud room connects directly to the garage that has off white siding (see figure 2).



Figure 1

Page 1



Figure 2

Page 2

Case 2:24-mj-00372-SCD     Filed 05/01/24     Page 204 of 218     Document 1

<u>ATTACHMENT A-2</u>

**Place To Be Searched**

The place to be searched pursuant to this warrant is 921 W. Walker Street, Milwaukee, Wisconsin ("**Target Location 2**"), more fully described below:

- 921 W. Walker Street, Milwaukee, Wisconsin is a two-story single-family home on the southside of W. Walker Street approximately midblock between S. 9th Street and S. 10th Street (see figure 1). The siding for the residence is white with brown trim around the windows. The front access door for the residence on the east side of the building and faces north. The numbers "921" are affixed to the front of the residence in black numbers. There is a separate, detached, rear cottage on the property and no garage. The rear property has the address "923A" and has gray siding with white trim. This warrant does not authorized case agents to search the detached rear cottage. This warrant does authorize case agents to search vehicles located at this premises, to include a 2011 Jeep Grand Cherokee - Gray (WI ASF1393, VIN #1J4RS4GT7BC707102).



Figure 1

Page 1

<u>ATTACHMENT A-3</u>

**Place To Be Searched**

The place to be searched pursuant to this warrant is 1118 S. 35th, Milwaukee, Wisconsin ("**Target Location 3**"), more fully described below:

- 1118 S. 35th Street is a two-story single-family home located on the east side of S. 35th Street (see figure 1). The house sits on top of a small hill adjacent to a T-Alley. The residence is partially fenced in with a driveway on the southside of the residence. The siding is off white with brown trim and a brown roof. The front door of the house faces west with a small brown roof over the front stoop. The numbers "1118" are attached to the detached garage in yellow numbers. This warrant authorizes case agents to search the residence, the detached garage, and vehicles located at the premises, to include a 2009 Chevrolet Tahoe - Tan (WI ASL3439, VIN #1GNFK13088R212004).



Figure 1

Page 1

<u>ATTACHMENT A-4</u>

**Place To Be Searched**

The place to be searched pursuant to this warrant is 2218 S. 21st, Milwaukee, Wisconsin ("**Target Location 4**"), more fully described below:

• 2218 S. 21st Street, Milwaukee, Wisconsin is a two-family home located on the east side of S. 21st Street (see figure 1). There are two front doors on the front of the building which faces westbound. The siding for the residence is blue, the front doors are white, and the window trim is white. 2218 S. 21st Street is the upper unit and accessed through the northern most door. The lower unit is accessed through a separate door and has a separate address. The numbers "2218" are affixed above a black mailbox to the right of the front door. This warrant authorizes case agents to search the upper unit (2218 S. 21st Street), as well as any common or storage areas accessible to the occupant(s) of the upper unit, including the detached garage to the rear of the residence, and vehicles located at the premises, to include a 2014 Jeep Grand Cherokee - Silver (WI APK9306, VIN #1C4RJFBG5EC269554), a 2001 Toyota 4Runner - Gray (WI ANR7001, VIN #JT3HN86R410331744), and a 2012 GMC Sierra Pickup truck - Black (WI PX8933, VIN #3GTP2XE25CG147023).



Figure 1

Page 1

<u>ATTACHMENT A-5</u>

**Place To Be Searched**

The place to be searched pursuant to this warrant is 2630 S. 7th Street, Milwaukee, Wisconsin ("**Target Location 5**"), more fully described below:

- 2630 S. 7th Street, Milwaukee, Wisconsin is a single-family home located on the east side of S. 7th Street (see figure 1). The front door is wood with a glass windowpane and faces west. There is a front porch accessed by a series of stairs. The siding is white, the window trim is gray, and the roof is brown shingles. The numbers "2630" are affixed to the siding near the front door in gold numbers. There is a detached garage to the rear of the residence.  This warrant authorizes case agents to search the detached garage to the rear of the residence and vehicles located at the premises, to include a 2009 GMC Yukon - Black (WI AJU6218, VIN #1GKFK03279J107575) and a 2019 Infiniti Q50 - Black (WI ATY4364, VIN #JN1EV7AR1KM558645).



Figure 1

Page 1

<u>ATTACHMENT A-6</u>

**Place To Be Searched**

The place to be searched pursuant to this warrant is 5089 W. Colonial Court, Greenfield, Wisconsin ("**Target Location 6**"), more fully described below:

- 5089 W. Colonial Court, Greenfield, Wisconsin is a multi-condo building located at the northeast corner of 51st and Crawford Avenue (see figure 1). Each condo has its own address and separate access doors. 5089 occupies the southernmost condo of the building. The building consists of mostly brick with some white siding near the second floor. The front door faces west and is white. There is a red door facing east that has a white storm door. The numbers "5089" are affixed to the brick next to the rear door in black numbering. This warrant authorizes case agents to search the detached garage assigned to Andrew Sabo's unit and vehicles located at the premises, to include a 2020 Jeep Grand Cherokee - Black (WI G0TME1, VIN #1C4RJFN96LC279861), a 2017 Dodge Ram Pickup truck - Red (WI FB54999, VIN #3C63RRGL9HG545247), and a 2010 GMC Yukon - Black (WI AWJ7565, VIN #1GKUKMEF8AR151444).



Figure 1

Page 1

<u>ATTACHMENT A-7</u>

**Place To Be Searched**

The place to be searched pursuant to this warrant is 919 W. Walker St., Milwaukee, Wisconsin ("**Target Location 7**"), more fully described below:

- 919 W. Walker Street, Milwaukee, Wisconsin is a single-family home located on the south side of W. Walker Street approximately mid-block between S. 9th Street and S. 8th Street (see figure 1). There are gray stone pillars and a front porch on the residence. The siding is off white/gray with white trim and a black shingled roof. The front door faces north and has a black storm door. The numbers "919" are affixed to the front of the residence in black numbers above a black mailbox. This warrant authorizes case agents to search the detached garage to the rear of the residence and vehicles located at the premises, to include a 2005 GMC Yukon – Black (WI 969UWZ VIN 1GKEK13T75R188972.



Figure 1

Page 1

<u>ATTACHMENT A-8</u>

**Place To Be Searched**

The place to be searched pursuant to this warrant is 5946 S. Honey Creek Drive, Greenfield, Wisconsin ("**Target Location 8**"), more fully described below:

• 5946 S. Honey Creek Drive, Greenfield, Wisconsin is a multifamily building. Each unit within the building has its own address and access door. The first floor of the building consists of brick and the second floor consists of brown siding with brown trim. The access door to the building is brown with a brown storm door. The numbers "5946" are affixed in black numbering with a white background above the access door to the unit. This warrant authorizes case agents to search vehicles located at the premises, to include a 2005 Jeep Grand Cherokee - Black (WI JAYM0, VIN #1J4GR48K45C513625).



Figure 1

Page 1

ATTACHMENT A-9

**Place To Be Searched**

The place to be searched pursuant to this warrant is 2040 S. 20th Street Milwaukee, Wisconsin ("**Target Location 9**"), more fully described below:

- 2040 S. 20th Street, Milwaukee, Wisconsin is a two-story single-family home located on the eastside of S. 20th Street adjacent to the alley way (see figure 1). The front door of the residence faces west. The siding is white, the trim is brown, and the roof is a brown shingles roof. There is a gray porch with stairs leading to the front door. The numbers "2040" are affixed to the front of the residence in black letters above a gray mailbox. This warrant authorizes case agents to search the detached garage at the rear of the residence and vehicles located at the premises, to include a 2014 Jeep Grand Cherokee - Silver (WI APK9306, VIN #1C4RJFBG5EC269554).



Figure 1

Page 1

<u>ATTACHMENT A-10</u>

**Place To Be Searched**

The place to be searched pursuant to this warrant is 1639 S. 12th Street, Milwaukee, Wisconsin ("**Target Location 10**"), more fully described below:

- 1639 S. 12th Street is a one-story, two-family home located on the west side of S 12th Street (see figure 1). There is a wooden porch on the front of the residence with white pillars. The siding is white over gray with white trim around the windows and door. The front door to the residence faces east and grants access to the front unit. There is a second door on the southside of the residence granting access to the rear unit or unit "A". The markings near the second door "1639 A" are affixed to the siding near that door. This warrant authorizes case agents to search 1639 S. 12th Street, and all common areas, basements, and garages accessible to the unit occupied by Jaime Reyes-Delgado, including but not limited to the detached garage to the rear of the residence. This warrant also authorizes case agents to search vehicles located at the premises to include a 2016 Ford Escape, gray in color (WI 730-XKZ VIN# 1FMCU9GX9GUC82937) a 2013 F-150, black in color (WI ST7670 VIN# 1FTFW1ET3DKD05746), and a 2004 Nissan Titan, black in color (WI NW8742 VIN# 1N6AA07B04N516566).



Figure 1

Page 1

<u>ATTACHMENT A-11</u>

**Place To Be Searched**

The place to be searched pursuant to this warrant is 2055A N 31st Street, Milwaukee, Wisconsin ("**Target Location 11**"), more fully described below:

- 2055A N. 31st Street, Milwaukee, Wisconsin is a two-family home consisting of an upper and lower unit. Unit "A" occupies the second floor of the residence (upper unit) (see figure 1). Unit "A" is accessed through the door on the southwest corner of the residence. The access door to unit "A" is near the driveway on the south side of the house. The house mostly consists of gray siding with white trim. There is wooden balcony on the front of the residence. The numbers "2055" are affixed in black numbers on a white pillar on the front of the residence. This warrant authorizes case agents to search the upper unit, to include any common or storage areas accessible to the occupant(s) of the upper unit, and vehicles parked at the premises, to include a 2016 Dodge Charger - Black (WI ARB1674, VIN #2C3CDXL94GH214519) and a 2024 Jeep Grand Cherokee - White (WI ARH8573, VIN #1C4RJHDG8RC699786).



Figure 1

Page 1

<u>ATTACHMENT A-12</u>

**Place To Be Searched**

The place to be searched pursuant to this warrant is 2436 S. 8th Street, Milwaukee, Wisconsin ("**Target Location 12**"), more fully described below:

- 2436 S. 8th Street Milwaukee, Wisconsin is a two-family home consisting of an upper and lower unit (see figure 1). The house has yellowish siding with white trim. There is a porch on the front of the residence with brick pillars and a white railing. The front door faces S. 8th Street. The numbers "2436" are affixed to the siding near the front door. This warrant authorizes case agents to search both units at this premises.



Figure 1

Page 1

<u>ATTACHMENT A-13</u>

**Place To Be Searched**

The place to be searched pursuant to this warrant is W234N700 Busse Road, Waukesha, Wisconsin ("**Target Location 13**"), more fully described below:

- W234N700 Busse Road, Waukesha, Wisconsin is an unenclosed employee parking lot associated with Woodway Industries, accessible from a paved drive located to the west of Busse Road. This warrant only authorizes case agents to search vehicles at that location operated by Mario Garcia-Puente, to include a 2005 GMC Yukon – Black (WI 969UWZ VIN 1GKEK13T75R188972).

Page 1

Case 2:24-mj-00372-SCD     Filed 05/01/24     Page 216 of 218     Document 1

<u>ATTACHMENT B</u>

**Items To Be Seized**

All items, records and information related to violations of Title 21, United States Code, Sections 841, 843(b), and 846; more specifically:

1.  Paraphernalia associated with the manufacture and distribution of controlled substances including but not limited to materials and items used for packaging, processing, diluting, weighing, and distributing controlled substances;

2.  Duffel, canvas bags, suitcases, safes, or other containers to hold or transport controlled substances and drug trafficking related items and proceeds;

3.  Proceeds of drug trafficking activities, such as United States currency, precious metals, financial instruments, and jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the proceeds from drug trafficking activities;

4.  Firearms, including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition, silencers, components of firearms including laser sights and other components which can be used to modify firearms, ammunition and ammunition components, bulletproof vests, gun boxes and any and all documentation related to the purchase of such items;

5.  Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;

6.  Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed;

7.  Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, receipts, documents and other items or lists reflecting names, addresses, purchases, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

8.  Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

Page 1

9. Cellular telephones, text messaging systems, other communication devices, and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data, as well as any records associated with such communications services used to commit drug trafficking offenses;

10. Records, items and documents reflecting travel for the purpose of participating in drug trafficking activities, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxi cab receipts, hotel and restaurant receipts, canceled checks, maps, and records of long distance calls reflecting travel;

11. Indicia of occupancy, residency or ownership of the premises, vehicles, and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents and keys;

12. Photographs, videotapes or other depictions of assets, firearms, coconspirators, or controlled substances;

13. Computers, laptops, or other electronic storage device capable of being used to commit the violations or store any of the information described above.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

Page 2